**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| CITGO PETROLEUM CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:21-cv-02086 |
| | ) | |
| | ) | |
| TEKNIK TRADING INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF**

Plaintiff CITGO Petroleum Corporation ("CITGO"), by and through its attorneys, alleges as follows:

**INTRODUCTION**

1.     Under highly unusual circumstances, CITGO seeks a declaration on what—if anything—it owes a third-party vendor for procuring and storing goods purchased by CITGO that are now stranded in two warehouses because their intended recipient is subject to U.S. sanctions. CITGO also reserves the right to seek emergency relief from this Court restraining that vendor, Defendant Teknik Trading Inc. ("Teknik"), from imminently auctioning off the key evidence in this case: *the goods themselves.*  Those goods are central to this suit, and their unique characteristics (their condition based on storage, their quantity, and their value) make the goods irreplaceably relevant to the matters at issue in this dispute.  Although the parties have agreed to a temporary stay of the auction, if the auction takes place before CITGO can inspect the goods, the goods' evidentiary value will be lost forever.

2.     Over a decade ago, CITGO entered into a commercial agreement with Teknik to

obtain goods for Petróleos de Venezuela S.A. ("PdVSA"), CITGO's parent company.[1]  Pursuant to this Agreement, CITGO purchased millions of dollars' worth of goods, and relied on Teknik to obtain, store, and deliver those goods to PdVSA in exchange for a commission on the overall value of the goods and reimbursement of Teknik's costs.

3.      Consistent with industry practice, CITGO obtained assurances from Teknik that Teknik would substantiate any requests for payment from CITGO with appropriate documentation; comply with both the terms of the Agreement and the law; waive any lien-right Teknik might otherwise have to dispose of the goods; and permit CITGO broad audit rights to ensure compliance with these terms and all applicable laws.

4.      This dispute involves $11 million worth of goods subject to that Agreement, which were paid for by CITGO, procured by Teknik, and destined for delivery to PdVSA.  They never got there.  In early 2019, the U.S. Department of Treasury Office of Foreign Assets Control ("OFAC") added PdVSA to its List of Specifically Designated Nationals and Blocked Persons List pursuant to Executive Order 13850.  As a result, the property and interests in property of PdVSA— including the $11 million worth of goods—were frozen.

5.      To comply with the blocking order, CITGO directed Teknik to cancel any pending purchase orders.  Teknik also stored the now-stranded goods in two warehouses in Houston and Miami—as its contract with CITGO required it to do.

6.      CITGO also learned that a member of Teknik's affiliate, Clover, pled guilty to bribery schemes related to procurement agreements with PdVSA.  Due to the close relationship between Teknik and Clover and this troubling development, CITGO has been dutifully trying to

---

[1] Teknik is a subsidiary of Clover International, the primary freight forwarder vendor used by PdVSA.

navigate its contractual duties while also honoring the sanctions order and ensuring that it does not unwittingly further corruption on the part of Teknik or its affiliate.

7.     Against that backdrop, this case arises because the parties dispute what, if anything, CITGO owes Teknik under the Agreement.  Although OFAC has now allowed Teknik to receive payment from CITGO for some amounts due, CITGO has consistently taken the position that an audit and inspection of the goods is required to (1) ensure that Teknik has complied with both the Agreement and all applicable laws, including public-corruption laws; and (2) determine the present value of the goods and the accuracy of Teknik's documentation of its costs, which is a prerequisite for determining what CITGO owes Teknik for procuring and storing the goods.

8.     Teknik's suspicious and evasive conduct during the parties' inspection negotiations has only increased CITGO's concerns about what is *actually* happening on Teknik's end.  Teknik has repeatedly thwarted CITGO's request for an inspection of the goods; submitted incomplete and incorrect documentation of the amounts it claims CITGO owes; and refused to allow CITGO to take over storage of goods *CITGO paid for*.

9.     Now, Teknik plans to auction off the stranded goods to offset the amounts that Teknik claims CITGO owes.  Although the parties agreed to a temporary stay of the auction, any such auction violates the Agreement.  Even worse, an auction will irreparably harm CITGO by eliminating its ability to assess these goods' value, condition, and quantity—issues at the heart of the declaratory relief CITGO requests in this Court.  If the goods are auctioned, CITGO will permanently lose the right to inspect these goods and assess their value based on condition of storage—a right Teknik expressly conferred on CITGO for precisely such a situation as this.  By comparison, Teknik will not be harmed by any delay, *because CITGO has already offered to store the goods at its own expense*—an offer Teknik has refused.

10.     CITGO seeks the following relief.  *First*, CITGO seeks a declaration that it owes nothing because Teknik has breached or otherwise not complied with the Agreement (Count I). *Second,* assuming some payment *is* due, CITGO seeks a declaration of the proper amount due (Count II).  In connection with Count II, CITGO reserves the right to seek emergency relief halting the auction of the stranded goods and requiring Teknik to permit CITGO to conduct a commercially-reasonable inspection of the goods.  The goods are crucial evidence on the central issues in this case: what amount CITGO owes Teknik for storage, warehousing, and commission fees (over $5 million, as Teknik demands, or much less, as CITGO asserts), and whether Teknik complied with its duty to mitigate by auctioning the goods at a reasonable price that approximates their true value.  *Third*, CITGO seeks a judgment that Teknik's failure to permit a pre-auction inspection is a breach of the parties' contract, and an injunction requiring Teknik to comply with the contract and permit an inspection.

11.     To preserve the status quo, this Court could issue either (a) a temporary restraining order halting the auction and—after a hearing—issuing a preliminary injunction requiring Teknik to permit a commercially-reasonable inspection, or (b) an evidence-preservation order halting the auction and ordering outright that a commercially-reasonable inspection take place.

## PARTIES

12.     Plaintiff CITGO is a Delaware corporation with its principal place of business in Houston, Texas.  CITGO is a wholly owned subsidiary of CITGO Holding, Inc., which is a wholly owned subsidiary of PDV Holding, Inc., which in turn is a wholly owned subsidiary of PdVSA, which is the state-owned petroleum corporation of the Bolivarian Republic of Venezuela.

13.     Defendant Teknik is a Florida corporation with its principal place of business in Miami, Florida.  Teknik may be served by service of process through its registered agent, PBYA

Corporate Services, LLC, located at 200 S. Andrews Avenue, Suite 600, Fort Lauderdale, Florida 33301-2066.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this is an action between citizens of different states and the amount in controversy exceeds $75,000.  CITGO is a citizen of Texas, Teknik is a citizen of Florida, and the amount in controversy includes, among other things, approximately $5 million in amounts that Teknik claims CITGO owes for services performed pursuant to the Agreement.

15.     This Court has personal jurisdiction over Teknik because Teknik purposefully and contractually availed itself of the privileges and benefits of conducting business in Texas, and has purposefully directed its activities at Texas by maintaining a Houston office and serving Texas customers.  In addition, Teknik contractually agreed to submit to the exclusive jurisdiction of the applicable State and Federal Courts in Houston, Texas.  Further, the Agreement was negotiated in Houston, Texas.

16.     Venue is proper in the Southern District of Texas under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to CITGO's claims occurred in Houston. Among other things, a majority of the evidence (*i.e.*, the goods) is currently stored in Houston and, as noted, the parties negotiated the Agreement in Houston.  Moreover, the Agreement identifies Federal Courts in Houston, Texas as the proper venue for any disputes under the Agreement.

## STATEMENT OF FACTS

**I.      CITGO Contracts with Teknik to Procure, Deliver, and Store Goods for PdVSA**

17.     CITGO is a United States-based refiner, transporter, and marketer of transportation fuels, lubricants, petrochemicals, and other industrial products.  In 2008, CITGO and PdVSA

executed a contract pursuant to which CITGO agreed to procure goods on behalf of PdVSA and arrange for their delivery in exchange for payment.

18.     To fulfill its contractual obligations to PdVSA, on May 5, 2010, CITGO engaged Teknik to provide logistics services.

19.     Under the Agreement, Teknik must procure goods at CITGO's direction, perform various logistics services, and deliver the goods to PdVSA at specified delivery points.[2]  The Agreement contemplates that Teknik will hold title to the goods until they are delivered to PdVSA, at which point PdVSA takes title.  The Agreement provides that CITGO will reimburse Teknik for certain reimbursable costs, *i.e.*, "costs necessarily incurred by [Teknik] in performance of the Work and that are reasonable based on the location where they are incurred."  *See* Exhibit A, Agreement, Exhibit B to Contract Amendment Number 2.  Upon delivery, Teknik is also entitled to a six-percent commission or service fee based on the amount that CITGO paid for the goods.  Exhibit A, Agreement, Section 1 ("Commission will be earned upon delivery to the delivery point."); Exhibit A, Agreement, Amendment dated April 8, 2013 (Fee increased to a flat rate of 6.0 %).

20.     The Agreement sets out specific requirements for seeking reimbursement for these costs and states that "CITGO's obligation to reimburse [Teknik] [is] contingent on [Teknik] providing a detailed summary of its costs and expenditures together with sufficient supporting documentation such as invoices, sales receipt or other receipt evidence payment of such expenditures."  Exhibit A, Agreement, Exhibit B to Contract Amendment Number 2.

21.     The Agreement requires that each party comply with applicable laws, including foreign corruption laws, in the performance of its rights and obligations. Exhibit A, Agreement,

---

[2] Although the contract states that "Teknik has agreed to purchase Goods for CITGO," CITGO—not Teknik—paid for the goods.  *See* Exhibit A, Agreement, Section 1.

Amendment dated April 8, 2013, Section 4(a).

22.     The Agreement waives any carrier's lien, warehouseman's lien, or any other right Teknik might otherwise have to unilaterally dispose of goods procured under the Agreement if they are left in Teknik's possession longer than expected.  Exhibit A, Agreement, Section 16 ("Teknik . . . waives all rights of claim, lien and encumbrances against the Goods.").

23.     The Agreement gives CITGO a broad and unqualified audit right to ensure Teknik complies with the terms of the Agreement.  Section 17 states that "CITGO shall have the right to audit Teknik and Clover's records to confirm compliance" with the Agreement.  Exhibit A, Agreement, Section 17.

24.     Any breach of the Agreement is grounds for CITGO to withhold payment from Teknik.  Exhibit A, Agreement, Amendment dated April 8, 2013, Section 4(c) ("In the event that either party breaches any provision of this Agreement or Addendum related thereto, the breaching party agrees to . . . hold harmless the other party from . . . any cost incurred by the non-breaching party").

## II.     Goods are Stranded Amidst Legal Troubles for PdVSA and Teknik's Affiliate

25.     On January 28, 2019, OFAC added PdVSA to its List of Specifically Designated Nationals and Blocked Persons ("SDN").  When a company is added to the SDN list, its assets are blocked and U.S. persons are generally prohibited from dealing with them or their assets.[3] Accordingly, any goods that Teknik had in its possession that were bound for PdVSA could not be delivered.  Nor could CITGO make payments to Teknik under the Agreement related to goods in which a blocked entity held an interest.

---

[3] U.S. Department of the Treasury, *Specially Designated Nationals And Blocked Persons List (SDN) Human Readable Lists*, available at https://home.treasury.gov/policy-issues/financial-sanctions/specially-designated-nationals-and-blocked-persons-list-sdn-human-readable-lists (last visited: June 21, 2021).

26.     At the time PdVSA was added to the SDN list, Teknik had in its possession over $11 million in goods for which CITGO had already paid.  (Although Teknik has title to the goods under the Agreement, Teknik does not own them and the cost of the goods themselves is not at issue in this dispute.)

27.     The sanctions against PdVSA occurred against the backdrop of troubling public revelations of criminal bribery in procurement contracts on the part of PdVSA employees and an employee of Clover, Teknik's affiliate.  This was especially concerning to CITGO because Clover and Teknik have substantial overlap in leadership.  In particular, Luis Alonso Rincon and Holly Ana Rincon of Teknik—signatories to the Agreement with CITGO—are current or former officers and/or beneficial owners of Clover.  In addition, in April of 2018, Juan Castillo Rincon, a former senior manager of Clover, was indicted for a foreign bribery charge for his role in a scheme to corruptly secure contracts from PdVSA.[4]

28.     CITGO was naturally concerned—and remains concerned—that its conduct toward Teknik and the stranded goods complies with all relevant U.S. anti-corruption and criminal laws. As a result, when the U.S. imposed sanctions on PdVSA, the goods were effectively frozen and CITGO directed Teknik to immediately cancel any outstanding purchase orders.  The goods are currently stored in two warehouses, one in Miami and one in Houston.

## III.    Teknik Demands Payment for Obtaining and Storing the Stranded Goods While Resisting an Inspection of the Goods, in Violation of Its Contract with CITGO

29.     Although Teknik demanded payment from CITGO under the Agreement as early as March 2019, CITGO reminded Teknik that OFAC's sanctions prohibited payment absent approval/appropriate licensing.  More specifically, CITGO stated that if Teknik wished to transact

---

[4] Department of Justice, Office of Public Affairs, *Business Executive Pleads Guilty to Foreign Bribery Charge in Connection With Venezuelan Bribery Scheme*, available at  https://www.justice.gov/opa/pr/business-executive-pleads-guilty-foreign-bribery-charge-connection-venezuelan-bribery-scheme (last visited: June 22, 2021).

in the property moving forward, including any attempts to liquidate the property to pay handling or storage fees, Section 1(b) of Executive Order 13850 requires that OFAC issue a general or specific license authorizing the specific transaction before the transaction occurs.

30.     On February 18, 2021, OFAC issued licensing that allowed at least some payment from CITGO to Teknik for amounts owing under the Agreement.  The license merely *authorizes* payment and does not resolve whether the underlying fees are actually owed under the Agreement.

31.     As of June 24, 2021, Teknik claims that CITGO owes roughly $5,040,436.96 under the Agreement: storage and warehousing ($3,528,426.42); inspections ($8,130.40); service fee/commission ($657,963.70); demurrage ($81,460.00); freight ($34,664.42); handling ($460,558.37); insurance ($3,006.21); and finance charges ($266,227.44).

32.     CITGO, however, harbors grave concerns about Teknik's conduct and the amounts claimed to be owed.  Indeed, CITGO believes it does not owe the full amount claimed by Teknik— or, given Teknik's breaches and failure to provide sufficient documentation, anything at all.

33.     *First*, CITGO is concerned that performance and payment under the contract will embroil CITGO in the corruption-related quagmire involving PdVSA and Clover (Teknik's affiliated company).  Given the allegations of bribe-paying involving Clover, CITGO cannot be confident that Teknik's conduct with regard to the stranded goods in this case complies with all applicable U.S. laws—as the Agreement between CITGO and Teknik requires.  On information and belief, Teknik has breached Section 4(a) of the Amendment to the Agreement dated April 8, 2013 and payment is therefore not required.

34.     *Second*, CITGO cannot ascertain the accuracy of the amounts Teknik claims that it owes.  The Agreement requires adequate substantiation of all amounts Teknik seeks to recover and

provides that CITGO's payment obligation is contingent on such substantiation.  Despite repeated requests from CITGO, Teknik refuses to adequately comply with this requirement.

35.     To address these misgivings, CITGO has attempted to exercise its contractual rights to sufficient documentation and an audit.  At every step, Teknik has frustrated CITGO's efforts to resolve these concerns and get to the bottom of the situation.

36.     For example, on March 29, 2021, CITGO requested, among other things, supporting documentation related to how Teknik calculated storage and warehousing costs in its invoices to CITGO and whether the goods on which Teknik is claiming its service fee/commission is due have been delivered to the delivery point as required for payment under the Agreement. CITGO also objected to Teknik's imposition of a 1.5% finance charge when the Agreement provides for a 1.0% finance charge[5] and to Teknik's insurance charges, which appear to be double-billed.

37.     In response, Teknik provided a morass of documentation through which CITGO had to sift to attempt to substantiate the alleged amounts due.  The documentation, however, did not answer CITGO's questions regarding the service fee/commission, finance charges, and insurance double-billing.  Instead, the documentation simply revealed additional miscalculations by Teknik, such as imposition of the wrong storage rate for the goods in Houston.[6]  And, suspiciously, the majority of the invoices provided by Teknik in support of claimed amounts due

---

[5] CITGO also objects to the imposition of any finance charge because no amounts are due under the Agreement.

[6] More specifically, a letter from Teknik to CITGO dated April 19, 2021 stated that warehousing fees are calculated at the following rates: "1) $0.0009863 per pound daily—which is the equivalent of $0.03 per pound monthly; or 2) $0.02465753 per cubic foot daily—which is the equivalent of $0.75 per cubic foot monthly.  The rate chosen is whichever is greater."  Per Exhibit B to Contract Amendment Number 2 of the Agreement, warehousing fees are to be charged at $0.75 per square foot monthly for storage in Miami and $0.50 per square foot monthly for storage in Houston.  It appears that Teknik improperly charged the Miami rate for all goods, including those located in Houston.  Further, the Agreement does not contain language that permits Teknik to select the higher of the given rates (either by volume or by weight).

bore the same date, as though they were all created at the same time and not contemporaneously with the underlying transactions.

38.     As of the date of this filing, Teknik has yet to justify its apparent miscalculations or provide CITGO with adequate support for its claimed amounts due.  Because Teknik has failed to provide CITGO with sufficient supporting documentation in a timely manner, and the Agreement makes such documentation a condition precedent to payment, payment from CITGO is not required.

39.     *Third*, and in light of its growing concerns about Teknik's transparency and record-keeping, CITGO has for months insisted on being able to conduct a complete audit that includes an inspection of the stranded goods themselves in the warehouses.

40.     An audit is necessary to ensure that Teknik's conduct under the contract is in compliance with bribery and anti-corruption laws.  An inspection of the goods is necessary to ascertain the value of the goods and the accuracy of the amounts Teknik claims that it is owed.

41.     Teknik has suspiciously and repeatedly changed its mind on the conditions under which it will permit CITGO to exercise its audit right to an inspection of the goods.  For example, on March 29, 2021, counsel for Teknik stated in an email that Teknik is "ready, willing and able to coordinate the inspection to take place as soon as possible…"  Subsequently, however, Teknik has resisted CITGO's efforts at every turn.  To start, Teknik insisted that CITGO's inspection vendor have its inspectors sign broad releases of any claims arising out of the inspection.  CITGO and its inspection vendor agreed to this, but that wasn't enough.  Shortly after that, Teknik insisted that the inspection vendor add Teknik and Clover as additional insureds on its general commercial liability policy—an unreasonable request not standard in the industry.  Weeks later, Teknik gave CITGO a list of "options" for how Teknik would allow an inspection—none of which are

supported by the Agreement—and demanded an up-front payment of over $100,000 before inspecting the goods in Miami; the charge for the Houston inspection of a narrow subset of the goods (those subject to the June 29 auction) is over $30,000.00.  Recently, on June 15, 2021—Teknik demanded that *CITGO* (not the inspection vendor) agree to hold Teknik harmless if any damage, claim, injury, or lawsuit arises out of Crane's inspection.  Attempting to keep up with Teknik's changing requirements for CITGO to its contractually-supported inspection has been futile.

42.    Teknik's refusal to permit an audit and inspection of the goods is a breach of Section 17 of the Agreement.  Under such circumstances, CITGO is not obligated to pay any alleged amounts due.

43.    In addition to refusing CITGO's efforts to inspect the goods on reasonable terms, Teknik also refuses to give CITGO possession of the goods and has rejected all efforts by CITGO to relieve the burden of storing the goods (which, according to Teknik, costs Teknik over $70 thousand per month).

44.    Because Teknik has breached one or more of the provisions of the Agreement, Teknik is not entitled to any payment from CITGO under the Agreement.

## IV.    Teknik Intends to Auction the Goods Without an Inspection, In Violation of CITGO's Rights Under the Agreement

45.    During the parties' negotiations, Teknik proposed selling the goods to rid itself of the monthly storage fees and off-set any amounts that CITGO might otherwise owe.  CITGO has repeatedly opposed any such auction, which would require CITGO's consent under Section 16 of the Agreement—consent that Teknik does not have.

46.    At the very least, CITGO repeatedly insisted that it be able to complete its audit and a physical inspection of the goods prior to any auction.

47.     As noted above, a physical inspection in particular is indispensable for determining what—if anything—CITGO owes to Teknik under the Agreement.

48.     Specifically, some categories of charges that Teknik claims are due depend on the value, condition, or presence of the goods themselves.   For example, Teknik's storage and warehousing fees are calculated by square footage and vary based on the location of the goods. CITGO cannot ascertain whether it is being overcharged for storage and warehousing fees unless it can inspect the goods and their condition of storage for itself and identify the location of the goods.   And, upon information and belief, CITGO was overcharged for storage fees because Teknik imposed the Miami rate on all goods, including the majority of goods that are stored in Houston.

49.     As another example, CITGO is not required to pay Teknik's service fee/commission until the goods are delivered to PdVSA.   *See* Exhibit A, Agreement, Section 1. Teknik will not offer a direct response when asked whether the goods are still in storage or were delivered to PdVSA.   Upon information and belief, CITGO has been improperly charged for commission on goods that have not been delivered.   A physical inspection is therefore CITGO's only way to verify whether delivery—which is the trigger for any alleged duty to pay Teknik's service fee/commission—has occurred.

50.     In addition, a physical inspection is required to determine the value of the goods in aid of CITGO's failure-to-mitigate defense in this case.   Teknik claims that CITGO owes over $5 million in unpaid amounts due under the Agreement.   However, if CITGO does in fact owe something to Teknik, Teknik is legally obligated to exercise ordinary care to mitigate any alleged damages caused by CITGO's failure to pay.   Assuming Teknik proceeds to auction the goods, Teknik is therefore obligated to sell those goods at a commercially-reasonable price to mitigate its

damages (which would offset any amount CITGO is determined to owe).  If Teknik sells the goods at an unreasonably low price, CITGO can raise a failure-to-mitigate defense and reduce any amounts due.  But to effectively raise and litigate a failure-to-mitigate defense in this case, CITGO must inspect the goods to determine their commercially-reasonable value (which includes an assessment of their present condition) and enable CITGO to determine whether Teknik used ordinary care to auction the goods at a reasonable price.  This is particularly true given the handful of photographs CITGO has received from Teknik that indicate that the goods have not been properly stored, which is directly relevant to their value.  CITGO cannot assess the value of the goods if the goods are auctioned before an inspection occurs.

51.     CITGO has exhausted all efforts to work out a commercially-reasonable solution to this matter and negotiate an inspection on reasonable terms.  With Teknik's ever-changing requirements and demands, moving forward with an inspection of the goods has been impossible.

52.     Instead, Teknik has now unilaterally scheduled an auction of the goods.  On June 8, 2021, Teknik informed CITGO by email that it intends to auction the goods in three rounds.  The first round of the auction was initially set to begin on June 29, 2021 with goods for which CITGO paid an estimated $533,139.12, but Teknik agreed to stay commencement of the auction until July 13.  *See* Exhibit B, Letter from Auction Company Postponing Action Until After July 13.  The second and third rounds are between July 29 and August 13 and August 23 and September 9, respectively, and involve goods for which CITGO paid an estimated $1,726,602.55 and $9,382,830.54, respectively.

53.     This auction, conducted over CITGO's objection, violates Section 16 of the Agreement because Teknik waived any lien it might have against CITGO related to the goods.

54.     If CITGO cannot inspect the goods before any auction, CITGO will be permanently

unable to obtain evidence of their value, condition, weight, and presence—all of which is essential to settling the amounts owed under the Agreement.

## V.   CITGO Will Be Irreparably Harmed if The Auction Occurs Before An Inspection

55.    As noted, the first round of goods will be auctioned off starting after July 13 pursuant to the stay agreed by Teknik.  CITGO reserves the right to seek emergency relief and an order from this Court enjoining Teknik from auctioning the goods before CITGO can inspect the goods on commercially reasonable terms.

56.    CITGO is likely to succeed on the merits of its claim (Count II below) that if it owes Teknik anything at all under the Agreement, the amounts claimed must be reduced so that they comply with the Agreement and take account of Teknik's duty to mitigate.  That is, if in fact CITGO owes something to Teknik, it must be reduced by (a) a proper calculation of the storage and warehouse fees based on the formula set out in the Agreement (which depends on the quantity and location of the goods); (b) the commission, which is not due at all if the goods remain undelivered and in warehouses;[7] (c) any damages from CITGO's alleged underpayment which result from Teknik's failure to properly store the goods and failure to exercise ordinary care to (albeit illegally) auction the goods at a price approximating their current value; (d) the finance charge, which is not due at all based on Teknik's breaches of the Agreement or should be reduced from 1.5% to the proper rate of 1.0%; and (e) any claimed amounts due for storage that were incurred after CITGO offered to take possession of the goods, *i.e.*, after March 5, 2021. CITGO is

---

[7] CITGO has reason to believe that Teknik has been less than forthcoming about where specific goods are located.  For example, on March 29, 2021, Teknik provided CITGO with an inventory that purported to list the goods in its Miami warehouse.  Just a few weeks later, Teknik provided another list of the goods in its Miami warehouse that was materially different, containing an additional 54,678.91 pounds of goods.  Teknik did not respond to CITGO's request for an explanation of this discrepancy.

also likely to succeed on the merits of its claim (Count III below) that Teknik breached the Agreement by refusing to permit an audit and inspection before the goods are auctioned.

57.     Unless the auction is halted and an inspection occurs, CITGO will be irreparably harmed by the irreversible loss of evidence that is critical to the issues presented in this case. CITGO will be permanently deprived of the best and most direct evidence available regarding the amounts of storage and warehouse fees due under the Agreement; the amount (if any) of commission fees due under the Agreement; and the amount (if any) by which Teknik's recovery from CITGO should be offset by Teknik's failure to auction the goods at a commercially-reasonable price using ordinary care. CITGO's ability to meaningfully present its case on these issues, and this Court's ability to grant meaningful relief on the merits while protecting CITGO's right to its requested remedy of declaratory relief on Count II, will be irreparably harmed if the goods are auctioned and rendered permanently beyond the reach of CITGO and its counsel.

58.     CITGO will also be irreparably harmed if an auction takes place before CITGO is able to inspect the goods because these goods have unique features that make them irreplaceably relevant to the matters at issue here. These particular stranded goods—their value, condition, and quantity—are the subject matter of the instant action, and they are critical evidence in the instant action. The parties' Agreement recognizes this by providing CITGO the right to inspect the goods and waiving any ability Teknik might otherwise have to dispose of them without CITGO's consent. Once the goods are auctioned without an inspection, however, the goods cannot be replaced for those purposes because their true value, condition, and quantity cannot be ascertained by CITGO.

59.     CITGO will also be irreparably harmed absent an injunction from this Court requiring Teknik to comply with Section 17 of the Agreement (the audit provision) by allowing CITGO to inspect the goods at issue in this matter. The goods have a present market value specific

to their storage condition, and in this context, irreparable harm by definition follows from the failure to honor an audit provision.  If CITGO is denied the ability to exercise its inspection right and audit the goods' condition, quantity, and value before the auction, its inspection right will be irreplaceably lost in a manner not remedied by money damages.

60.     Absent an order enjoining the auction and requiring an inspection of the goods, CITGO has no adequate remedy at law.

61.     Equity also favors an order stopping the sale and ordering Teknik to permit CITGO to conduct an inspection. CITGO faces the irreparable loss of evidence crucial to its claims and key defense in this action if the goods are auctioned before an inspection.

62.     By contrast, Teknik will not be harmed if it is temporarily required to halt the sale and allow a commercially-reasonable inspection to occur.  The Agreement already requires Teknik to store the goods and permit an audit and inspection at CITGO's request, meaning the relief this Court grants would be no more burdensome to Teknik than a requirement Teknik voluntarily agreed to impose on itself.  Teknik also has no contractual right to conduct this auction in the first place, and it can hardly be heard to complain if its unlawful plan is briefly delayed.  Moreover, CITGO has already offered to take over storing the goods at its expense—an offer Teknik has refused.  In addition, *every* litigant has the duty to preserve evidence relevant to a suit brought against it.  The emergency relief CITGO seeks here simply enforces that duty for a period long enough to permit a reasonable inspection.

63.     The public interest also favors temporary relief allowing CITGO to gather evidence critical to its claims.  The public has an interest in the gathering of evidence relevant to the claims in a judicial proceeding so that the judicial process has the benefit of all proof bearing on the truth of the matter.  The public also has a particularly strong interest in ensuring that a plaintiff's

remedies and right to judicial relief are not frustrated by efforts by the defendant to place critical evidence beyond the reach of the plaintiff or the Court.

64.     The Court should have a significant level of concern for the continuing existence and integrity of the evidence in this case (the goods themselves) absent an order halting the auction and ordering an inspection.  Once the goods are auctioned, CITGO will be unable to locate them and appraise their value, because they will be owned by and in the hands of third-party buyers from around the country and (potentially) the world.

65.     An order requiring Teknik to preserve the goods as evidence long enough for an inspection will also not impose unreasonable burdens on the parties or anyone else, and the parties have the capability to maintain the goods and arrange an inspection on commercially-reasonable terms.  Indeed, CITGO is willing to tender into escrow with this Court the costs associated with a commercially-reasonable inspection.  CITGO also remains willing to take over storage of the goods at CITGO's own expense.

## CLAIMS FOR RELIEF: DECLARATORY AND INJUNCTIVE RELIEF

## COUNT I: DECLARATORY JUDGMENT

66.     CITGO hereby incorporates Paragraphs 1 through 65 of this Complaint.

67.     At issue is whether Teknik has breached its duties and obligations owed under the Agreement and relevant laws, and whether CITGO has any duty to pay Teknik the amounts claimed due under the Agreement in light of Teknik's breaches.

68.     Under 28 U.S.C. § 2201(a), this Court is empowered, "upon the filing of an appropriate pleading," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

69.     CITGO seeks the following such declarations from this Court.  (In the event these

declarations that CITGO owes Teknik *nothing* fail, CITGO would seek an alternative declaration under Count II as to what amount CITGO owes Teknik under the Agreement.)

- *First*, Teknik does not have a right to auction the goods because Teknik contractually waived any rights of claim, liens, and encumbrances against the goods pursuant to Section 16 of the Agreement, and any such auction conducted without CITGO's consent constitutes a breach of Section 16 of the Agreement;

- *Second*, CITGO owes nothing under the Agreement because Teknik has violated Section 4(a) of the Amendment to the Agreement dated April 8, 2013, which requires compliance with applicable laws (including anti-corruption and bribery laws), thereby materially breaching a valid contract under which CITGO has fully performed and causing CITGO injury;

- *Third*, that CITGO does not owe Teknik the amounts claimed under the Agreement because Teknik has not complied with the requirements of Exhibit B to the Amendment to Contract Number 2 of the Agreement by failing to provide sufficient supporting documentation for claimed amounts due, which is a condition precedent for payment under the Agreement;

- *Fourth*, that CITGO does not owe Teknik the amounts claimed under the Agreement because Teknik has violated Section 17 of the Agreement, which provides CITGO with the right to audit Teknik and Clover for compliance with all applicable laws, thereby materially breaching a valid contract under which CITGO has fully performed and causing CITGO injury; and

- *Fifth*, that CITGO does not owe Teknik anything under the Agreement because Teknik has breached one or more provisions of the Agreement.

## <u>COUNT II: DECLARATORY AND INJUNCTIVE RELIEF</u>

70.     CITGO hereby incorporates paragraphs 1 through 69 of this Complaint.

71.     Assuming that Count I fails in relevant part, and this Court finds that Teknik is entitled to *some* payment under the Agreement, the issue is what that amount is: specifically, whether CITGO owes the amount claimed by Teknik, or some lower amount.

72.     Under 28 U.S.C. § 2201(a), CITGO therefore seeks a declaration as to what—if anything—the parties owe to each other under the Agreement in light of their obligations thereunder and applicable law.  To that end, CITGO seeks the following declarations:

- *First*, what amounts the parties owe to each other under the Agreement;

- *Second*, that Teknik is not owed the full amount claimed under the Agreement ($5,040,436.96);

- *Third*, that under the Agreement Teknik is owed warehouse/storage fees only in the amount determined by application of the formula in the Agreement;

- *Fourth*, that under the Agreement Teknik is not owed its commission/service fee until the goods at issue have been delivered;

- *Fifth*, that under the Agreement Teknik is not owed a finance charge because no amounts are due, or that Teknik is not entitled to a 1.5% finance charge;

- *Sixth*, that Teknik is obligated to mitigate its damages by using ordinary care to auction the goods at a commercially-reasonable price approximating their true value, and any failure to do so correspondingly reduces the amounts Teknik claims that CITGO owes under the Agreement; and

- *Seventh*, that Teknik is not owed any warehouse/storage fees incurred after Teknik received and rejected CITGO's offer to take possession of and assume responsibility for storing the goods, due to Teknik's failure to mitigate its damages.

73.    In addition, and as a remedy ancillary to the requested declaration, CITGO also requests (1) a temporary restraining order (a) forbidding Teknik from auctioning or otherwise disposing of the goods until such time as a preliminary-injunction hearing may be held, and (b) ordering that Teknik cease interfering with CITGO's right to conduct a commercially-reasonable inspection of the goods or otherwise preventing the inspection from moving forward; **and** (2) after a hearing, a preliminary injunction requiring that Teknik permit CITGO to conduct a commercially-reasonable inspection of the goods within a reasonable period of time set by the Court.

74.    As an alternative to a TRO or preliminary injunction, CITGO requests that this Court issue an evidence-preservation order (1) forbidding Teknik from auctioning or otherwise disposing of the goods until CITGO can complete a commercially-reasonable inspection for

purposes of gathering evidence essential to the claims in this case, and (2) ordering outright that such a commercially-reasonable inspection be conducted.

## COUNT III: BREACH OF CONTRACT

75.     CITGO hereby incorporates paragraphs 1 through 74 of this Complaint.

76.     Teknik has materially breached Section 17 of the Agreement by auctioning the goods without permitting CITGO to inspect the goods.  The Agreement is a valid contract.  CITGO has fully performed under it.  Section 17 of the Agreement requires Teknik to permit CITGO to inspect the goods.  By auctioning the goods before CITGO can exercise its rights under the audit provision, Teknik has breached the Agreement and caused injury to CITGO as a result.

77.     In addition, and as a remedy for Teknik's breach, CITGO requests injunctive relief requiring Teknik to comply with Section 17 of the Agreement.  Specifically, CITGO requests (1) a temporary restraining order (a) forbidding Teknik from auctioning or otherwise disposing of the goods until such time as a preliminary-injunction hearing may be held, and (b) ordering that Teknik cease interfering with CITGO's right to conduct a commercially-reasonable inspection of the goods or otherwise preventing the inspection from moving forward; **and** (2) after a hearing, a preliminary injunction requiring that Teknik permit CITGO to conduct a commercially-reasonable inspection of the goods within a reasonable period of time set by the Court.  Such relief is necessary because CITGO would not be adequately compensated for the loss of its contractually-guaranteed inspection right by money damages.  CITGO has complied with all terms of the Agreement insofar as its performance under the Agreement is required.

## PRAYER FOR RELIEF

WHEREFORE, CITGO requests a judgment against Teknik as follows:

1.  A declaration (a) that Teknik has no right to auction the goods without CITGO's

consent under Section 16 of the Agreement; (b) that CITGO owes nothing under the Agreement because Teknik has breached Section 4(a) of the April 8, 2013 Amendment to the Agreement; (c) that CITGO does not owe Teknik the amounts claimed under the Agreement because Teknik has not complied with the sufficient-documentation requirement of Exhibit B to Contract Amendment Number 2 to the Agreement; (d) that CITGO does not owe Teknik the amounts claimed under the Agreement because Teknik has breached Section 17 of the Agreement; and (e) that CITGO does not owe Teknik anything because Teknik has breached one or more provisions of the Agreement;

2.   Alternatively, a declaration (a) of what amounts the parties owe under the Agreement; (b) that CITGO does not owe the full amount claimed by Teknik; (c) that Teknik is owed only those storage/warehousing fees calculated in conformity with the relevant provisions of the Agreement; (d) that Teknik is owed no commission/service fee until the goods have been delivered; (e) that Teknik is owed no finance charge or, alternatively, that Teknik is only owed a 1.0% finance charge; (f) that any failure by Teknik to properly store the goods that has reduced their value and any failure by Teknik to auction the goods at a commercially-reasonable price and thereby mitigate its damages will result in a corresponding reduction of any amount CITGO would otherwise owe under the Agreement; and (g) that CITGO is not required to pay warehouse/storage fees to Teknik incurred after Teknik received and rejected CITGO's offer to take possession of the goods and store them at CITGO's expense;

3.   A temporary restraining order (a) forbidding Teknik from auctioning or otherwise

disposing of the goods until such time as a preliminary-injunction hearing may be held, and (b) ordering that Teknik cease interfering with CITGO's right to conduct a commercially-reasonable inspection of the goods or otherwise preventing the inspection from moving forward; **and**, (c) after a hearing, a preliminary injunction requiring that Teknik permit CITGO to conduct a commercially-reasonable inspection of the goods within a reasonable period of time set by the Court.

4. As an alternative to the relief requested in Paragraph 3 above, an evidence-preservation order (1) forbidding Teknik from auctioning or otherwise disposing of the goods until CITGO can complete a commercially-reasonable inspection for purposes of gathering evidence essential to the claims in this case, and (2) ordering outright that such a commercially-reasonable inspection take place.

5. A judgment that Teknik has breached Section 17 of the Agreement, as well as injunctive relief enforcing Section 17 in the form of (1) a temporary restraining order (a) forbidding Teknik from auctioning or otherwise disposing of the goods until such time as a preliminary-injunction hearing may be held, and (b) ordering that Teknik cease interfering with CITGO's right to conduct a commercially-reasonable inspection of the goods or otherwise preventing the inspection from moving forward; **and** (2) after a hearing, a preliminary injunction requiring that Teknik permit CITGO to conduct a commercially-reasonable inspection of the goods within a reasonable period of time set by the Court.

6. Costs and attorneys' fees.

7. Such other and further relief as this Court deems just and proper.

Dated: June 25, 2021                        Respectfully submitted,


/s/ *Nicole M. Perry*
Nicole M. Perry
Attorney-In-Charge
S.D. Texas No. 725420
J. Laurens Wilkes
Texas State Bar No. 24053548
S.D. Texas No. 737955
**JONES DAY**
717 Texas, Suite 3300
Houston, TX  77002.2712
Telephone:  +1.832.239.3939
Facsimile:   +1.832.239.3600

COUNSEL FOR CITGO PETROLEUM
CORPORATION