**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

CITGO PETROLEUM CORPORATION,

     Plaintiff,

v.

                             Case No. 4:21-cv-02086

TEKNIK TRADING, LLC.,

     Defendant.

_____

## DEFENDANT TEKNIK TRADING, LLC'S SECOND AMENDED ANSWER AFFIRMATIVE DEFENSES[1] AND AMENDED COUNTERCLAIMS

     Defendant Teknik Trading, LLC ("Teknik"), by and through its undersigned counsel, hereby files its second amended answer and affirmative defenses to the Complaint and Request for Injunctive Relief (the "Amended Complaint") [Dkt. 1] filed herein by Citgo Petroleum Corporation ("CITGO") ("Teknik" and "CITGO" together are the "Parties") and states the following:

### INTRODUCTION

     1.     Teknik admits that CITGO seeks a declaration and reserves the right to seek emergency relief. Teknik denies that CITGO is entitled to any relief and denies the remaining the allegations in paragraph 1.

---

[1]. Teknik denies each and every allegation, matter, statement, and thing alleged in CITGO's Complaint except as may be hereinafter admitted, qualified, or otherwise explained.

2.     Teknik admits that it first entered into the Commercial Agreement dated May 5, 2010 (attached to the Complaint as Exhibit A[2]) with CITGO on May 5, 2010. Teknik states that the Commercial Agreement dated May 5, 2010 speaks for itself and is the best evidence as to its terms, meaning and requirements. Teknik also admits that CITGO purchased millions of dollars' worth of the goods at issue. Teknik is without sufficient knowledge or information to determine the accuracy of the allegations regarding what CITGO relied on, and therefore denies same and demands strict proof. Teknik denies the remaining allegation in paragraph 2 and footnote 1.

3.     Teknik states that the Agreements speak for themselves and are the best evidence as to their terms, meaning and requirements. Teknik admits that it provided assurances that it would substantiate requests for payment from CITGO with appropriate documentation; comply with both the terms of the Agreements and the law; waive any lien right Teknik might otherwise have to dispose of the goods; and permit CITGO a right to audit to ensure compliance with these terms and applicable laws, to the extent these assurances are set forth in the Agreements. Teknik denies any remaining allegations in paragraph 3.

4.     Teknik admits that this dispute involves the goods subject to the Agreements, which were paid for by CITGO, procured by Teknik, and destined for delivery to Petróleos

---

[2]. Exhibit A to the Complaint contains the Commercial Agreement dated May 5, 2010, the Amendment to Commercial Agreement dated April 8, 2013, the Change Order Form dated June 1, 2017, the Change Order Form dated August 3, 2017, the Change Order Form dated November 30, 2017, and the Amendment to Commercial Agreement dated January 2, 2019 (collectively, the "Agreements").

de Venezuela, S.A. ("PdVSA"). Teknik also admits that, on January 28, 2019, the U.S. Office of Foreign Assets Control ("OFAC") added PdVSA to its List of Specifically Designated Nationals and Blocked Persons ("SDN") under Executive Order 13850, thereby freezing the goods in Teknik's possession before reaching PdVSA. Teknik is without sufficient knowledge or information to determine the accuracy of any remaining allegations in paragraph 4, and therefore denies same and demands strict proof.

5.     Teknik states that Executive Order 13850 speaks for itself and is the best evidence as to what it requires. Teknik further states that the Agreements speaks for themselves and are the best evidence as to their terms, meaning and requirements. Teknik admits that CITGO directed Teknik to cancel any pending purchase orders, and that it stored the goods in facilities located in Miami and Houston. Teknik denies any remaining allegations in paragraph 5.

6.     Teknik states that the allegations in paragraph 6 are self-serving, conclusory, and contain unsubstantiated hearsay lacking any relevance to the instant matter. Clover Internacional, LLC is not a named party in this proceeding, nor is it a signatory to any of the Agreements in this case. Thus, paragraph 6 is impertinent and should be stricken from the Complaint under Rule 12(f). To the extent a response it required, Teknik denies that there is any corruption by Teknik or an affiliate of Teknik; and Teknik is without sufficient knowledge or information to determine the accuracy of any remaining allegations in paragraph 6 (which concern what CITGO claims to have learned and was trying to do), and therefore denies same and demands strict proof.

7.      Teknik admits that the parties dispute the amounts CITGO owes Teknik, and that OFAC allows Teknik to receive payment from CITGO, Teknik admits that CITGO has requested an audit and an inspection of the goods, and states that it has complied with CITGO's request to audit its records to confirm compliance with the Agreements, and has permitted a commercially reasonable physical inspection of the goods. Teknik denies the remaining allegations in paragraph 7.

8.      Teknik denies the allegations in paragraph 8.

9.      Teknik further states that the Agreements speaks for themselves and are the best evidence as to their terms, meaning and requirements. Teknik admits that it has advised CITGO that it intends to auction the goods if CITGO does not comply with certain obligations regarding the goods, including covering storage expenses. Teknik admits that CITGO offered to take storage of the goods while failing to agree to provide any form of adequate security as a substitute for the goods. Teknik denies the remaining allegations in paragraph 9.

10.     Teknik admits that CITGO purports to demand relief stated in paragraph 10, but denies that CITGO is entitled to any relief, including the relief sought

11.     Teknik admits that CITGO purports to demand relief stated in paragraph 11, but denies that CITGO is entitled to any relief and denies that such relief is needed to preserve the status quo sought.

## **PARTIES**

12.     Admitted upon information and belief.

4

13.     Teknik states that it converted to a Florida Limited Liability Company in August 2011, and changed its name from Teknik Trading Inc. to Teknik Trading, LLC. Teknik admits to the remaining allegations in paragraph 13.

## JURISDICTION AND VENUE

14.     Admitted for purposes of subject matter jurisdiction.

15.     Admitted for purposes of personal jurisdiction.

16.     Admitted for purposes of venue.

## STATEMENT OF FACTS

**I.    CITGO Contracts with Teknik to Procure, Deliver, and Store Goods for PdVSA**

17.     Teknik admits upon information and belief that CITGO is a United States-based refiner, transporter, and marketer of transportation fuels, lubricants, petrochemicals, and other industrial products. Teknik is without sufficient knowledge or information to form a belief as to the remaining allegation in paragraph 17, and therefore denies same and demands strict proof.

18.     Teknik admits that on May 5, 2010, Parties entered into the Commercial Agreement, and Teknik states that the Commercial Agreement dated May 5, 2010 speaks for itself and is the best evidence as to what it requires. Teknik is without sufficient knowledge or information to form a belief as to the remaining allegation in paragraph 18, and therefore denies same and demands strict proof.

5

19.     Teknik states that the Agreements speak for themselves and are the best evidence as to what they require. As to the allegation in footnote 2, Teknik admits that CITGO paid for the goods procured under the Agreements. Teknik denies any remaining allegations in paragraph 19.

20.     Teknik states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik denies any remaining allegations in paragraph 20.

21.     Teknik states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik denies any remaining allegations in paragraph 21.

22.     Teknik states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik denies any remaining allegations in paragraph 22.

23.     Teknik further states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik denies any remaining allegations in paragraph 23.

24.     Teknik further states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik denies any remaining allegations in paragraph 24.

## II.     Goods are Stranded Amidst Legal Troubles for PdVSA and Teknik's Affiliate

25.     Teknik admits that on January 28, 2019 OFAC added PdVSA to its List of SDN. Teknik further states that the article referenced in footnote 3 titled Executive Order 13850 and *Specially Designated Nationals And Blocked Persons List (SDN) Human*

6

*Readable Lists* are the best evidence as to what they require and prohibit. Teknik denies any remaining allegations in paragraph 25.

26.     Teknik admits that it was in possession of the goods at issue when PdVSA was added to OFAC's List of SDN. Teknik is without sufficient knowledge or information to determine the accuracy of the allegations regarding the value of the goods, and therefore denies same and demands strict proof. Teknik admits that Teknik had title to the goods. Teknik states that the Agreements speak for themselves and are the best evidence as to who owned the goods under the Agreements. Teknik denies any remaining allegations in paragraph 26.

27.     Teknik states that the allegations in paragraph 27, including the article referenced in footnote 4 titled *Business Executive Pleads Guilty to Foreign Bribery Charge in Connection With Venezuelan Bribery Scheme*, are self-serving, conclusory, and contain unsubstantiated hearsay lacking any relevance to the instant matter. Clover Internacional, LLC is not a named party in this proceeding, nor is it a signatory to any of the Agreements in this case. Thus, paragraph 6 is impertinent and should be stricken from the Complaint under Rule 12(f). To the extent a response it required, Teknik admits that Luis Alonso Rincon and Holly Ana Rincon of Teknik—signatories to the Agreement with CITGO—are current or former officers and/or beneficial owners of Clover, and that, in April of 2018, Juan Castillo Rincon, a former senior manager of Clover, was indicted for a criminal charge. Teknik denies that there is any corruption by Teknik or an affiliate of Teknik; and

Teknik is without sufficient knowledge or information to determine the accuracy of any remaining allegations in paragraph 27, and therefore denies same and demands strict proof.

28.     Teknik states that Executive Order 13850 speaks for itself and is the best evidence as to what it requires. Teknik admits that CITGO directed Teknik to cancel any pending purchase orders, and that it stored the goods in facilities located in Miami and Houston. Teknik is without sufficient knowledge or information to determine the accuracy of any remaining allegations in paragraph 28, and therefore denies same and demands strict proof.

## III.   Teknik Demands Payment for Obtaining and Storing the Stranded Goods While Resisting an Inspection of the Goods, in Violation of Its Contract with CITGO

29.     Teknik states that Section 1(b) of Executive Order 13850 speaks for itself and is the best evidence as to what it requires. Teknik admits that Teknik and CITGO had communications in March 2019 regarding the subject matter of paragraph 29, and states that such communications are in the e-mail chain attached as Exhibit C to Teknik's Counterclaims hereto. Teknik states that Exhibit C speaks for itself and is the best evidence as to the communications between CITGO and Teknik in March 2019. Teknik denies the remaining allegations in paragraph 29.

30.     Teknik admits that on February 18, 2021, OFAC issued licensing. Teknik states that the license issued by OFAC on February 18, 2021 is the best evidence as to what it requires. Teknik denies the remaining allegation in paragraph 30.

31.     Admitted.

8

32.     Teknik is without sufficient knowledge or information to determine the accuracy of any remaining allegations in paragraph 32 regarding what CITGO believes and harbors, and therefore denies same and demands strict proof. Teknik denies the remaining allegations in paragraph 32.

33.     Teknik states that the allegations in paragraph 33 are self-serving, conclusory, and contain unsubstantiated hearsay lacking any relevance to the instant matter. Clover Internacional, LLC is not a named party in this proceeding, nor is it a signatory to any of the Agreements in this case. Thus, paragraph 33 is impertinent and should be stricken from the Complaint under Rule 12(f). To the extent a response is required, Teknik states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik is without sufficient knowledge or information to determine the accuracy of the allegations in paragraph 33 regarding what CITGO believes and has concerns about, and therefore denies same and demands strict proof. Teknik denies the remaining allegations and legal conclusion in paragraph 33.

34.     Teknik states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik denies the remaining allegations in paragraph 34.

35.     Teknik states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik denies the remaining allegations in paragraph 35.

36.     Teknik states that any e-mail communications between the parties on March 29, 2019 speak for themselves and are the best evidence as to what was stated by the parties on that day. Teknik denies the remaining allegations in paragraph 36.

37.     Teknik admits that it provided CITGO with the amount it currently owes Teknik for outstanding storage and warehousing rates as contemplated under the Agreements, along with supporting documentation, and states that this documentation speak for itself and is the best evidence as to what it contains. Teknik denies the remaining allegations in paragraph 37. Teknik denies the remain denies the allegation in footnote 6.

38.     Teknik denies the allegations in paragraph 38.

39.     Teknik admits that CITGO has requested an audit and an inspection of the goods, and states that it has complied with CITGO's request to audit its records to confirm compliance with the Agreements, and has permitted a commercially reasonable physical inspection of the goods. Teknik denies the remaining allegations in paragraph 39.

40.     Teknik states that it has complied with CITGO's request to audit its records to confirm compliance with the Agreements. Teknik further states that it has offered CITGO the opportunity to conduct a commercially reasonable physical inspection of the goods. Teknik denies the remaining allegations in paragraph 40.

41.     Teknik admits that, on March 29, 2021, counsel for Teknik sent an e-mail to CITGO and states that the e-mail speaks for itself and is the best evidence as to its terms. Teknik admits that it requested that CITGO's inspection vendor have its inspectors sign reasonable agreed upon releases. CITGO and its inspection vendor agreed to this, but that was not enough. Teknik admits that it requested that the inspection vendor add Teknik and Clover as additional insureds on its general commercial liability policy, gave CITGO commercially reasonable options for how the inspection would take place, requested up-

front payments for the reasonable costs that Teknik would incur with the inspections, and requested that CITGO agree to certain hold harmless provisions. Teknik states that its e-mail communications with CITGO (including the referenced June 15, 2021 e-mail) are the best evidence as to what was specifically stated in these regards. Teknik denies the remaining allegations in paragraph 41. Teknik further states that it has gone above and beyond to cooperate with CITGO's request for an inspection of the goods by taking the following actions: (1) Teknik cancelled the auction set for June 29, 2021 so Parties could schedule a no-cost walk-through inspection of the goods at the Houston facility; (2) Teknik offered CITGO two different quotes based on the estimated cost to conduct a broad or narrow physical inspection of the goods; (3) Teknik invited CITGO to obtain competitive bids from third parties for the same work in case CITGO was concerned about any price disparity; (4) Teknik permitted CITGO to conduct no-cost walk-through inspections of the goods at the Houston facility and the Miami facility on July 6, 2021 and July 27, 2021, respectively; (5) Teknik agreed to halt the auction process through October 25, 2021 so CITGO could obtain competitive bids from third parties in order to conduct a commercially reasonable physical inspection of the goods; and (6) Teknik continues to halt the auction process as of the below filing date and has permitted CITGO to conduct a commercially reasonable physical inspection of the goods at the Houston facility on July 18 and 20, 2022, and at the Miami facility on July 25, 26, and 27, 2022.

42.     Teknik denies the allegations and legal conclusion in paragraph 42.

43.    Teknik denies the allegations in paragraph 43. Further, Teknik admits that it rejected CITGO's offer to take possession of the goods because CITGO has never offered any form of adequate security as a substitute for the goods.

44.    Teknik denies the allegation and legal conclusion in paragraph 44.

## IV.    Teknik Intends to Auction the Goods Without an Inspection, In Violation of CITGO's Rights Under the Agreement

45.    Teknik states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik admits that auctioning the goods to help cover the storage and handling costs was discussed, and that Teknik received consent from CITGO to auction the goods in an e-mail from Daniel Beuses, the General Manager of Procurement for CITGO, on March 27, 2019. Teknik denies the remaining allegations in paragraph 45.

46.     Teknik admits that CITGO has requested an audit and an inspection of the goods. Teknik stated that e-mail communications between the parties speak for themselves and are the best evidence of CITGO's requests and how many requests were made. Teknik states that it has complied with CITGO's request to audit its records to confirm compliance with the Agreements, has offered a commercially reasonable physical inspection of the goods, and allowed CITGO to conduct no-cost walk-through inspections of the goods at the Houston facility and Miami facility on July 6, 2021 and July 27, 2021, respectively. Teknik further states that it continues to halt the auction process as of the below filing date and that it has permitted CITGO to conduct a commercially reasonable physical inspection of the goods at the Houston facility on July 18 and 20, 2022, and at the Miami facility on July 25, 26, and 27, 2022. Teknik denies the remaining allegations in paragraph 46.

47.     Teknik denies the allegation in paragraph 47.

48.     Teknik admits square footage and the location of the goods are considered in determining Teknik's storage and handling fees. Teknik denies the remaining allegations in paragraph 48.

49.     Teknik states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik denies any remaining allegations in paragraph 49.

50.     Teknik admits that Teknik claims that CITGO owes Teknik over $5 million in unpaid amounts due under the Agreements. Teknik denies the remaining allegations in paragraph 50.

51.     Teknik denies the allegations in paragraph 51.

52.     Teknik admits the allegations in paragraph 52.

53.     Teknik denies the allegation and legal conclusion in paragraph 53.

54.     Teknik denies the allegation in paragraph 54. Teknik states that it offered CITGO the opportunity to conduct a commercially reasonable physical inspection of the goods. Teknik also states it allowed CITGO to conduct no-cost walk-through inspections of the goods at the Houston facility and Miami facility on July 6, 2021 and July 27, 2021, respectively. Teknik continues to halt the auction process as of the below filing date and has permitted CITGO to conduct a commercially reasonable physical inspection of the goods at the Houston facility on July 18 and 20, 2022, and at the Miami facility on July 25, 26, and 27, 2022.

## V.  CITGO Will Be Irreparably Harmed if The Auction Occurs Before An Inspection

55.  Teknik admits that CITGO reserves the right to seek emergency relief and an order to be determined by the Court, but denies that CITGO is entitled to any relief. Teknik denies the remaining allegations in paragraph 55.

56.  Teknik denies the allegations and legal conclusion in paragraph 56, including the allegations stated in subparts (a) through (e). Teknik states that it has complied with CITGO's request to audit its records to confirm compliance with the Agreements. Teknik further states that CITGO conducted a commercially reasonable physical inspection of the goods at the Houston facility on July 18 and 20, 2022, and at the Miami facility on July 25, 26, and 27, 2022. Teknik also states that it received consent from CITGO to auction the goods in an e-mail from Daniel Beuses, the General Manager of Procurement for CITGO, on March 27, 2019. Teknik further denies the allegation in footnote 7.

57.  Teknik denies the allegations in paragraph 57.

58.  Teknik denies the allegations in paragraph 58.

59.  Teknik states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik denies any remaining allegations in paragraph 59.

60.  Teknik denies the allegation in paragraph 60.

61.  Teknik denies the allegations in paragraph 61.

62.  Teknik states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik admits that CITGO has offered to take over storing the goods at its expense but without providing security as a substitute for the goods, and

Teknik could not accept the offer because it was not commercially reasonable without security. Teknik denies the allegations in paragraph 62.

63.     Teknik admits that the public has an interest in the gathering of evidence relevant to the claims in a judicial proceeding. Teknik denies that the relief sought by CITGO is needed to prevent any critical evidence from being beyond the reach of the Court in this case. Teknik denies the allegations in paragraph 63.

64.     Teknik admits that if the goods are sold to third party buyers at an auction, they will then be owed by such buyers. Teknik is without knowledge or information to determine the accuracy of the allegations regarding the location of potential buyers and whether they will physically possess the goods. Teknik states that CITGO has had ample opportunity to appraise the goods. Teknik allowed CITGO to conduct no-cost walk-through inspections of the goods at the Houston facility and Miami facility on July 6, 2021 and July 27, 2021, respectively. Teknik further states that CITGO conducted a commercially reasonable physical inspection of the goods at the Houston facility on July 18 and 20, 2022, and at the Miami facility on July 25, 26, and 27, 2022. Teknik denies the remaining allegations in paragraph 64.

65.     Teknik is without knowledge or information to determine the accuracy of the allegations regarding what CITGO is willing to do. Teknik states that it offered CITGO the opportunity to conduct a commercially reasonable physical inspection of the goods, and allowed CITGO to conduct no-cost walk-through inspections of the goods at the Houston facility and Miami facility on July 6, 2021 and July 27, 2021, respectively. Teknik also

admits that CITGO's offer to take storage of the goods was unreasonable because CITGO has never offered any form of adequate security as a substitute for the goods. Teknik denies any remaining allegations in paragraph 65.

## CLAIMS FOR RELIEF: DECLARATORY AND INJUNCTIVE RELIEF

## COUNT I: DECLARATORY JUDGMENT

66.     Answering paragraph 66, Teknik incorporates repeats and realleges its answers to paragraphs 1 through 65 as though fully stated herein.

67.     Teknik denies the allegation in paragraph 67.

68.     Teknik states that 28 U.S.C. § 2201(a) speaks for itself and is the best evidence as to what it requires.

69.     Teknik admits that CITGO purports to demand declarations from the Court, but denies that CITGO is entitled to any relief.  Teknik further states that the Agreements speak for themselves and are the best evidence as to what they require. Teknik denies any remaining allegations in paragraph 69.

## COUNT II: DECLARATORY AND INJUNCTIVE RELIEF

70.     Answering paragraph 70, Teknik incorporates repeats and realleges its answers to paragraphs 1 through 69 as though fully stated herein.

71.     Teknik states that CITGO owes payment to Teknik based on its performance under the Agreements, and admits that CITGO claims there is an issue as to whether CITGO owes the amount claimed by Teknik, or some lower amount. Teknik denies the remaining allegations in paragraph 71 to the extent a response is required.

16

72.     Teknik admits that CITGO purports to demand a declaration to be determined by the Court, but denies that CITGO is entitled to any relief. Teknik further states that 28 U.S.C. § 2201(a) speaks for itself and is the best evidence as to what it requires. Teknik denies any remaining allegations in paragraph 72.

73.     Teknik admits that CITGO purports to demand a temporary restraining order to be determined by the Court, but denies that CITGO is entitled to any relief. Teknik denies any remaining allegations in paragraph 73 to the extent a response is required, including subparts (1) and (2).

74.     Teknik admits that CITGO purports to demand an order to be determined by the Court, but denies that CITGO is entitled to any relief. Teknik denies any remaining allegations in paragraph 74 to the extent a response is required, including subparts (1) and (2).

## COUNT III: BREACH OF CONTRACT

75.     Answering paragraph 75, Teknik incorporates repeats and realleges its answers to paragraphs 1 through 74 as though fully stated herein.

76.     Teknik admits the Agreements are valid contracts. Teknik further states that Section 17 of the Commercial Agreement speaks for itself and is the best evidence as to what it requires. Teknik denies the remaining allegations and legal conclusion in paragraph 76.

77.   Teknik admits that CITGO purports to demand injunctive relief to be determined by the Court, but denies that CITGO is entitled to any relief. Teknik denies any remaining allegations in paragraph 77, including subparts (1) and (2).

Answering the Wherefore clause, Teknik admits that CITGO purports to demand a judgment against Teknik for declaratory relief, injunctive relief, costs and attorneys' fees, and other relief determined by this Court, but denies that CITGO is entitled to any relief.

## AFFIRMATIVE DEFENSES

Pursuant to Federal Rule of Civil Procedure 8(c), Teknik asserts the following defenses to the causes of action asserted in the Complaint, undertaking to prove only those defenses on which it bears the burden of proof under the applicable law:

## First Affirmative Defense – Breach of Contract by CITGO

78.   CITGO cannot seek damages against Teknik, as it was CITGO's breach of the Agreements that precipitated Teknik's alleged breach. Indeed, it is axiomatic that the "first breach" or "prior breach" doctrine applies in this case. Simply stated, it is as follows: "It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) *citing Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692, 37 Tex. Sup. Ct. J. 731 (Tex. 1994).

79.   Further, in Texas, the elements of a breach of contract claim are: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff,

18

(3) breach of the contract by the defendant, and (4) damages to the plaintiff resulting from that breach. *Adams v. H & H Meat Prods.*, 41 S.W.3d 762, 771 (Tex. App. 2001); *Petras v. Criswell*, 248 S.W.3d 471 (Tex. App. 2008).  A breach of contract claim accrues when the contract is breached. *Santander Consumer USA, Inc. v. Palisades Collection, LLC*, 447 S.W.3d 902, 906 (Tex. App. 2014).

80.    Here, Teknik provided CITGO with the documents and materials necessary to substantiate Teknik's costs associated with the goods. However, since Teknik obtained its OFAC license in February 2021, CITGO has manufactured issues at every turn in order to avoid making payment under the Agreements. Thus, CITGO has breached its obligation to "reimburse Teknik within 5 business days after Teknik provides CITGO with supporting documentation." See Exhibit A at p. 3 ¶ 5. CITGO's failure to honor Teknik's demand for payment has required that Teknik stop the bleeding of storage costs and explore the possibility of auctioning the goods in its possession. Of course, Teknik only intends to do this as a measure of last resort, and has already agreed to multiple extended stays of the auction process so that CITGO can perform no-cost walk-through inspections of the goods in facilities located in Miami and Houston, obtain competitive bids from third parties in order to conduct a commercially reasonable physical inspection of the goods, which it performed at the Houston facility and the Miami facility on July 18 and 20, 2022 and July 25, 26, and 27, 2022, respectively. Thus, CITGO's failure to tender performance under the Agreements constitutes its "first" or "prior" breach of the Agreements, thereby discharging

19

Teknik's contractual liability. Teknik hereby refers to and incorporate the allegations in the Counterclaim below regarding the subject matter of the allegations in this defense.

## **Second Affirmative Defense – Estoppel**

81.     CITGO's claims are barred under the principles estoppel. Under Texas law, "The rule of law as to estoppel *in pais* is clear, that when one, by his words or conduct, willfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time." *Love v. Barber*, 17 Tex. 312, 317 (1856). The elements of equitable estoppel are (1) a false representation or concealment of material facts (2) made with the knowledge, actual or constructive, of those facts (3) to a party without knowledge, or the means of knowledge, of those facts (4) with the intention that it should be acted on, and (5) the party to whom it was made relied or acted on it to his prejudice. *Furmanite Worldwide, Inc. v. NextCorp, Ltd.*, 339 S.W.3d 326, 334 (Tex. App. 2011).

82.     On March 27, 2019, Daniel Beuses, the General Manager of Procurement for CITGO, sent an e-mail message to Teknik indicating that CITGO would pay for or cover (including through liquidation of the Property) the handling and storage fees associated with the goods, as contemplated under the Agreements, if Teknik first obtained a license from OFAC. This communicated to Teknik that CITGO was agreeing to be responsible to such expenses and would not require Teknik to pay for storage and handling without reimbursement. Once Teknik obtained this license, CITGO changed its position and began

20

making every effort to avoid paying Teknik what it is rightfully owed. Teknik relied on CITGO's representation that it would honor the Agreements if Teknik obtained an OFAC license. Teknik relied on CITGO's misrepresentations to its detriment and has been injured in that Teknik has been forced (i) to spend capital expenditures and resources to obtain an OFAC license; (ii) to defer and/or lose other business opportunities in the industry, thereby materially affecting Teknik's position in the overall market; and (iii) necessarily incur legal fees, costs, and other expenses in connection with requesting OFAC's cooperation and obtaining the OFAC license. Thus, CITGO's conduct and acquiescence amounts to estoppel herein. Teknik hereby refers to and incorporate the allegations in the Counterclaim below regarding the subject matter of the allegations in this defense.

## Third Affirmative Defense – Frustration of Purpose

83.     CITGO's claim that Teknik failed to properly store the goods and therefore reduced their value is barred under the principles of frustration of purpose. Under this theory—also described as "impossibility of performance" or "commercial impracticability"—"an obligor may be excused from performing a contract if an event occurs and the contract was made on the basic assumption that the event would not occur." *See* Restatement (Second) of Contracts § 261; *Philips v. McNease*, 467 S.W.3d 688, 695-96 (Tex. App. 2015). This defense generally applies in three instances: "(1) the death or incapacity of a person necessary for performance, (2) the destruction or deterioration of a thing necessary for performance, and (3) prevention by governmental

regulation. The third allows courts to read into a contract an escape clause that does not otherwise exist." *Key Energy Servs. v. Eustace*, 290 S.W.3d 332 (Tex. App. 2009).

84.     Under the Agreements, CITGO purchased millions of dollars' worth of goods, and Teknik performed various logistics services to deliver the goods to PdVSA at specified delivery points. <u>Exhibit A</u> at p. 2 ¶ 1. In early 2019, however, OFAC added PdVSA to its List of Specifically Designated Nationals and Blocked Persons List pursuant to Executive Order 13850, thereby indefinitely freezing the goods in Teknik's possession. This meant the goods could not be transported without the risk of Teknik violating Executive Order 13850. Since then, Teknik has been forced to act as a warehouse facility despite never having the ability or capacity to hold the goods indefinitely. CITGO knew and understood that the purpose of the Agreements was to have Teknik deliver goods to PdVSA, and not store them indefinitely. Teknik's original purpose under the Agreements has been frustrated by the actions of the U.S. government. Obviously, this frustration was not the doing of Teknik and was not foreseeable. Thus, CITGO's allegation that Teknik failed to properly store the goods is barred by the doctrine of frustration of purpose.

## **Fourth Affirmative Defense – Express Waiver of Liability**

85.     CITGO's claims are barred under the Agreements' waiver of liability provision. The Amendment to Commercial Agreement dated April 8, 2013, Section 4(c), provides that "[i]n the event that either party breaches any provision of this Agreement or Addendum related thereto, the breaching party agrees to . . . hold harmless the other party from . . . any cost incurred by the non-breaching party". If Teknik is liable to CITGO,

22

which it is not, it is held harmless due to CITGO's failure to reimburse Teknik within five

business days after Teknik provided CITGO with supporting documentation for expenses,

as required under the Agreements. Thus, Teknik is to be held harmless against CITGO's

claims per the terms of the Agreements themselves.

## Fifth Affirmative Defense – Implied Waiver

86.     CITGO waived its right, if any, to assert any of its claims against Teknik by

engaging in conduct demonstrating the voluntary relinquishment of its alleged rights, or,

alternatively, warranting an inference of such voluntary relinquishment. Among other

things, on March 27, 2019, Daniel Beuses, the General Manager of Procurement for

CITGO, sent an e-mail message to Teknik indicating that CITGO would pay for or cover

(including through liquidation of the Property) the handling and storage fees associated

with the goods if Teknik first obtained a license from OFAC. This communicated to Teknik

that CITGO was voluntarily relinquishing any right to require Teknik to pay for storage

and handling without reimbursement. Teknik inferred such relinquishment and waiver,

and, in reliance, obtained this license and incurred the fees. Teknik hereby refers to and

incorporate the allegations in the Counterclaim below regarding the subject matter of the

allegations in this defense.

## COUNTERCLAIMS

Defendant Teknik Trading LLC ("Teknik"), hereinafter the Counter-Plaintiff, by

and through its undersigned counsel, hereby files its asserted counterclaims against

Plaintiff Citgo Petroleum Corporation ("CITGO"), the Counter-Defendant herein ("Teknik" and "CITGO" together are the "Parties").

## **INTRODUCTION**

87.     This case is about a company trying to get something for nothing. In May 2010, CITGO and Teknik entered into an agreement where CITGO purchased millions of dollars' worth of goods, and Teknik performed various logistics services to deliver the goods to PdVSA at specified delivery points.

88.     In early 2019, however, the U.S. Office of Foreign Assets Control ("OFAC") added PdVSA to its List of Specifically Designated Nationals and Blocked Persons pursuant to Executive Order 13850, thereby freezing the goods in Teknik's possession and preventing their transport without risk of sanctions.

89.     Subsequently, in October 2019, in reliance on representations made by CITGO, assuring that it would pay for Teknik's services and cover storage expenses, or support liquidation of the goods to cover the expenses, Teknik applied for a license from OFAC to move the goods and collect accounts receivable from CITGO for services rendered, which was finally approved in February 2021. However, unbeknownst to Teknik, CITGO never intended to honor its representations and promises to pay Teknik for its services. Instead, CITGO has manufactured excuses at every turn to avoid paying Teknik what it is rightfully owed.

24

90.     In this case, Teknik sues CITGO for breach of contract (the Agreements), quantum meruit (in the alternative), breach of contract (Terms and Conditions), and seeks a declaratory judgment as to whether Teknik may auction the goods in its possession.

## THE PARTIES

91.     Counter-Plaintiff Teknik is a Florida limited liability company that maintains its principal place of business in Miami, Florida, and carries out its core executive and administrative functions in Miami.

92.     Teknik is a subsidiary of Rincon Family Holdings, LLC ("RFH"). The members of RFH are AC Rincon, LLC, HA Rincon, LLC, LALF Rincon, LLC, LALO Rincon, LLC, and HS Rincon, LLC.

93.     The member of AC Rincon, LLC is Ana C. Rincon. Ana C. Rincon is a citizen of the state of Florida and resides in Broward County, Florida.

94.     The member of HA Rincon, LLC is Holly A. Rincon. Holly A. Rincon is a citizen of the state of Florida and resides in Miami-Dade County, Florida.

95.     The member of LALF Rincon, LLC is Luis Alfredo Rincon. Luis Alfredo Rincon is a citizen of the state of Florida and resides in Miami-Dade County, Florida.

96.     The member of LALO Rincon, LLC is Luis Alonso Rincon. Luis Alonso Rincon is a citizen of the state of Florida and resides in Miami-Dade County, Florida.

97.     The member of HS Rincon, LLC is Holly Susana Rincon. Holly Susana Rincon is a citizen of the state of Florida and resides in Marion County, Florida.

25

98.     Upon information and belief, Counter-Defendant CITGO is a Delaware corporation with its principal place of business in Houston, Texas.

99.     Upon information and belief, CITGO is a wholly owned subsidiary of CITGO Holding, Inc., which is a wholly owned subsidiary of PDV Holding, Inc., which in turn is a wholly owned subsidiary of PdVSA, which is the state-owned petroleum corporation of the Bolivarian Republic of Venezuela.

## JURISDICTION AND VENUE

100.     This Court has personal jurisdiction over CITGO as it expressly consented to such jurisdiction in the Agreements (as defined below). *See* Exhibit A at p. 3 ¶ 19. Further, this Court has personal jurisdiction over CITGO as a substantial part of the events giving rise to the claims against it occurred in this jurisdiction.

101.     This Court has subject matter diversity jurisdiction over this action under 28 U.S.C. § 1332, as the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship.

102.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events establishing the claims occurred here, and Defendants expressly consented to such venue in the Agreements. *See id.*

103.     All conditions precedent to the initiation of this claim have been performed, waived, or otherwise satisfied.

104.     Teknik has been required to retain the services Greenberg Traurig, LLP and Perlman, Bajandas, Yevoli & Albright, P.L. to enforce its rights under the Agreements and

prosecute this action and seeks an award of costs associated with enforcing this action, including without limitation, all reasonable attorneys' fees, costs, and expenses.

## GENERAL ALLEGATIONS

105.    Teknik is a United States-based company that provides procurement and logistics services to the energy industry and manufacturers. In May 2010, CITGO engaged Teknik to provide logistics services.

106.    To this end, CITGO and Teknik entered into a written Commercial Agreement dated May 5, 2010; an Amendment to Commercial Agreement dated April 8, 2013; a Change Order Form dated June 1, 2017; a Change Order Form dated August 3, 2017; a Change Order Form dated November 30, 2017; and an Amendment to Commercial Agreement dated January 2, 2019, Commercial Agreement. The foregoing Commercial Agreement, Change Orders and Amendments are included in the "Agreements" attached hereto as Exhibit A and are incorporated herein.

107.    Under the Agreements, CITGO purchased millions of dollars' worth of goods, and Teknik performed various logistics services to deliver the goods to PdVSA— the state-owned petroleum corporation of the Bolivarian Republic of Venezuela—at specified delivery points. Exhibit A at p. 2 ¶ 1. The Agreements provide terms and conditions related to the storage and warehousing of the goods.[3]

---

[3].   The Agreements provide long term storage rates for goods stored in Miami, Florida ($0.75/square foot/month) and Houston, Texas ($0.50/square foot/month). *See id.* at p. 19.

108.    For years, Teknik sent monthly invoices to CITGO for services related to the goods. These invoices are subject to Teknik's General Terms and Conditions of Sales ("Terms and Conditions"), which are explicitly referenced on the front page of each invoice. A copy of an invoice referencing Teknik's Terms and Conditions and a copy of Teknik's Terms and Conditions are attached hereto and incorporated herein as <u>Composite Exhibit B</u>.

109.    On January 28, 2019, however, pursuant to Executive Order 13850 (the "Order"), OFAC added PdVSA to its List of Specifically Designated Nationals and Blocked Persons List. The effect of this designation is that all of PdVSA's property is considered blocked as a matter of United States law, and no United States person may engage in any transaction or dealing involving such property without a license from OFAC. Thus, the goods in Teknik's possession were suddenly halted.

110.    Since the Order, Teknik has been forced to act as a warehouse facility for the goods despite never representing itself as having the ability or capacity to hold the goods indefinitely. The goods continue to remain at Teknik's facilities in Houston and Miami.

111.    In February 2019, Daniel Beuses, the General Manager of Procurement for CITGO at that time, requested that Teknik send its cost structure for warehousing and storing the goods. In response, on March 4, 2019, an employee of Teknik e-mailed CITGO and stated the following:

> For the past year we have been warehousing goods in our facilities, but Citgo shipments and business has pretty much been at a standstill for the past 9 months. We have been incurring the warehousing expense, insurance expenses, etc. but we have not been able to offset these

28

expenses simply because there are no shipments. We never designed the business to warehouse goods at our facilities because the business was designed to ship goods not warehouse them, but looking at the fact that there are no shipments, we need to begin to bill for said services.

The rates we have for warehousing fees are set at either $0.03 per Lbs. or $0.75 per cuft. Whichever is greater. Looking at the amount of cargo you have in our warehouses it would seem that the expense if calculated by weight would be $54,066.90 or if calculated by Cuft. It would be $64,600.24. In order to reduce the impact, we would be willing to provide a 25% discount on the rate of the higher amount ($54,066.90 -$16,150 = $48,450.24 per month), but the expense would need to be from the time of the last shipment we shipped for Citgo which was back in September 2018.

Therefore our proposal would be to bill Citgo $290,701.44 for Sept. 2018 thru Feb. 2019. And then $48,450.24 monthly until shipments can begin once again.

When speaking to you last week, I was not aware that we had so much cargo in our warehouses waiting to be shipped and had to ask my team to create a report that would substantiate the storage values and amounts. Just to give you an idea the amount stored in our warehouse is equivalent to 70 to 80 containers. Please indicate if you feel our proposal is reasonable and if you have any questions, please do not hesitate to call me.

A copy of this e-mail is attached hereto and incorporated herein as Exhibit C.

113.    CITGO never responded to the above e-mail. In fact, Teknik attempted to

contact CITGO by telephone and e-mail multiple times to discuss cost and logistics related

to warehousing and storing the goods, but CITGO ignored all of Teknik's requests for

discussion.

113.    Finally, on March 27, 2019, Daniel Beuses e-mailed employees of Teknik,

stating that

Should you wish to transact in the Property moving forward, ***including any attempts to liquidate the property to pay handling or storage fees***, Section 1(b) of Executive Order 13850 requires that OFAC issue a general or specific license authorizing the specific transaction before the transaction occurs. ***CITGO would fully support a request by Teknik to OFAC to issue a license permitting the liquidation of the Property in order to cover Teknik's handling or storage fees***. We are prepared to cooperate with you in good faith efforts to seek such relief from OFAC, to the extent the requested relief complies with our existing agreements.

(emphasis added). *See* <u>Exhibit C</u>.

114.    Despite the foregoing representations in that e-mail, CITGO did not intend to cover Teknik's handling or storage fees or to allow liquidation of the goods to cover such fees. In reality, CITGO intended to use the Order as an opportunity to manufacture issues related to the goods in order to avoid ever having to make payment under the Agreements. CITGO's statements that it would cover, pay or reimburse the costs and expenses of Teknik's handling or storage of the goods, or allow liquidation of the goods to cover such costs, including the statements in the March 27, 2019 e-mail are hereinafter referred to as the "Misrepresentations and Omissions."

115.    In reliance on CITGO's Misrepresentations and Omissions, Teknik applied with OFAC for a license. On February 18, 2021, Teknik obtained a license from OFAC authorizing it to collect all of its outstanding storage fees from CITGO. The license authorizes collection of specifically $2,056,261.95 that had accrued up until the date Teknik requested the license, and then an additional $70,103.07 per month for each month since that date. The license also indicates that Teknik is able to dispose of the goods to end its liabilities. A copy of the license is attached hereto and incorporated herein as <u>Exhibit D</u>.

116.    In accordance with the Agreements, and to collect payment owed, Teknik provided CITGO with a detailed summary of its costs and expenditures together with sufficient supporting documentation evidencing payment of its expenditures. It also offered CITGO the opportunity to conduct a commercially reasonable physical inspection of the goods, which it performed at the Houston facility on July 18 and 20, 2022, and at the Miami facility on July 25, 26, and 27, 2022.

117.    In response, CITGO has made every effort to avoid paying Teknik the costs of storing and handling the goods after CITGO had agreed and represented it would do so. In this regard, CITGO has made the following unsubstantiated claims: (1) CITGO claims that the cost estimates Teknik provided CITGO for a physical inspection of the goods are "commercially unreasonable" without explaining the basis for its position or offering an alternative; (2) CITGO claims Teknik refuses to allow CITGO to take storage of the goods, but CITGO has never offered any form of adequate security as a substitute for the goods; and (3) CITGO claims Teknik prevents CITGO's ability to inspect the goods, but CITGO conducted a commercially reasonable physical inspection of the goods at the Houston facility and the Miami facility on July 18 and 20, 2022, and July 25, 26, and 27, 2022, respectively.

118.   CITGO was served with a subpoena from the U.S. Department of Justice in or around May 2019.[4] After receiving its subpoena from the U.S. Department of Justice, CITGO's procurement division suddenly ceased all communications with Teknik.

119.   The reality is that CITGO's lawsuit against Teknik is the byproduct of the U.S. Department of Justice's bribery investigation into CITGO and its ultimate owner and parent, PdVSA. It is not about any illegal or improper activities performed by Teknik or its affiliates. Rather, this lawsuit is meant to act as a sword and shield for CITGO against any and all past procurement relationships that could impact the optics (whether based in reality or not) of the U.S. Department of Justice's ongoing investigation into CITGO and PdVSA. To be clear, at no time has the U.S. Department of Justice charged Teknik or any of its affiliate entities for any illegal or improper activity.

120.   On July 25, 2019, after learning that Mr. Curtis replaced Mr. Beuses at CITGO, Mr. Rincon e-mailed Mr. Curtis to discuss Teknik's indefinite storage and warehousing of CITGO's goods. After Mr. Rincon sent this e-mail, Mr. Curtis did not respond and continued to not respond to all of Mr. Rincon's subsequent future e-mails.

121.   Teknik reasonably relied on CITGO's Misrepresentations and Omissions. Despite those representations made, CITGO, on the other hand, has shown it has no intention of covering Teknik's handling and storage fees, or permitting liquidation of the

---

[4] https://www.reuters.com/article/us-citgo-petroleum-usa-subpoena/u-s-prosecutors-seek-records-from-citgo-petroleum-in-bribery-probe-idUSKCN1T42PA.

goods to cover Teknik's costs. Now, Teknik seeks to auction the goods, as permitted under its OFAC license, in order to stop the bleeding of its accruing storage and handling costs.

122. All conditions precedent to the prosecution of this action have been performed, satisfied, excused, or waived.

123. Teknik has been required to retain the services Greenberg Traurig, LLP and Perlman, Bajandas, Yevoli & Albright, P.L. to enforce its rights under the Agreements and prosecute this action and seeks an award of costs associated with enforcing this action, including without limitation, all reasonable attorneys' fees, costs, and expenses.

## COUNT I: BREACH OF CONTRACT (THE AGREEMENTS)

124. Teknik repeats and realleges the factual allegations contained in paragraphs 87-123 as though fully set forth herein.

125. Teknik entered into the Agreements with CITGO.

126. Teknik did all, or substantially all, of the significant things that the Agreements required it to do, including providing CITGO with the documents necessary to substantiate the storage and handling related costs that Teknik incurred while storing the goods.

127. However, since Teknik obtained its OFAC license in February 2021, CITGO has manufactured issues at every turn in order to avoid making payment to Teknik that are required under the Agreements, including reimbursement fees, costs and expenses. Thus, CITGO has breached its obligation to "reimburse Teknik within 5 business days after Teknik provides CITGO with supporting documentation." *See* Exhibit A at p. 3 ¶ 5.

128.    The costs and expenses related to Teknik's indefinite handling or storage of the goods are covered under the Agreements.

129.    To date, no payment has been received and costs totaling $3,964,873.56 (through August 2021) continue to accrue for Teknik.[5]

130.    As a result of the above and foregoing, CITGO is in an unremedied material breach of the terms and conditions of the Agreements.

131.    As a direct and proximate result of the above and foregoing, Teknik has suffered and will continue to suffer damages in an amount to be proven at trial with said amount being in excess of the jurisdictional limit of seventy-five thousand dollars ($75,000).

## COUNT II: QUANTUM MERUIT (IN THE ALTERNATIVE)

132.    Teknik repeats and realleges the factual allegations contained in paragraphs 87-123 as though fully set forth herein.

133.    Teknik provided storage services to CITGO by, after OFAC added PdVSA to its List of Specifically Designated Nationals and Blocked Persons List pursuant to

---

[5]. Teknik has a legal right to pursue all outstanding warehousing fees and costs under the Agreements, including those beyond four-year statute of limitations for breach of contract claims, because CITGO initiated this lawsuit and Teknik filed its counterclaim within 30 days after its answer was required. *See* Tex. Civ. Prac. & Rem. Code Sec. 16.069 ("(a) [i]f a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross claim even though as a separate action it would be barred by limitation on the date the party's answer is required; (b) [t]he counterclaim or cross claim must be filed not later than the 30th day after the date on which the party's answer is required.")

Executive Order 13850, handling and storing the goods for an indefinite period of time, which is still ongoing.

134.    CITGO received and accepted a benefit of Teknik's storage and handling of the goods, under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it.

135.    CITGO has failed to pay Teknik for the storage services rendered and costs incurred by Teknik in its handling and storing the goods for an indefinite period of time.

136.    Teknik did not intend to bestow such services upon CITGO as a gift and understood at all times that CITGO would make full payments for storage services rendered and costs incurred by Teknik for and on behalf of CITGO.

137.    Teknik is entitled to receive compensation for its services.

138.    This claim is plead in the alternative; if Teknik's claims are unsuccessful, Teknik has no adequate remedy at law and it would be inequitable for CITGO to retain the benefits of Teknik's storage services rendered and costs incurred without having to pay the reasonable value thereof.

139.    As a direct and proximate result of the above and foregoing, Teknik has suffered and will continue to suffer damages in an amount to be proven at trial with said amount being in excess of the jurisdictional limit of seventy-five thousand dollars ($75,000).

## COUNT III: BREACH OF CONTRACT
## (TEKNIK'S GENERAL TERMS AND CONDITIONS OF SALE)

140.     Teknik repeats and realleges the factual allegations contained in paragraphs 87-123 as though fully set forth herein.

141.     Teknik entered into the Agreements with CITGO. When CITGO entered into the Agreements it also agreed to be bound by Teknik's Terms and Conditions, which are explicitly referenced in the invoices Teknik previously provided to CITGO.

142.     Teknik did all, or substantially all, of the significant things that the Agreements required it to do, including providing CITGO with the documents necessary to substantiate the storage and handling costs that Teknik incurred while storing the goods.

143.     To date, Teknik has not received payment from CITGO for costs associated with Teknik's storage and handling services.

144.     As a result of CITGO's failure to make payment, Teknik has imposed a 1.5% finance charge onto CITGO's outstanding invoices for its failure to make payments to Teknik within 30 days of receipt.

145.     Teknik's justification for the imposition of a 1.5% finance charge is based on the Terms and Conditions, which provides the following:

> Price Adjustments; Payments; Late Fees; Currency. Prices stated on the Seller's quotation and/or invoice are valid for 30 days. After 30 days, Seller may change prices at its discretion or to reflect any increase in its costs resulting from state, federal or local legislation, price increases from suppliers and/or manufacturers, or any change in the rate, charge, or classification of any carrier. The prices stated on the Seller's quotation and/or invoice do not include any sales, use, or other taxes unless so stated specifically. All prices and payments hereunder are F.O.B. Seller's facility (unless otherwise specified by Seller in a separate writing,

36

including incoterms sections of Seller's quotations and/or invoices for any product) and will be invoiced and paid in United States Dollars (unless otherwise specified by Seller in a separate writing). ***Buyer shall pay interest on any unpaid invoices at the rate of 18% or the maximum allowable rate under applicable law, whichever is greater, plus all collection costs and expenses, including, but not limited to, reasonable attorneys' fees***.[6]

(emphasis added). *See* <u>Composite Exhibit B</u> at p. 2.

146.    CITGO agreed to be bound by Teknik's Terms and Conditions as of the time it received Teknik's first invoice that explicitly reference the Terms and Conditions and then made payment. At no time in Teknik and CITGO's nearly decade long relationship did CITGO challenge or reject Teknik's Terms and Conditions.

147.    In fact, CITGO and its legal department have long been aware of Teknik's Terms and Conditions throughout their relationship with Teknik. These Terms and Conditions were previously presented to various vendors that did business with CITGO and Teknik during their relationship. If any vendor had comments or proposed edits to Teknik's Terms and Conditions, Teknik would take those proposals into consideration, consult with CITGO's legal department, and await its review and approval of the same before proceeding to fulfill a purchase order. *See* <u>Composite Exhibit F</u>.

148.    Pursuant to Teknik's Terms and Conditions, Teknik imposes a 1.5% finance charge onto CITGO's outstanding invoices because CITGO has failed to make payment as required. Teknik has a legal right to pursue its financing costs as compensation because CITGO continues to detain money rightfully owed to Teknik.

---

[6]. 18% annum divided by twelve months is 1.5%.

149.     Moreover, CITGO seeks to have it both ways with respect to its position on finance charges. In June 2021, CITGO was adamant that Teknik was only entitled to a 1% finance charge under the Agreements and expressly stated in writing that "the relevant provisions" justifying its position "are Exhibit A Scope of Work, Sections 2(XII) and 3(A)(c)." *See* Exhibit G, CITGO's June 4, 2021 correspondence to Teknik referencing finance charges, at p. 4. Now, CITGO completely flips its argument and contends that the Agreements do not contain an interest charge on past due payments or the Terms and Conditions that CITGO agreed to when it entered into the Agreement. *See* Dkt. 37 at p. 13.

150.     Due to the fact Teknik has not received payment for its services, finance charges[7] continue to accrue for CITGO in an amount totaling $3,045,572.34 (through August 2021).[8]

151.     As a result of the above and foregoing, CITGO is in an unremedied material breach of Teknik's Terms and Conditions.

152.     As a direct and proximate result of the above and foregoing, Teknik has suffered and will continue to suffer damages in an amount to be proven at trial with said

---

[7]. Finance charges for the months of August, September and October 2021 have not yet been invoiced.

[8]. Teknik has a legal right to pursue all outstanding finance charges provided under its Terms and Conditions, including those beyond the four-year statute of limitations for breach of contract claims, because CITGO initiated this lawsuit and Teknik filed its counterclaim within 30 days after its answer was required. *See* Tex. Civ. Prac. & Rem. Code Sec. 16.069 ("(a) [i]f a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross claim even though as a separate action it would be barred by limitation on the date the party's answer is required; (b) [t]he counterclaim or cross claim must be filed not later than the 30th day after the date on which the party's answer is required.")

amount being in excess of the jurisdictional limit of seventy-five thousand dollars ($75,000).

## <u>COUNT IV: DECLARATORY RELIEF</u>

153.    Teknik repeats and realleges the factual allegations contained in paragraphs 87-123 as though fully set forth herein.

154.    At issue is whether Teknik has a legal right to auction the goods in its possession.

155.    Under 28 U.S.C. § 2201(a), Teknik therefore seeks a declaration as to whether it has a legal right to auction the goods in light of Parties' obligations under the Agreement and applicable law.

156.    On March 27, 2019, Daniel Beuses e-mailed employees of Teknik about the goods in Teknik's possession, stating that

> Should you wish to transact in the Property moving forward, ***including any attempts to liquidate the property to pay handling or storage fees***, Section 1(b) of Executive Order 13850 requires that OFAC issue a general or specific license authorizing the specific transaction before the transaction occurs. ***CITGO would fully support a request by Teknik to OFAC to issue a license permitting the liquidation of the Property in order to cover Teknik's handling or storage fees***. We are prepared to cooperate with you in good faith efforts to seek such relief from OFAC, to the extent the requested relief complies with our existing agreements.

(emphasis added). *See* <u>Exhibit C</u>.

157.    Thus, based on the above e-mail, Teknik understood that if it obtained a license from OFAC, CITGO would support Teknik's desire to dispose of the goods in its possession.

158.    On February 18, 2021, in reliance on CITGO's written assurances, Teknik received a license from OFAC to dispose the goods. The license provides the following:

> **SECTION I – AUTHORIZATION:** Subject to the conditions and limitations stated herein, Teknik Trading LLC (the "Licensee") is hereby authorized to engage in all transactions necessary to collect accounts receivable from CITGO Holding, Inc. (CITGO) and Petroleos de Venezuela S.A. (PDVSA), for good and services provided to CITGO and PDVSA for the total amount of $2,056,261.95, which includes the total amount of accrued warehousing fees through September 9, 2019, plus $70,103.07 per month, from October 9, 2019 until CITGO settles this matter with the Licensee and takes custody of the goods, and if a settlement cannot be reached for the Licensee to be able to pursue its legal rights pursuant to its agreement with CITGO, ***including the disposal of the goods, as described in the Application.***

(emphasis added). Exhibit D at p. 2.

159.    While Teknik has been granted permission to auction the goods by CITGO and OFAC, CITGO's counsel repeatedly requested that Teknik halt any sale or marketing of the goods through October 25, 2021.

160.    On August 25, 2021, CITGO told Teknik that it is willing to pay $12,000 into escrow with the Court for a full inspection of the goods at Teknik's Houston and Miami facilities to further evaluate storage and other charges claimed by Teknik and to determine the value of the goods. *See* Exhibit E at pp. 1-2.

161.    Teknik does not believe CITGO is coordinating an inspection of the goods in good faith. CITGO is grossly underestimating the time, resources, and money required for this investigation. CITGO's proposed initial escrow deposit of $12,000 only accounts for three weeks of hourly work from two third-party employees. CITGO is not accounting for the cost and time commitments associated with operating equipment (i.e. forklifts), getting boxes from their locations and moving them to a staging area, breaking boxes, packing boxes, and bringing them back to their storage location. Additionally, CITGO does not state whether it will be covering the costs of Teknik's agents who will need to oversee the inspection and help CITGO locate the goods. CITGO also fails to mention who will be fronting the direct costs associated with such an inspection, and Teknik believes that CITGO expects Teknik to cover these costs—something that Teknik is not contractually obligated to perform.[9]

162.    Teknik believes that CITGO is not negotiating in good faith and intends to force Teknik into a financially disadvantageous position through its commercially unreasonable inspection proposal. By dragging the inspection process out and proposing commercially unreasonable terms, CITGO forces Teknik to bleed storage costs.

---

[9]. Indeed, the Agreements do not obligate Teknik to pay for any kind of third-party inspection. "***Teknik's obligations include, amongst other things, 'Coordination of third party services contracted by CITGO (third party inspection***, customs, logistics, freight forward, transport) and provide Inspection releases to authorized CITGO representative for approval. CITGO reserves the right to assign third party inspection company." *See* <u>Exhibit A</u> at p. 13 (emphasis added).

41

163.    Now, in reliance on written representations made by CITGO, and in accordance with the license granted by OFAC, Teknik seeks to dispose the goods in its possession to stop the bleeding of storage costs and lost business opportunities.

164.    As such, Teknik seeks the following declaration from this Court: Teknik has a right to auction the goods in its possession because CITGO provided its express written consent for Teknik to do so, and an auction is permitted based on the license granted to Teknik by OFAC.

## Prayer for Relief

WHEREFORE, Counter-Plaintiff requests this Court enter judgment:

1.    finding that Teknik has a right to auction the goods because CITGO provided its express written consent for Teknik to do so, and such auction is permitted based on the license granted to Teknik by OFAC.

2.    in favor of Counter-Plaintiff against Counter-Defendant on all counts;

3.    awarding Counter-Plaintiff actual and compensatory damages in an amount to be proven at trial;

4.    awarding Counter-Plaintiff punitive and exemplary damages, according to proof at trial, in an amount constitutionally permitted;

5.    awarding Counter-Plaintiff attorneys' fees;

6.    awarding Counter-Plaintiff costs of suit incurred herein; and

7.    such other and further relief as the Court deems just and proper.

42

Dated this 14th day of October, 2022.

Respectfully submitted,

GREENBERG TRAURIG, LLP
*/s/ C. Mark Stratton*
C. Mark Stratton, Attorney-in-Charge
Southern District Bar No. 12144
Texas Bar No. 19359200
E-mail: strattonm@gtlaw.com
Gregory J. Casas
Southern District Bar No. 16836
Texas Bar No. 00787213
E-mail: casasg@gtlaw.com
300 West 6th Street, Suite 2050
Austin, Texas 78701
Telephone: (512) 320-7200
Facsimile: (512) 320-7210

Paul D. Turner (*Pro Hac Vice Approved*)
Florida Bar No. 121690
Benjamin L. Reiss (*Pro Hac Vice Approved*)
Florida Bar No. 121690
Nima Tahmassebi  (*Pro Hac Vice Approved*)
Florida Bar No. 121690
Kristin Drecktrah Paz (*Pro Hac Vice Approved*)
Florida Bar No. 91026
PERLMAN, BAJANDAS, YEVOLI,
& ALBRIGHT, PL
283 Catalonia Avenue, Suite 200
Coral Gables, Florida 33134
Telephone: (305) 377-0086
Facsimile: (305) 377-0781

*Attorneys for Teknik Trading, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was electronically filed with the Court and that counsel of record, who are deemed to have consented to electronic service in the above-referenced case, are being served this 14th day of October, 2022, with a copy of the above-document via the Court's CM/ECF System.

*/s/ C. Mark Stratton*
C. Mark Stratton

# EXHIBIT "A"

# Commercial Agreement

Teknik and CITGO have reached a commercial agreement to operate the procurement and logistics process under the following terms and conditions:

**1.    Commission:** Teknik has agreed to purchase Goods for CITGO under the cost plus percentage of cost contract. Teknik's commission is based on the total cost of the purchase of the Goods, excluding freight, insurance, duties and any other expenses incurred in the delivery to the deliver point.

| Total spend: | Commission: |
|---|---|
| Under $10,000,000 | 3% |
| $10,000,001 to $20,000,000 | 2.5% |
| Over $20,000,000 | 2% |

Commission will be earned upon delivery to the delivery point. The commission will be based on the total spend of all Goods going back to the first dollar of spend. CITGO shall pay Teknik and Teknik will reimburse or credit CITGO for any payments in the event the commission percentage decreases due to increased spend. The percentage agreed was a percentage of the total cost of purchase paid to the vendor including any direct payments from CITGO to vendor.

Wiring Instruction for Teknik:
| | |
|---|---|
| Beneficiary: | Teknik Trading, Inc. |
| Bank: | Mercantil Commercebank, N.A. |
| Address: | 3105 NW 107 Avenue. Miami, FL 33172, USA |
| Account #: | 8601314206 |
| Swift Code: | MNBMUS33 |
| ABA/Routing Number: | 067010509. |

**2.    Term:** This Agreement shall expire on December 31, 2010. Either party may terminate upon 30 day notice to the other party excluding any purchase orders issued prior to termination. There is no guaranteed minimum under this Agreement or exclusive relationship.

**3.    Purchases:** CITGO will provide Teknik with complete information about each purchase requirement, including:
- 3.1.- Full description of Goods
- 3.2.- Quantity to purchase and unit of measure
- 3.3.- Unit and Total Price
- 3.4.- Vendor/Supplier
- 3.5 – Agreed delivery terms and schedule

**4.    Purchase Process:** Teknik will execute the following steps:
- 4.1.- enter into purchase orders with vendors for the purchase of the Goods
- 4.2.- Check up export compliance on vendors and Goods
- 4.3.- Send CITGO a Pro Forma Invoice for this purchase including price of goods and other related expenses:
  - 4.3.1.- The Pro Forma Invoice from Teknik to CITGO will be DDU Venezuela. The specific delivery point will be provided by CITGO prior to delivery in Venezuela.
  - 4.3.2.- The Pro Forma Invoice will show "Bill To" CITGO and "Ship To" PDVSA
  - 4.3.3 – The Pro Forma Invoice will include copies of invoices from Clover and other related expenses paid to vendors under this Agreement.

**5.    Direct Payments:** CITGO reserves the right to pay vendors directly. CITGO will notify Teknik in writing to initiate the purchase. Teknik will use reasonable efforts to establish credit



terms with vendors if needed. For any payment due to Teknik under any purchase of Goods, CITGO will wire transfer to Teknik the full amount of the purchase as per the Pro Forma Invoice For freight, insurance, customs and other expenses incurred by Teknik to deliver Goods to the delivery point, CITGO shall reimburse Teknik on 5 business days after Teknik provides CITGO with supporting documentation. Teknik shall provide CITGO with supporting documentation without mark-up, including but not limited to bills of lading and shipping papers, to validate any payments to vendors or expenses incurred hereunder.

**6. Time of the Essence:** Teknik will proceed to purchase the Goods from the vendor indicated by CITGO, pay the vendor, and ship the Goods to Clover which is the freight forwarder used by CITGO. TIME IS OF MATERIAL IMPORTANCE.Notwithstanding any terms of this provision, Citgo agrees that Teknik will not be held responsible for vendor failure regarding Citgo's desired delivery schedule.

**7. Title:** Teknik will purchase the Goods in its own name and transfer title to PDVSA, or its designee, at the delivery point. CITGO shall not take title.

**8. Invoicing:** Teknik will invoice and ship these Goods to the nominated delivery point according to the Pro Forma Invoice previously sent to CITGO. Transportation mode shall be determined by CITGO (marine or air).

**9. Customs:** Shipments will be on a delivered basis and PDVSA will be responsible for customs clearance in Venezuela. ,.

**10. Destination Charges:** CITGO will be responsible for any and all demurrage charges, waiting time, hotel expenses ,etc., incurred at destination and such services may be up to 60% of the inland transportation charge per day. Such charges will only accumulate once Venezuela Customs has notified Clover that materials have cleared customs and is available for pickup. Said charges will be charged per terms and conditions from the Venezuelan Transportation CITGO handling this cargo.

**11. CITGO Contact/Notice:** Geoff Gannaway    ggannaw@citgo.com 281/610-1542
   **Billing Address:** CITGO PETROLEUM CORPORATION, 1293 Eldridge Parkway, Houston, Texas 77077
   **TEKNIK Contact/Notice:** Holly Rincon  holly.rincon@clovergroup.com 305-499-7002
Billing address: 1910 NW 97 Avenue Miami Florida 33172

**12. Taxes and Duties.** Teknik or Clover will pay all excise sales, use, license fees, duties, charges, occupational assessments or other taxes, fees or assessments that may be payable to any federal, state or local authority. CITGO shall reimburse Teknik for such taxes and duties. CITGO may provide tax exemption certificates if applicable. In the event CITGO pays or reimburses Teknik for any duties or taxes on the Goods, CITGO reserves the right to claim, receive and retain drawbacks on imported materials used in the manufacture of the Goods delivered hereunder

**13. Insurance:** Teknik, or Clover, to procure in CITGO's name to the delivery point. CITGO will be named as Loss Payee. Teknik shall assign any claim and insurance proceeds to CITGO.

**14. Shipper:** Teknik shall be the U.S. Principal Party in Interest and serve as the Exporter of Record. Teknik shall be responsible for the filing all necessary export documentation with U.S. Customs and Border Protection, including the filing of the EEI information through the AES. Teknik shall at all times comply with all U.S. export laws and regulations.

**15. Warranties.** Teknik shall assign any vendor or manufacturer warranties to PDVSA and use reasonable efforts to assist PDVSA to enforce such warranties.



**16. Liens:** To the full extent permitted by applicable law, Teknik, for itself and all of its suppliers and subcontractors, waives all rights of claim, lien and encumbrances against Goods, including materialmen or mechanics liens, against CITGO and the property and premises of CITGO for the Goods supplied or labor rendered and shall keep CITGO premise and property free from all such claims, liens and encumbrances, at its own cost.

**17. Audit.** CITGO shall have the right to audit Teknik and Clover's records to confirm compliance with these terms.

**18. Independent Contractor.** In performance of its obligations hereunder, Teknik shall act solely as an independent contractor and nothing herein shall at any time be construed to create the relationship of employer and employee, partnership, principal and agent or joint venture as between CITGO and Teknik. Teknik shall have no right to enter into any contract, commitment, or agreement, or incur any debt or liability of any nature in the name, or on behalf of the CITGO. Nothing herein shall create an exclusive relationship for the purchase of Goods or a supplier relationship.

**19. Choice of Law and Venue.** Each party shall, in the performance of this Agreement, comply with all applicable laws and regulations. This Agreement will be governed by and construed in accordance with the laws of the state of Texas without preference to conflict of laws statutes. Each party agrees to submit to the exclusive jurisdiction of the applicable State and Federal Courts situated in Houston, Texas, USA. The Incoterms 2000, including amendments and revisions, shall apply only to international deliveries. The United Nations Convention on Contracts for the International Sale of Goods does not apply to this Agreement.

**20. Miscellaneous.** No amendments, changes, modifications or waivers to this agreement shall be valid or effective unless made in writing and signed by a duly authorized representative of each of the parties hereto. Neither the failure or delay on the part of either party to exercise or enforce any right, remedy, power or privilege provided herein shall operate as a waiver. No waiver of a breach of this agreement, whether express or implied, shall constitute a waiver of a subsequent breach. Teknik shall not assign any rights or obligations under this Commercial Agreement or any portion of the Goods without the prior written consent of CITGO, in its sole discretion. CITGO reserves the right to assign this agreement, in whole or in part without Teknik's prior written consent. This Commercial Agreement shall be binding on the parties hereto, their successors and permitted assigns. Neither party shall be entitled to any common law, equitable or statutory rights to set-off. In the event any provision of this agreement shall be held to be invalid, void or otherwise unenforceable, such holding shall not affect the remaining part or portions of the provision, or any other provision hereof. This agreement is intended by the parties to be the final, complete and exclusive statement of the terms of the agreement. All prior agreements, negotiations and proposals, whether oral or written, pertaining to this Agreement are superseded and merged into this agreement.

This Commercial Agreement is Agreement made on May 5, 2010

Holly Ana Rincon
Vice President
Teknik Trading Inc
1910 NW 97th Ave
Miami, FL 33172

Alejandro Granado
President/CEO
CITGO Petroleum Corporation
1293 Eldridge Parkway
Houston, TX 77077



## AMENDMENT TO COMMERCIAL AGREEMENT

This Amendment is made this _8th_ day of _April_ ___, 2013 (Effective Date), to that certain Commercial Agreement by and between Teknik Trading Inc ("TEKNIK") and CITGO Petroleum Corporation ("CITGO"), dated May 5, 2010 (the Agreement).  The parties to said Agreement agree as follows:

      1.    **Fee.**    The Fee shall be increased to a flat rate of 6.0% (without regard to the volume of purchases hereunder).   The increased percentages shall be in return consideration for the additional services provided by Teknik to CITGO pursuant to the attached Exhibit "A" attached hereto and made a part hereof at Exhibit "A" (and hereinafter referred to as the "Additional Services").  The parties acknowledge that the services provided hereunder are above and beyond those services originally contemplated under the Agreement, and that TEKNIK, has in fact, been providing said Additional Services for some time.   TEKNIK, in return consideration for the fee increase identified hereunder, hereby agrees to waive any claim for the Additional Services completed prior to the Effective Date.

      2.    **Term.** The term of the agreement shall be extended until December 31, 2018. The remaining terms of the Agreement Section 2 shall remain effective as to termination notice and existing orders; and

      3.    **Purchase Process.**  The purchase process provided under Section 4 of the original Agreement shall be expanded to include those items identified in the Pre-Delivery section of Exhibit "A".

      4.    **Compliance with Laws and US Regulatory Requirements**
(a)  Each party shall, in the performance of all of its rights and obligations under this agreement, comply with all applicable laws, rules and regulations issued by applicable governmental authorities. Nothing in this agreement shall be construed as requiring either party to perform its obligations hereunder, where such performance shall constitute an infringement, contravention, breach or interference with such laws.

(b)  Both CITGO and TEKNIK are committed to complying with U.S. legal requirements governing exports and re-exports of goods and products from the United States ("Export Compliance Requirements" or "Requirements").  The parties acknowledge that these Requirements may prohibit or require a license for the export of certain types of Goods and technical data to specified countries.  To that end, both parties agree to cooperate in ensuring that shipments made pursuant to this Agreement, as amended by this Addendum, comply with such Requirements. Prior to shipment TEKNIK will seek to obtain required documentation and information from the ultimate end-user, including but not limited to end-user certificates and any vendor-requested documentation. CITGO will provide reasonable assistance, as necessary, to TEKNIK in obtaining such required documentation and information.

(c)  In the event that either party breaches any provision of this Agreement or Addendum related hereto, the breaching party agrees to indemnify, defend and hold harmless the other party from any fine, penalty, and/or any cost incurred by the non-breaching party. The parties understand that failing to comply with the Export Compliance Requirements

could result in the imposition of fines amounting to $250,000 or more per incident and/or criminal charges for those involved.

All other terms and conditions under the Agreement shall remain in effect and in good stead. To the extent that any term of this Amendment shall be in contradiction to the terms of the Agreement, the terms and/or the provisions of this Amendment shall control.

TEKNIK:

Luis A. Rincon, Director

CITGO:

Alejandro Granado, President



EXHIBIT "A"
Additional Services

PRE DELIVERY:

A. Create Purchase Order with CITGO Vendors;

B. Verify that all Line Items, Quantities, Incoterms, and Values are correct between CITGO and their Vendors;

C. Correct any discrepancies noticed prior to sending PO to Vendors, including but not limited to Incoterms, Freight values, delivery schedules and taxes;

D. Request Export Compliance Information to Vendors;

E. Verify the Export Compliance Information sent by the Vendor to ensure accuracy and reliability; AND

F. When the Vendor does not provide Export Compliance Information or is not knowledgeable or certified with Export Compliance Regulations, TEKNIK does one of the following:

    (i)    Research and declare the proper Schedule B Number and ECCN for every Line Item..

    (ii)    Whenever Export Licenses are required TEKNIK applies for licenses with the proper government entities.

    (iii) TEKNIK shall gather all Technical Specifications and Supporting documentation from the Vendor and other related parties in order to submit as back-up documentation for the license request.

    (iv)    TEKNIK shall continues to follow up with license requests in order to expedite the License Approval Period.

GOOD RECEIPT (US SIDE):

When the equipment and materials for each purchase orders are received at TEKNIK's warehouse location(s), the following tasks are performed:

    (i)    A physical inspection is performed to determine the condition of the merchandise, if export packing is required and the type of packing that is best fit for export;

    (ii)    The physical inventory is reconciled with the Original PO to determine if there are any Overages, Shortages or Discrepancies;

    (iii) An OS&D report is issued if applicable;

    (iv) A second Inspection is done whenever a discrepancy exists;

    (v)    When a discrepancy is noted, all parties are notified and TEKNIK works with Vendors to correct in the least amount of time;

    (v)    When part numbers do not match with the PO, TEKNIK works with vendors to determine if the goods received have equivalent/substitute part numbers. Once all items with part number discrepancies are resolved and cleared by Vendor, CITGO is notified. TEKNIK will issue a Purchase Order Change (amendment) to reflect the new or revised part number; and

    (vi) In case of overages or items shipped incorrectly, TEKNIK coordinates with vendor in the reverse logistics process to return discrepant goods to vendor.



In addition to the foregoing, TEKNIK continues to:

    (a)  expedite, verify the accuracy of items received, and resolve all Vendor Overages, Shortages and Discrepancies are corrected and received at our facilities;

    (b)  TEKNIK manages partial deliveries through the order process and tracks all deliveries until all goods are received and the PO has been completed according to the original and/or amended order;

    (c)  Whenever hazardous cargo is involved, TEKNIK works together with the vendor and/or with a Hazardous Material Expert to make sure that cargo meets all transportation requirements for Dangerous Goods;

    (d)  If required, TEKNIK looks for different shipping alternatives to inform CITGO of efficiencies for all expenses related to the shipping process from origin to final destination; AND

    (e)  Once CITGO receives the air and ocean quote, they determine the best shipping option.


**FULFILMENT:**

Once CITGO has given the green light to ship goods, TEKNIK then prepares all pertinent documentation and makes sure that cargo is packed properly for shipment and complies with all export regulations, included as part thereof:

    A.  When required Teknik will need to collect technical specifications, product catalogs, and other pertinent documentation in order to pre-clear goods with the Department of Commerce, Bureau of Industry & Security, Office of Export Enforcement and any/or Government Agency which might be involved with the Export of goods.

    B.  Will prepare Export Shipping Invoices according to Inco terms (Ex-Works, FOB, CIF, C&F, DDU, DDP, etc) requested by CITGO and monitor the shipping process in order to make sure that the cargo arrives at final destination in the least amount of time.

    C.  Attempt to accelerate material shipments to Venezuela;

    D.  Prepare comprehensive progress reports;

    E.  Coordinate export documents and the respective customs.

    F.  Prepare customs documents for imports into Venezuela;

    G.  Coordinate all custom activities, including payment of customs, with the customs broker in Venezuela.

    H.  Receive all materials in storage by CLOVER INTERNATIONAL;

    I.  Create shipping documents for air and steamship cargo shipments;

    J.  Continue to track and follow-up with vendors to guarantee that orders are received within the ETD timeline offered to CITGO and pressures to see if the delivery times can be improved ahead of the ETD;

    K.  Provide comprehensive Purchase Order Status reports to CITGO on a weekly basis in order to make sure they are informed of the status of every line item for each and every order;

    L.  Gather all shipping documents, related invoices, and then proceeds to bill in one invoice the TEKNIK service fee and all pertinent charges incurred in the shipping process; and

Where necessary (specifically on orders for PDVSA La Estancia and if so required by TEKNIK, after CITGO provides appropriate collateral therefor) pay vendors on behalf of



CITGO for the purchased goods prior to delivery and then bill CITGO back for the Cost of Goods Sold.

With respect to the foregoing, TEKNIK acknowledges that CITGO has also developed an inspection process for the more technical equipment and materials, including the hiring of a material inspection company, ReCon. TEKNIK for the agreed fee, TEKNIK acknowledges that it is responsible for coordinating these inspections and escorting inspectors within their warehouse while performing the inspections. TEKNIK further understands in some instances, TEKNIK coordinates vendor's visiting technicians to correct or repair damaged items shipped by vendor or whenever shipments are received with materials having either different part numbers or no part numbers at all. Where applicable, TEKNIK further undertakes to coordinate with the supplier and request a technician visit their warehouse to identify the material or equipment. As with the inspectors, these technicians must be escorted by TEKNIK until they have completed their task.

From time to time and depending on circumstances, the Scope of Work will be revised in order to include additional services required to comply with changes in Rules and Regulations set forth by the U.S. Government, change in customer requirements, change in consignee requirements, and any request that will enhance the services provided. Changes to the services should not affect the cost of services as long as these are reasonable and do not affect the cost of doing business significantly.



## Exhibit G - CHANGE ORDER FORM

**CITGO Petroleum Corporation**

Date: 06/01/2017
Contractor Name: Teknik Trading LLC.
Contractor Address: 1910 NW 9th Ave. Miami Fl. 33172

ATTENTION: Luis A. Rincon

Subject: Amendment to Contract Number 2

The parties entered into an outline agreement dated **04/08/2013** ("Contract") This Change Order is made in consideration of the mutual covenants and other valuable consideration, the receipt and sufficiency of which are acknowledged, and it is agreed the subject Contract is hereby amended as follows:

Delete the Following: 1) **Exhibit A**-Additional Services

And Replace/Add the Following: 1) **Exhibit A**-Scope of Work (listed below)
**Exhibit B**-Reimbursable Cost (listed below)

The Effective date of these changes shall be May 22, 2017. ~~May 22, 2017.~~  June 8, 2017 BSP LR

This Change Order shall not be effective unless executed below by an Authorized Representative as set forth in the Contract. Authorization by any other CITGO personnel or third party representative shall not constitute valid acceptance of the Change Order document on CITGO's behalf. Any capitalized terms shall have the meaning set forth in the Contract.

The terms of this Change Order shall supersede and replace the terms of the Contract to the extent they are inconsistent. All other terms and requirements of original Contract and any other Change Order shall remain in full force and effect. This Change Order and the Contract Documents are the entire agreement on the amendments and there are no additional or oral agreements.

The above stipulated changes shall only become effective upon the full execution by both Parties in the space(s) designated below with an original copy returned to the authorized CITGO representative below.

| Teknik Trading LLC. | CITGO Petroleum Corporation |
|---|---|
| By: | By: |
| Print Name: Luis Alonso Rincon | Print Name: Brian Paulson |
| Title: Director | Title: GM Procurement |
| Date: Jun 6, 2017 | Date: 6/6/17 |

LR

**EXHIBIT "A"**
**SCOPE OF WORK**

**SERVICES REQUIRED FROM CONTRACTOR**

**1.**     **Instructions to Create Purchase Order**

**i.**     Receive Purchase Order (PO) request from CITGO with applicable documentation (Instructions to Purchase (ITP), Letter of Understanding (LOU), Quote from Vendor, Certificates, Drawings, if applicable & available).

**II.**     Verify that all line items, quantities, Incoterms, and values are correct between CITGO ITP and the Vendor's Quote. CONTRACTOR must compare selected vendor's quote to PO template to verify accuracy.

**III.**     Any discrepancies are to be resolved with the vendor. CONTRACTOR must notify CITGO prior to sending PO to vendors, including but not limited to Incoterms, freight values, delivery schedules and taxes. Any discrepancies identified by CONTRACTOR requiring a change to the PO will be documented in a formal Change Order to CONTRACTOR.

**IV.**     Request and verify for accuracy the export compliance information from the selected vendor.

**V.**     When the vendor does NOT provide export compliance information or is not knowledgeable or certified with export compliance regulations, the procurement services CONTRACTOR must perform the following:

        **a)**     Research and declare the proper Schedule B Number and ECCN for every Line Item.

        **b)**     Whenever export licenses are required, CONTRACTOR applies for licenses with the proper government entities.

        **c)**     CONTRACTOR shall gather all technical specifications and supporting documentation from the Vendor and other related parties in order to submit as back-up documentation for the license request.

        **d)**     CONTRACTOR shall continue to follow up with license requests in order to expedite the license approval period.

        **e)**     CONTRACTOR will notify CITGO of export compliance issues and resolution method and timing.

**VII.**     Create and place PO with selected vendors on behalf of CITGO.

**VIII.**     CONTRACTOR must provide CITGO with a Pro-forma and/or commercial invoice when required (for permits processing) Line items on invoices must match CITGO PO on all aspects.

**IX.**     Purchase order follow-up with selected vendor:

Revision date 7/22/2009 Revision 1                    2

 

A.    Expediting:

a)    Track, follow-up with vendors to guarantee that orders are received within the ETD timeline offered to CITGO and pressure to see if the delivery times can be improved ahead of the ETA.

**Communicate any changes in the delivery date to CITGO.**

b)    Ensure prompt delivery of materials. Call vendors and logistics companies to accelerate delivery dates.

B.    Avoid demurrages. When they cannot be avoided, negotiate to benefit CITGO to the fullest. Costs must be clearly identified and presented to an authorized CITGO representative for approval before they are incurred.

C.    CONTRACTOR is responsible for management of claims and settlements with other parties involved.

X.    Goods Receipt (US SIDE): When the equipment and materials for each purchase orders are received at CONTRACTOR's warehouse location(s), the following tasks are performed:

A.    A physical inspection is performed to determine the condition of the merchandise, if export packing is required. A blind count must be performed by warehouse personnel in order to ensure accurate quantity, and the type of packing that is best fit for export unless already packed for export by the vendor as instructed through CONTRACTOR PO.

B.    The physical inventory must be reconciled with the original PO to determine if there are any overages, shortages or discrepancies.

C.    An OS&D (Over, Short & Damaged (cargo)) report is issued to the vendor and a copy provided to CITGO, if applicable. The CONTRACTOR works with the vendor to correct the discrepancy. Once a resolution is identified, the CONTRACTOR requests approval from an authorized CITGO representative to proceed through a formal Change Order from CITGO to CONTRACTOR.

D.    When part numbers do not match with the PO, CONTRACTOR works with vendors to determine if the goods received have equivalent/substitute part numbers. Once all items with part number discrepancies are resolved and cleared by vendor, CITGO is notified. CITGO will create a Change Order and send change order to CONTRACTOR so that a purchase order change (amendment) is issued to reflect the new or revised part number

E.    In case of overages or items shipped incorrectly, CONTRACTOR coordinates with vendor in the reverse logistics process to return discrepant goods to vendor. Any handling, warehousing, and/or transport expenses related to overages or incorrect deliveries will be billed at the desecration of CONTRACTOR to vendor at no cost to CITGO.

F.    CONTRACTOR manages partial deliveries through the order process and tracks all deliveries until all goods are received and the PO has been completed according to the original and/or amended order. The CONTRACTOR recommends and seeks approval from an authorized CITGO representative for partial shipment when applicable. Conditions for partial shipment include but are not limited to: urgent need for the materials, significant time between partial deliveries, etc.

G.    Whenever hazardous cargo is involved, CONTRACTOR works together with the vendor and/or with a Hazardous Material Expert to make sure that cargo meets all transportation requirements for dangerous goods.

H.    CONTRACTOR provides on-line procurement system with full access to CITGO for follow-up & reporting. CONTRACTOR provides reports to demonstrate performance of process management including but not limited to: On-time delivery by Vendor, On-time delivery to Venezuela, Discrepancies, etc.

I.    CONTRACTOR is responsible for management of claims and settlements.

J.    Coordination of third party services contracted by CITGO (third party inspection, customs, logistics, freight forward, transport) and provide inspection releases to authorized CITGO representative for approval. CITGO reserves the right to assign third party inspection company.

K.    Provide inland transport in USA based on per-approved rate sheet (ranges) included in Exhibit B. Rates outside those provided in Exhibit B must be approved by an authorized CITGO representative prior to the work taking place.

L.    Guarantee that all goods are packed for export in HT Certified Wood Packaging for all goods received on behalf of CITGO.

M.    Provide warehousing activities in origin, and if required, in destination. Rates for these services are included as part of Exhibit B. Any unique service must be included in Exhibit A or approved by an authorized CITGO representative prior to the service taking place.

N.    Provide Cargo handling in warehouses in origin and destination. Rates for these services are included in Exhibit B. Any unique service must be included in Exhibit A or approved by an authorized CITGO representative prior to the service taking place.

O.    CITGO will provide adequate and timely shipping instructions to CONTRACTOR on a weekly basis. In an effort to expedite the shipping process, CONTRACTOR will be allowed to ship goods at its discretion, when goods on hand meet all PO specs, requirements, and compliance issues. CITGO will determine the allowed criteria for shipping without consent and inform the CONTRACTOR whenever such criteria changes.

P.    If required, CONTRACTOR looks for different shipping alternatives to inform CITGO of efficiencies for all expenses related to the shipping process from origin to final destination.



Q. CONTRACTOR will schedule shipping using rates in (Exhibit B). When required, due to special circumstances (expedited delivery, special cargo, etc.), CONTRACTOR will review shipping options (ocean, air) identified to be the most cost effective delivery with an authorized CITGO representative for approval.

R. Where required as described in the Incoterms in the PO, the CONTRACTOR will provide inland transportation in Venezuela. The costs will be per the rates in Exhibit B or pre-approved by an authorized CITGO representative. Cost for these services will fluctuate frequently due to inflationary trends in Venezuela; therefore CONTRACTOR will submit requests to CITGO approval.

S. Provide other expenses or payments made to custom brokers in Venezuela (to be reimbursed). These expenses when not identified in (Exhibit B) will pre-approved by an authorized CITGO representative.

## 2. LOGISTICS/FREIGHT FORWARDING SERVICES

Once CITGO has given the approval to ship goods, CONTRACTOR then prepares all pertinent documentation and makes sure that cargo is packed properly for shipment and complies with all export regulations, included as part thereof:

I. When required, CONTRACTOR will need to collect technical specifications, product catalogs, and other pertinent documentation in order to pre-clear goods with the Department of Commerce, Bureau of Industry & Security, Office of Export Enforcement and any/or Government Agency which might be involved with the Export of goods.

II. Will prepare Export Shipping Invoices according to INCOTERMS (Ex-Works, FOB, FCA, CIF,C&F, DDU, DDP, etc.) requested by CITGO and monitor the shipping process in order to make sure that the cargo arrives at final destination in the least amount of time.

III. CONTRACTOR will provide a delivery date in Venezuela according to the Incoterms in the PO. CONTRACTOR will attempt to accelerate material shipments to Venezuela.

IV. CONTRACTOR will coordinate export documents, customs forms and documents for shipment into Venezuela. Rates for these services are included as part of the CONTRACTOR's scope of work. Services outside the contract are billable according to Exhibit B or will be pre-approved by and authorized CITGO representative.

V. CONTRACTOR will receive all materials in storage by selected Freight Forwarder. CITGO will select freight forwarder.

VI. CONTRACTOR will provide comprehensive Purchase Order Status reports on a weekly basis in the format requested by CITGO to make sure they are informed of the status of every line item for each and every order.

X. CONTRACTOR must provide performance KPI's such as: on-time delivery to final destination. Additional KPIs will develop.

Revision date 7/22/2009 Revision 1      5




XI.     Gathers all shipping documents, related invoices, and then proceeds to bill in one (1) invoice, the Procurement Services CONTRACTOR's service fee and all pertinent charges incurred in the shipping process per shipment and when necessary.

XII.    When requested by an authorized CITGO representative in writing, the CONTRACTOR will pay vendors on behalf of CITGO for the purchased goods prior to delivery and then bill CITGO back for the Cost of Goods Sold. Payment of Contractor invoice will be net 10 from date of PO. Late payment will be subject to a 1% service charge.

XIII.   In some instances, CONTRACTOR coordinates vendor's visiting technicians to correct or repair damaged items shipped by vendor or whenever shipments are received with materials having either different part numbers or no part numbers at all. For the latter, CONTRACTOR must coordinate with the supplier and request a technician visit their warehouse to identify the material or equipment. As with the inspectors, these technicians must be escorted by the CONTRACTOR until they have completed their task.

XVI.    In some instances, depending on circumstances, the Scope of Work will be revised in order to include additional services required to comply with changes in Rules and Regulations set forth by the US Government, change in customer requirements, change in consignee requirements, and any request that will enhance the service provided. Changes to the services should not significantly affect the cost of services as long as these are reasonable and do not affect CONTRACTOR's cost of doing business. Any charges the CONTRACTOR believes are outside the contract should be presented to an authorized CITGO representative for approval prior to the initiation of the Services.

XVII.   Provide on-line, real-time visibility of PO status and reports.

XVIII.  Legal Services.

        Once all line items for a particular PO have been delivered and all applicable invoices have been processed and paid, CONTRACTOR must closeout the PO by reconciling all pertinent invoices and delivery documents. All documents are then compiled into a single file and forwarded to CITGO.

3.      Invoicing

        A.      Invoices from CONTRACTOR - Logistics Services and Freight Forwarding invoices will be payable Net 30 from date of invoice.

                a)      CONTRACTOR will process all shipping documents, related reimbursable third party service invoices, and title fee billable in one invoice to be itemized by service type. For example: freight, packaging, customs, handling, warehousing, and title fee must all be on the same invoice .

                        Should any additional charges be incurred due to an unexpected service, CITGO will be informed and charges must be detailed and supported.

                b)      CONTRACTOR will bill title fee against proof of completed service and/or delivery to destination as specified by Incoterm. Contractor will be allowed to bill for partial



services rendered for delays beyond their control with approval from an authorized CITGO representative.

c) CONTRACTOR may be required to pay vendors on behalf of CITGO for goods and/or services. These payments will be labeled as cushions. Written communication for authorizations will be required from CITGO Procurement Manager for approval and CONTRACTOR Manager for acknowledgment. Payment of Contractor Invoice will be net 10 from date of PO. Late payment will be subject to a 1% service charge.

CONTRACTOR cushion payments will be under a cost of $1 million US Dollars.

CONTRACTOR will invoice CITGO for cushions as reimbursable within 24 hours of payment to vendor. Invoice for payment will be payable Net 15 from date of invoice.

d) CONTRACTOR invoice numbers should be limited to 16 characters or less.

e) CONTRACTOR will submit their invoice to SPInvoices@CITGO.com with the CITGO PO Number, CONTRACTOR Name, and InvoiceNo.

Example of email subject line: PO12345_CONTRACTOR_Inv.123456

B. Invoices from vendors - CONTRACTOR will manage vendor invoices for all CITGO PO's payment terms. Invoices will be payable per the contract terms.

a) CONTRACTOR will confirm the vendor's material and/or services invoiced have been delivered and inspected according to the PO terms with no discrepancies such as unit counts, condition of material (less than perfect not acceptable), matching part numbers, matching description, certificates, etc. Invoices will be payable

If there are discrepancies, inform CITGO and contact the vendor to correct accordingly.

b) If all material and services have been delivered and inspected satisfactorily, vendors' invoice must be submitted to CITGO within three (3) days to SPInvoices@CITGO.com. Invoice support documentation must include all warehouse receipts, and/or inspection reports pertaining to thatInvoice.

One email per invoice with supporting documentation should be submitted at a time. Email subjects should be: CITGO PO Number, Vendor Name, and Vendor Invoice NO.

Example of email subject line: PO12345_John Doe Inc_Inv.123456

Forward all Invoice matters to: SPInvoices@CITGO.com
***INTANGIBLE SERVICES***

 

Finally, it should be noted there are many intangible services that the procurement services CONTRACTOR provides CITGO and PDVSA based on their experience in: 1) Legal and practical compliance with US commerce and export rules and regulations; 2) PDVSA and Venezuela commerce and import rules and regulations (and reporting); 3) Hazardous Material (HAZMAT) handling; and 4) Shipping cargo via air and water transportation. These sensitive areas necessitate only the most experienced and reputable provider for CITGO's export services and truly a "partner" to make them happen as required.

The CONTRACTOR's supply chain and order management process must protect CITGO from export fines, shipment/order discrepancies, import fines at destination, regulatory fines, and shipping expenses due to order discrepancies, damaged materials expenses due to improper export packing requirements, plant closures and demurrage.

8


LR

**EXHIBIT B**
**REIMBURSABLE COSTS**

This agreement is on a reimbursable cost basis. The term "Reimbursable Cost" shall mean costs necessarily incurred by the Contractor in the performance of the Work and that are reasonable based on the location where they are incurred. Such Reimbursable Costs are based on generally accepted accounting principles consistently applied and reasonably incurred in good faith in connection with performance of the Services. All reimbursable costs must be itemized clearly showing the actual cost incurred and paid by Contractor, and third party invoices will be reimbursed at cost <u>without mark-up</u> unless previously agreed by CITGO. CITGO's obligation to reimburse Contractor in contingent on Contractor providing a detailed summary of its costs and expenditures together with sufficient supporting documentation such as invoices, sales receipt or other receipt evidencing payment of such expenditures. The Fee includes Contractor's (a) overhead and general and administrative expenses including indirect labor (b) interest (c) internal cost of capital (d) service charges charged by Contractor, (e) insurance (f) benefits (g) profit and (j) mark-up for the reimbursable costs set forth herein.


The Reimbursable Costs and fees are set forth below unless otherwise previously agreed by CITGO:

 


**Clover**
INTEGRATED LOGISTICS

Clover

| | UNIT | RATE | Min | Comments |
|---|---|---|---|---|
| IN/OUT | EA | $0.070 | $30,000 | |
| Rewailing | CF | $2.400 | $100,000 | |
| 20" cont stuffing | EA | $750.000 | n/a | |
| 40" cont stuffing | EA | $450.000 | n/a | |
| Cap and band | EA | $75.000 | n/a | |
| Vacuum pack | CF | $3.960 | $45,000 | |
| Steel Box | CF | $3.500 | $80,000 | |
| Offsite parking | EA | cost +10% | n/a | |
| Dangerous good | CF | packing cost + 50% | $125,000 | |
| Inspection | Unit | $3.000 | $95,000 | |
| Pallet Bags | EA | $120.000 | n/a | |
| Pallet sleeve | EA | $120.000 | n/a | |
| Mark and Labeling | EA | $2.000 | $25,000 | |
| | | | | |
| Delivery to port | LCL | $0.085 | $150,000 | |
| Delivery to MTRte | LCL | $0.085 | $90,000 | |
| Local pick-up | LTD | $0.041 | $200,000 | |
| Container Drayage | EA | $350.000 | n/a | |
| Chock Rental | EA | $150.000 | n/a | |
| | | | | |
| **Domestic (US) Trucking to Houston LTL** | UNIT | RATE | Min | |
| 0-100 lbs | per mile | $0.170 | $250,000 | LTL Rates are based on legal size cargoes for standard |
| 100 - 500 lbs | per mile | $0.140 | $250,000 | trucks. Expedite or guaranteed service is subject |
| 500 - 1000 lbs | per mile | $0.286 | n/a | to 50% over normal rate as well as 50% over fuel surcharge |
| 1000 - 2000 lbs | per mile | $0.940 | n/a | All costs are subject to market conditions |
| 2000 - 4000 lbs | per mile | $0.999 | n/a | |
| 4000 - 5000 lbs | per mile | $0.930 | n/a | |
| 5000 - 7000 lbs | per mile | $1.130 | n/a | |
| Fuel surcharge | | 54% over rate | | fuel cost are subject to market conditions & changes |
| Hazmat fixed rate | | $15.000 | | Hazmat rates vary per commodity and angle |
| | | | | |
| **Domestic (US) Trucking to Houston FTL** | UNIT | RATE | Min | |
| Flat bed loads | per mile | $3.950 | | Full truck load are based on "Legal Size" cargo and also based on |
| Van trailers loads | per mile | $3.110 | | standard service. Expedite service would have to be quoted on a |
| Fuel surcharge | | 50% over rate | | case per time basis. Rate do not include any special equipment if |
| Hazmat charge | per mile | $0.930 | | require both a team or specials drivers, etc Rates applicable for loads over 2000 lbs |
| International Trucking | | over 2% | | All costs are subject to market conditions Cost + 10% BW |
| | | | | |
| **Domestic (US) Trucking to Miami LTL** | UNIT | RATE | Min | |
| 0-100 lbs | per mile | $0.600 | $250,000 | LTL Rates are based on legal size cargoes for standard |
| 100 - 500 lbs | per mile | $0.120 | $250,000 | trucks. Expedite or guaranteed service is subject |
| 500 - 1000 lbs | per mile | $0.700 | n/a | to 50% over normal rate as well as 50% over fuel surcharge |
| 1000 - 2000 lbs | per mile | $0.930 | n/a | All costs are subject to market conditions |
| 2000 - 4000 lbs | per mile | $0.940 | n/a | |
| 4000 - 5000 lbs | per mile | $0.700 | n/a | |
| 5000 - 7000 lbs | per mile | $0.850 | n/a | |
| Fuel surcharge | | 50% over rate | | Fuel cost are subject to market conditions & changes |
| Hazmat fixed rate | | $25.000 | | Hazmat rates vary per commodity and angle |
| | | | | |
| **Domestic (US) Trucking to Miami FTL** | UNIT | RATE | Min | |
| Flat bed loads | per mile | $3.740 | | Full truck load are based on "Legal Size" cargo and also based on |
| Van trailers loads | per mile | $3.740 | | standard service. Expedite service would have to be quoted on a |
| Fuel surcharge | | 50% over rate | | case per time basis. Rate do not include any special equipment if |
| Hazmat charge | per mile | $0.930 | | require both a team or specials drivers, etc Rates applicable for loads over 2000 lbs |
| International Trucking | | over 2% | | All costs are subject to market conditions Cost + 10% BW |
| | | | | |
| Marine Surveyor | Hour | $150.00 | 2 hours | Flat overtime, gas mileage, permits, resort and other expenses |
| | | | | |
| Clean Title Labor Cost (if applicable) | UNIT | RATE | Min | |
| Laborer | Hour | $35.00 | n/a | |
| Supervisor | Hour | $45.25 | n/a | |
| Clerical | Hour | $32.00 | n/a | |
| Equipment operator | Hour | $32.00 | n/a | |
| | | | | |
| Long Term Storage | UNIT | RATE | Min | |
| Clover Miami | sq/ft/month | $0.75 | | 30 days free time |
| Clover Houston | sq/ft/month | $0.50 | | 30 days free time |
| Port Of Houston | sq/ft/month | Cost + 10% | | |

## Ocean Freight

| OCEAN FREIGHT RATES Maracaibo to beach both HOU | UNIT | RATE | Min | MARACAIBO, GUANTA, GUARANAO, PUERTO CABELLO |
|---|---|---|---|---|
| Ocean Freight | w/m | $133.50 | $250.00 | |



**Clover**
INTEGRATED LOGISTICS

| | | RATE | Misc |
|---|---|---|---|
| Line Seller | w/m | $3.50 | |
| Port Security | w/m | $4.00 | $400.00 |
| Terminal Handling | every 20000 lbs | $10.00 | $50.00 |
| Wharfage | every 20000 lbs | $3.45 | $10.00 |
| Documents | EA | $75.00 | n/a |

**OCEAN FREIGHT RATES Istanza/Ana 20 ft load HOU — MARACAIBO, GUANTA, GUAIRA, PUERTO CABELLO**

| | UNIT | RATE | Misc |
|---|---|---|---|
| Ocean Seller | EA | $2,000.00 | $950.00 |
| Line Seller | EA | $50.00 | $3.50 |
| Port Security | EA | $200.00 | $4.00 |
| Terminal Handling | every 20000 lbs | $10.00 | $50.00 |
| Wharfage | every 20000 lbs | $3.45 | $10.00 |
| Documents | EA | $75.00 | n/a |
| Container Inspection fee | EA | $450.00 | n/a |

**OCEAN FREIGHT RATES Istanza/Ana 40 ft load HOU — MARACAIBO, GUANTA, GUAIRA, PUERTO CABELLO**

| | UNIT | RATE | Misc |
|---|---|---|---|
| Ocean Seller | EA | $3,975.00 | $950.00 |
| Line Seller | EA | $100.00 | $3.50 |
| Port Security | EA | $50.00 | $4.00 |
| Terminal Handling | every 20000 lbs | $10.00 | $50.00 |
| Wharfage | every 20000 lbs | $3.45 | $10.00 |
| Documents | EA | $75.00 | n/a |
| Container Inspection fee | EA | $450.00 | n/a |

| | UNIT | RATE | Misc |
|---|---|---|---|
| Heavy Lift Sur-charge | per / piece | $450.00 | n/a |
| Over 25 MT to 75 MT | per / piece | $50,000.00 | n/a |
| Over 75 MT to 100 MT | per / piece | $100,000.00 | n/a |
| Over 100 MT to 125 MT | per / piece | $150,000.00 | n/a |
| Over 125 MT to 150 MT | per / piece | $200,000.00 | n/a |
| Over 150 MT to 175 MT | per / piece | $250,000.00 | n/a |
| Over 175 MT to 200 MT | per / piece | $300,000.00 | n/a |
| Over 200 MT to 225 MT | per / piece | $350,000.00 | n/a |
| Over 225 MT to 250 MT | per / piece | $400,000.00 | n/a |
| Over 250 MT to 275 MT | per / piece | $500,000.00 | n/a |
| Over 275 MT to 300 MT | per / piece | to be negotiated | n/a |
| Over 300 MT | per / piece | | |

| | UNIT | RATE | Misc |
|---|---|---|---|
| Extra length Surcharge | w/m | $4.00 | n/a |
| 13 meter upto 20 meters | w/m | $6.00 | n/a |
| Over 20 meter up to 25 meter | w/m | $8.00 | n/a |
| Over 25 meter up to 30 meter | w/m | $10.00 | n/a |
| Over 30 meter up to 35 meters | w/m | $12.00 | n/a |
| Over 35 meters up to 40 meters | w/m | | |

| | UNIT | RATE | Misc |
|---|---|---|---|
| Special Equipment | EA | $1,000.00 | n/a |
| Flat Rack 20 ft | EA | $2,000.00 | n/a |
| Flat Rack 40 ft | EA | $1,000.00 | n/a |
| Open Top 20 ft | EA | $2,000.00 | n/a |
| Open Top 40 ft | EA | $500.00 | n/a |
| Rig Cube 40 ft | EA | | |

**Ocean Freight Miami**

**OCEAN FREIGHT LCL Miami-La Guaira**

| | UNIT | RATE | Misc |
|---|---|---|---|
| Ocean Freight | w/m | $150.00 | $150.00 |
| Line Seller | w/m | $5.00 | $3.00 |
| Loading | w/m | $40.00 | $50.00 |

**OCEAN FREIGHT RATES 20' FCL Miami-La Guaira**

| | UNIT | RATE | Misc |
|---|---|---|---|
| Ocean freight | EA | $3,500.00 | N/A |
| Dozier | EA | $165.00 | N/A |
| Loading | EA | $200.00 | N/A |
| Line Seller | EA | $50.00 | N/A |
| Charge | EA | $500.00 | N/A |
| Equipment Recovery Charge | EA | $150.00 | N/A |

**OCEAN FREIGHT RATES 40' FCL Miami-La Guaira**

| | UNIT | RATE | Misc |
|---|---|---|---|
| Ocean freight | EA | $6,675.00 | N/A |
| Dozier | EA | $325.00 | N/A |
| Loading | EA | $400.00 | N/A |
| Line Seller | EA | $100.00 | N/A |
| Charge | EA | $500.00 | N/A |
| Equipment Recovery Charge | EA | $150.00 | N/A |


**Clover**
INTEGRATED LOGISTICS

| OCEAN FREIGHT LCL Miami-Puerto Caballo | UNIT | RATE | Min. |  |
|---|---|---|---|---|
| Ocean Freight | w/m | $150.00 | $150.00 |  |
| Low Sulfur | w/m | $3.00 | $3.00 |  |
| Landing | w/m | $12.00 | $25.00 |  |

| OCEAN FREIGHT RATES 20' FCL Miami-Puerto Caballo | UNIT | RATE | Min. |  |
|---|---|---|---|---|
| Ocean Freight | EA | $3,556.00 | N/A |  |
| Bunker | EA | $190.00 | N/A |  |
| Landing | EA | $205.00 | N/A |  |
| Low Sulfur | EA | $92.00 | N/A |  |
| Drayage | EA | $300.00 | N/A |  |
| Equipment Recovery Charge | EA | $250.00 |  |  |

| OCEAN FREIGHT RATES 40' FCL Miami-Puerto Caballo | UNIT | RATE | Min. |  |
|---|---|---|---|---|
| Ocean Freight | EA | $4,013.00 | N/A |  |
| Bunker | EA | $370.00 | N/A |  |
| Landing | EA | $405.00 | N/A |  |
| Low Sulfur | EA | $300.00 | N/A |  |
| Drayage | EA | $900.00 | N/A |  |
| Equipment Recovery Charge | EA | $250.00 | N/A |  |

| OCEAN FREIGHT LCL Miami-Manzanillo | UNIT | RATE | Min. |  |
|---|---|---|---|---|
| Ocean Freight | w/m | $191.00 | $191.00 |  |
| Low Sulfur | w/m | $3.00 | $3.00 |  |
| Landing | w/m | $10.00 | $25.00 |  |

| OCEAN FREIGHT RATES 20' FCL Miami-Manzanillo | UNIT | RATE | Min. |  |
|---|---|---|---|---|
| Ocean Freight | EA | $4,305.00 | N/A |  |
| Bunker | EA | $130.00 | N/A |  |
| Landing | EA | $220.00 | N/A |  |
| Low Sulfur | EA | $90.00 | N/A |  |
| Drayage | EA | $300.00 | N/A |  |
| Equipment Recovery Charge | EA | $250.00 | N/A |  |

| OCEAN FREIGHT RATES 40' Miami-Manzanillo | UNIT | RATE | Min. |  |
|---|---|---|---|---|
| Ocean Freight | EA | $6,504.00 | N/A |  |
| Bunker | EA | $375.00 | N/A |  |
| Landing | EA | $405.00 | N/A |  |
| Low Sulfur | EA | $100.00 | N/A |  |
| Drayage | EA | $900.00 | N/A |  |
| Equipment Recovery Charge | EA | $190.00 | N/A |  |

## Air Freight

| Destination Airport from Houston to: | UNIT | RATE | Min. |  |
|---|---|---|---|---|
| Maiquetía | Kg Chargeable Weight | $1.25 | $163.00 |  |
| Maracaibo | Kg Chargeable Weight | $1.34 | $133.00 |  |
| Valencia | Kg Chargeable Weight | $1.84 | $153.00 |  |
| Barcelona | Kg Chargeable Weight | $1.84 | $153.00 |  |
| Valencia | Kg Chargeable Weight | $1.95 | $138.00 |  |
| Maturín | Kg Chargeable Weight | $2.52 | $135.00 |  |
| Las Piedras | Kg Chargeable Weight | $3.67 | $130.00 |  |

| Destination Airport form Miami to: | UNIT | RATE | Min. |  |
|---|---|---|---|---|
| Maiquetía | Kg Chargeable Weight | $3.15 | $125.00 |  |
| Maracaibo | Kg Chargeable Weight | $3.35 | $107.00 |  |
| Valencia | Kg Chargeable Weight | $3.74 | $135.00 |  |
| Barcelona | Kg Chargeable Weight | $3.90 | $103.00 |  |
| Valencia | Kg Chargeable Weight | $3.74 | $133.00 |  |
| Maturín | Kg Chargeable Weight | $3.66 | $135.00 |  |
| Las Piedras | Kg Chargeable Weight | $3.72 | $130.00 |  |

| | UNIT | RATE | Min. |  |
|---|---|---|---|---|
| Fuel Surcharge | Kg Chargeable Weight | $1.37 | $15.00 | This cost is variable |
| Security Surcharge | Kg Chargeable Weight | $0.15 | $10.00 |  |
| Government Surcharge | Kg Chargeable Weight | $0.30 | N/A | Applies only for Barcelona, Las Piedras |
| Government Surcharge | Kg Chargeable Weight | $0.30 | $30.00 | Applies only for Valencia, Caracas |

| Hazardous (Additional to rates above) | UNIT | RATE | Min. |  |
|---|---|---|---|---|
| DGR per UN# | EA | $240.00 | $240.00 | Max 5 per AWB |
| Additional Line# | EA | $130.00 |  |  |

# Exhibit G – CHANGE ORDER FORM

## CITGO Petroleum Corporation

Date: 08/3/2017
Contractor Name: Teknik Trading LLC
Contractor Address: 1910 NW 9th Ave. Miami, FL 33172

ATTENTION: Luis A. Rincon

Subject: Amendment to Contract Number 3

The parties entered into an outline agreement dated **04/08/2013** ("Contract") This Change Order is made in consideration of the mutual covenants and other valuable consideration, the receipt and sufficiency of which are acknowledged, and it is agreed the subject Contract is hereby amended as follows:

Add the following items below to **Exhibit B**-Reimbursable Costs:

**Review HS Code per Item: $2.00**
**Sencamer Permit Transaction per HS Code: $600.00**
**Technical Consultation Sencamer: $400.00**

The Effective date of these changes shall be August **7, 2017**.

**This Change Order shall not be effective unless executed below by an Authorized Representative as set forth in the Contract. Authorization by any other CITGO personnel or third party representative shall not constitute valid acceptance of the Change Order document on CITGO's behalf. Any capitalized terms shall have the meaning set forth in the Contract.**

The terms of this Change Order shall supercede and replace the terms of the Contract to the extent they are inconsistent. All other terms and requirements of original Contract and any other Change Order shall remain in full force and effect. This Change Order and the Contract Documents are the entire agreement on the amendments and there are no additional or oral agreements.

The above stipulated changes shall only become effective upon the full execution by both Parties in the space(s) designated below with an original copy returned to the authorized CITGO representative below.

**Clover International LLC**

By:

Print Name: Luis Rincon

Title: Director

Date: Aug 4, 2017

**CITGO Petroleum Corporation**

By:

Print Name: Brian Paulson

Title: GM Procurement

Date: 8/7/17

Revision date 7/22/2009 Revision 1     1

## Exhibit G - CHANGE ORDER FORM

**CITGO Petroleum Corporation**

Date: 11/30/2017
Contractor Name: Teknik Trading LLC.
Contractor Address: 1910 NW 9th Ave. Miami Fl. 33172

ATTENTION: Luis A. Rincon

Subject: Amendment to Contract Number 4

The parties entered into an outline agreement dated **04/08/2013** ("Contract") This Change Order is made in consideration of the mutual covenants and other valuable consideration, the receipt and sufficiency of which are acknowledged, and it is agreed the subject Contract is hereby amended as follows:

Add the Following: 1) **Exhibit B-Reimbursable Costs**

"Venezuela Container Handling Charge"
(Florida to Venezuela Ports)

**LCL $ 10.00 per m3 or 1000 kilos**
**Per 20' Container any type $ 400.00**
**Per 40' Container any type $ 500.00**
**Per 45' Container any type $ 575.00**

The Effective date of these changes shall be **December 10, 2017.**

**This Change Order shall not be effective unless executed below by an Authorized Representative as set forth in the Contract. Authorization by any other CITGO personnel or third party representative shall not constitute valid acceptance of the Change Order document on CITGO's behalf. Any capitalized terms shall have the meaning set forth in the Contract.**

**The terms of this Change Order shall supercede and replace the terms of the Contract to the extent they are inconsistent. All other terms and requirements of original Contract and any other Change Order shall remain in full force and effect. This Change Order and the Contract Documents are the entire agreement on the amendments and there are no additional or oral agreements.**

**The above stipulated changes shall only become effective upon the full execution by both Parties in the space(s) designated below with an original copy returned to the authorized CITGO representative below.**

**Teknik Trading LLC.**

BY: _____
Print Name: Luis Alonso Rincon
Title: Director
Date: Jan. 8th, 2018

**CITGO Petroleum Corporation**

BY: _____
Print Name: Brian Iguban
Title: GM Procurement
Date: 1/8/18

LR

 **Teknik**

Miami, November 28, 2017

**Citgo Petroleum Corporation**

1293 Eldridge Parkway

Houston, TX 77077-1670

Attn: Mr. Brian Paulson

**REF: Venezuela Container Handling Charge**

Dear Brian,

Attached please find a notification from King Ocean Services in which they state that beginning December 10th, 2017 there will be a "Venezuela Container Handling Charge" will apply on all cargo to and from Florida/Venezuelan ports as follows:

- LCL $10 per m3 or 1000 Kilos
- Per 20' Container any type $400
- Per 40' Container any type $500
- Per 45' Container any type $575

We kindly ask to take note of the said charges and to make an amendment to the Teknik contract in order to include said charges in Exhibit B "Reimbursable Costs". If you have any questions, please do not hesitate to contact us. Regards,

Luis Alonso Rincon

Teknik Trading

# AMENDMENT TO COMMERCIAL AGREEMENT

This **Amendment** ("Amendment") is made effective as of January 02, 2019 to the Commercial Agreement ("Agreement") between Teknik Trading Inc. ("TEKNIK") and CITGO Petroleum Corporation ("CITGO") dated April 8th, 2013, as amended. TEKNIK and CITGO are hereinafter referred to individually as a "Party" or collectively as the "Parties".

**WHEREAS**, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the adequacy, receipt and sufficiency of which are hereby acknowledged, and on terms and conditions herein set forth, TEKNIK and CITGO hereby agree to amend Section 2 of the Agreement as of the effective date as follows:

2. **Term**. The term of the Agreement shall be extended for an additional term of three (3) months after the current expiration date of December 31, 2018, and automatically renew for an additional terms of three (3) months, up to a maximum cumulative extension of twelve (12) months or December 31st, 2019; provided that either party may terminate the Agreement in its sole discretion effective at the end of the additional term by providing at least thirty (30) day prior written notice from the expiration of the current additional term. Such termination shall not be effective as to any purchase orders outstanding at the time of termination unless otherwise directed by CITGO. The remaining terms of the Agreement Section 2 shall remain effective as to termination notice and existing orders.

Except to the extent modified and expressly amended by this Amendment, the Agreement is in all respects ratified and confirmed, all of the terms and conditions thereof shall be and remain in full force and effect. This Amendment, together with the Agreement and all amendments thereto, constitutes the entire agreement and understanding between the Parties concerning the matters addressed herein, and supersedes any and all previous agreement or understanding, whether written or oral, between the Parties concerning such subject matters. This Amendment may be executed by the Parties in counterparts and delivered by facsimile or email and all such counterparts and facsimiles or email shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment of the date and year first above written.

**TEKNIK Trading Inc.**

By: _Luis Rincon (Dec 21, 2018)_

Name: Luis Alonso Rincon

Title: President

**CITGO Petroleum Corporation**

By: _____

Name: DANIEL BEUSES

Title: GM PROCUREMENT



# COMPOSITE

# EXHIBIT "B"



# Invoice

| | |
|---|---|
| **Invoice #** | INTT5050 |
| **Terms** | Due On Receipt |
| **Date** | 2/18/2021 |
| **Due Date** | 2/18/2021 |
| **PO #** | 150342-T-CRP |
| **Shipping Method** | Maritimo |
| **Origin** | |
| **Incoterm** | FCA |
| **End User** | CRP Citgo |
| **Page Number** | 1 of 1 |

**TEKNIK TRADING, LLC**
1910 N.W. 97TH AVE
MIAMI, FL 33172
P (305) 592-1512 | F (305) 591-3004
www.tekniktrading.com

**Bill To**
CITGO PETROLEUM CORPORATION
1293 ELDRIDGE PARKWAY
Houston, TX 77077
United States
Phone:

**Ship To**
BARIVEN S.A. - PDVSA PETROLEO S.A.
Av. Libertadir con calle El Empalme
Edif. PDVSA, Torre Este, PH
Urbanizacion La Campiña,
Caracas, Venezuela
RIF: J-00123072-6 VIA GUARANAO - VZLA

| Item Details | Quantity | Unit Price | Amount |
|---|---|---|---|
| **CITGO_HANDLING**<br>CLOVER CHARGES | 1 | $371.10 | $371.10 |
| **CITGO_COMMISSION**<br>6% SERVICE FEE ON $ 142,584.00 | 1 | $8,555.04 | $8,555.04 |

| | | |
|---|---|---|
| | **Total** | USD $8,926.14 |

**Shipping Invoice Notes:**

TERMS AND CONDITIONS
This document is subject to "Teknik Trading LLC General Terms and Conditions of Sales," which are available online at www.tekniktrading.com, and to the exclusion of other conflicting terms. No other Terms and Conditions govern and/or prevail on this transaction unless is accepted and signed by Teknik Trading LLC previous to the release of goods described in this document. INTERNATIONAL USE: These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations. CERTIFIED TRUE AND CORRECT.

**MIAMI**
1910 N.W. 97th AVE
MIAMI, FL 33172
P (305) 592-1512

**HOUSTON**
WORLD HOUSTON INTERNATINOAL
BUSINESS CENTER
5656 NORTH SAM HOUSTON PARKWAY EAST
SUITE 100
HOUSTON, TX 77032

**VENEZUELA**
AV. LUIS ERNESTO BRANGER
ED. COMPLEJO CLOVER
VALENCIA, VENEZUELA
P (0241) 874-1152

www.tekniktrading.com



# Teknik Trading LLC
## General Terms and Conditions of Sales

The items described in this document and other documents and descriptions provided by Teknik Trading, LLC, its subsidiaries and its authorized distributors ("Seller") are hereby offered for sale at prices to be established by Seller. All sales, purchase orders, quotations and invoices accepted by any customer ("Buyer") shall be governed by all the following Terms and Conditions. Buyer's order for any item described in its document, when communicated to Seller verbally, or in writing, shall constitute acceptance of this offer. All goods described will be referred to as "Products".

1. **Terms and Conditions.** Seller's willingness to offer Products, or accept an order for Products, to or from Buyer is expressly conditioned on Buyer's assent to these Terms and Conditions. Seller objects to any contrary or additional term or condition of Buyer's order or any other document issued by Buyer unless specifically agreed to by Seller in writing.

2. **Price Adjustments; Payments; Late Fees; Currency.** Prices stated on the Seller's quotation and/or invoice are valid for 30 days. After 30 days, Seller may change prices at its discretion or to reflect any increase in its costs resulting from state, federal or local legislation, price increases from suppliers and/or manufacturers, or any change in the rate, charge, or classification of any carrier. The prices stated on the Seller's quotation and/or invoice do not include any sales, use, or other taxes unless so stated specifically. All prices and payments hereunder are F.O.B. Seller's facility (unless otherwise specified by Seller in a separate writing, including incoterms sections of Seller's quotations and/or invoices for any product) and will be invoiced and paid in United States Dollars (unless otherwise specified by Seller in a separate writing). Buyer shall pay interest on any unpaid invoices at the rate of 18% or the maximum allowable rate under applicable law, whichever is greater, plus all collection costs and expenses, including, but not limited to, reasonable attorneys' fees.

3. **Delivery Dates; Title and Risk; Shipment.** All delivery dates are approximate and Seller shall not be responsible for any damages resulting from any delays outside the reasonable control of Seller. Regardless of the manner of shipment, title to any products and risk of loss or damage shall pass to Buyer upon tender to the carrier at Seller's facility. No deferment of shipment at Buyer's request beyond the respective dates indicated will be made except on terms that will indemnify, defend and hold Seller harmless against all loss and additional expense. Buyer shall be responsible for any additional shipping charges incurred by Seller due to Buyer's changes in product specifications or as otherwise provided for herein.

4. **Warranty.** Buyer acknowledges that Buyer was solely responsible for selection of the supplier for any Products. Products supplied by Seller that are obtained by Seller from an original manufacturer or third party supplier are not warranted by Seller. However, Seller agrees to assign to Buyer hereunder any warranty rights in such Products that Seller may have from the original manufacturer or third party supplier, to the extent such assignment is allowed by such original manufacturer or third party supplier, and as otherwise permitted by law. Seller will have no obligation to any Buyer or to any third party unless otherwise agreed in writing by Seller. Seller warrant (and gives no other warranty of any nature) to the Buyer only that the Products will conform to Buyer's descriptions and quantities as specified in the purchase order. **DISCLAIMER OF WARRANTY:** EXCEPT AS EXPLICITLY STATED AND TO THE EXTENT



ALLOWED BY LAW, SELLER DISCLAIMS ALL OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED IN FACT OR BY OPERATION OF LAW, OR STATUTORY, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, TITLE OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PRODUCTS.

5. **Claims; Commencement of Actions.** Buyer shall promptly inspect all Products for damages to the Products as caused by Seller and/or for shortages from the quantities and types specified by Buyer in its respective purchase order to Seller and shall immediately inform Seller of such shortages and/or damages upon delivery. Except as explicitly stated, no other claims against Seller shall be allowed. Any action based upon breach of this agreement or upon any other claim arising out of this sale (other than an action by Seller for any amount due to Seller from Buyer) must be commenced within 6 months from the date of tender of delivery by Seller.

6. **LIMITATION OF LIABILITY.** UPON PROPER NOTIFICATION, SELLER WILL, AT ITS OPTION, REPAIR OR REPLACE A DEFECTIVE PRODUCT, OR REFUND THE PURCHASE PRICE. **IN NO EVENT SHALL SELLER BE LIABLE TO BUYER FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF, OR AS THE RESULT OF, THE SALE, DELIVERY, NON-DELIVERY, SERVICING, USE OR LOSS OF USE OF THE PRODUCTS OR ANY PART THEREOF, OR FOR ANY CHARGES OR EXPENSES OF ANY NATURE INCURRED WITHOUT SELLER'S WRITTEN CONSENT, EVEN IF SELLER HAS BEEN NEGLIGENT, WHETHER IN CONTRACT, TORT OR OTHER LEGAL THEORY. IN NO EVENT SHALL SELLER'S LIABILITY UNDER ANY CLAIM MADE BY BUYER EXCEED AN AMOUNT EQUAL TO THE TOTAL PURCHASE PRICE THEREFORE PAID BY BUYER TO SELLER WITH RESPECT TO THE PRODUCTS GIVING RISE TO SUCH LIABILITY.**

7. **Contingencies.** Seller shall not be liable for any default or delay in performance if caused by circumstances beyond the reasonable control of Seller.

8. **Buyer Responsibility.** The Buyer, through its own analysis, is solely responsible for making the final selection of the Products and its respective manufacturer and assuring that all performance, endurance, maintenance, safety and warning requirements of the Products are met. The Buyer must analyze all aspects of the Products and follow applicable industry standards and Product information.

9. **Buyer's Obligation; Rights of Seller.** To secure payment of all sums due or otherwise, Seller shall retain a security interest in the goods delivered and this agreement shall be deemed a Security Agreement under the Uniform Commercial Code. Buyer authorizes Seller as its attorney to execute and file on Buyer's behalf all documents Seller deems necessary to perfect its security interest. Seller shall have a security interest in, and lien upon, any property of Buyer in Seller's possession as security for the payment of any amounts owed to Seller by Buyer.

10. **Improper use and Indemnity.** Buyer shall indemnify, defend, and hold Seller harmless from any claim, liability, damages, lawsuits, and costs (including attorney fees), whether for personal injury, property damage, patent, trademark or copyright infringement or any other claim, brought by or incurred by Buyer, Buyer's employees, or any other person, arising out of: (a) improper selection, improper application or other misuse of Products purchased by Buyer from Seller; (b) any act or omission, negligent or otherwise, of Buyer; or (c) Buyer's failure to comply with these terms and conditions. Seller shall not indemnify Buyer under any circumstance except as otherwise provided herein.



11. **Cancellations and Changes.** Orders shall not be subject to cancellation or change by Buyer for any reason, except with Seller's written consent and upon terms that will indemnify, defend and hold Seller harmless against all direct, incidental and consequential loss or damage.

12. **Entire Agreement; Assignment.** This agreement contains the entire understanding between Buyer and Seller and constitutes the final, complete and exclusive expression of the terms of this agreement. All prior or contemporaneous written or oral agreements or negotiations with respect to the subject matter are herein merged. Buyer may not assign its rights or obligations under this agreement, in whole or in part, without the prior written consent of Seller.

13. **Waiver and Severability.** Failure to enforce any provision of this agreement will not waive that provision nor will any such failure prejudice Seller's right to enforce that provision in the future. Invalidation of any provision of this agreement by legislation or other rule of law shall not invalidate any other provision herein. The remaining provisions of this agreement will remain in full force and effect.

14. **Termination.** This agreement may be terminated by Seller for any reason and at any time by giving Buyer 15 days written notice of termination. In addition, upon notice, Seller may immediately terminate this agreement for the following: (a) Buyer commits a breach of any provision of this agreement (b) the appointment of a trustee, receiver or custodian for all or any part of Buyer's property (c) the filing of a petition for relief in bankruptcy by Buyer on its own behalf or by a third party (d) an assignment for the benefit of creditors of Buyer, or (e) the dissolution or liquidation of Buyer.

15. **Governing Law.** This agreement and the sale and delivery of all Products hereunder shall be deemed to have taken place in and shall be governed and construed in accordance with the laws of the State of Florida, as applicable to contracts executed and wholly performed therein and without regard to conflicts of laws principles. Buyer irrevocably agrees and consents to the exclusive jurisdiction and venue of the courts of Miami-Dade County, Florida with respect to any dispute, controversy or claim arising out of or relating to this agreement. Disputes between the parties shall not be settled by arbitration unless, after a dispute has arisen, both parties expressly agree in writing to arbitrate the dispute.

16. **Intellectual Property Rights.** Products designed by Seller for an application are and shall remain proprietary to Seller and all designs and performance characteristics thereof shall be kept strictly confidential by Buyer.

17. **Taxes.** Unless otherwise indicated, all prices and charges are exclusive of excise, sales, use, property, occupational or like taxes which may be imposed by any taxing authority upon the manufacture, sale or delivery of Products.

18. **Force Majeure**. Seller shall not be responsible to Buyer for delay or failure in performance of any the obligations imposed by this agreement, provided such failure shall be occasioned by fire, flood, explosion, lightning, wind storm, hailstorm, earthquake, subsidence of soil, failure of machinery or equipment or supply of materials, discontinuity in the supply of power, computer hacks, attacks, and malware, acts of governmental actors, proxies, or persons acting on its behalf (including persons acting with the intent to aid such actors), court order or governmental interference, terrorist attacks, civil commotion, riot, war, strikes, labor disturbances, transportation difficulties, labor shortage, natural genetic variation of any living matter, or by any other cause of like or unlike nature beyond the control of such party.

19. **Drop Shipment.** In the event, Seller accepts a Drop Ship Purchase Order from customer, all such deliveries shall be FCA port of shipment of Vendor's facility (per Incoterms 2000) for international shipments. Customer bears cost of shipment and title and risk of loss or damage shall pass to Customer upon delivery of such Products to the carrier, and any loss or damage thereafter shall not relieve Customer from any obligation hereunder.

# EXHIBIT "C"

**From:** Beuses, Daniel <dbeuses@citgo.com>
**Sent:** Wednesday, March 27, 2019 12:08 PM
**To:** Luis Alonso Rincon <Luisalonso.Rincon@clovergroup.com>
**Subject:** RE: Warehousing Fees

Dear Luis Alonso,

Regarding the property referenced in your below email ("the Property"), I am sorry that we cannot assist you at this time.  As you know, PDVSA has funded the purchase of the Property and is the intended end-user of the Property, and thus maintains an interest in the Property.  The sole purpose of the agreement between Teknik and CITGO is to purchase, store, and arrange delivery of the Property to PDVSA in Venezuela.  On January 28, 2019, OFAC designated PDVSA as a Specially Designated National pursuant to Executive Order 13850.  The effect of that designation under existing OFAC guidance is that all of the "property" of PDVSA is considered to be "blocked" as a matter of U.S. law, and no U.S. person may engage in any transactions or dealings involving such "property" in the absence of a license from OFAC authorizing the transaction or dealing.  As a result—and regardless of the fact that Teknik's contractual engagement is with CITGO—we have no doubt that OFAC would consider the Property at issue here, and the payment you are seeking, to be blocked as a matter of law.  See OFAC, "Revised Guidance on Entities Owned by Persons Whose Property and Interests in Property Are Blocked" (August 13, 2014), https://www.treasury.gov/resource-center/sanctions/Documents/licensing_guidance.pdf (noting that "[p]roperty blocked pursuant to an Executive order or regulations administered by OFAC is broadly defined to include any property or interest in property, tangible or intangible, including present, future or contingent interests" and that "[a] property interest subject to blocking includes interests of any nature whatsoever, direct or indirect").

Should you wish to transact in the Property moving forward, including any attempts to liquidate the property to pay handling or storage fees, Section 1(b) of Executive Order 13850 requires that OFAC issue a general or specific license authorizing the specific transaction before the transaction occurs.  CITGO would fully support a request by Teknik to OFAC to issue a license permitting the liquidation of the Property in order to cover Teknik's handling or storage fees.  We are prepared to cooperate with you in good faith efforts to seek such relief from OFAC, to the extent the requested relief complies with our existing agreements.  Apart from that, CITGO cannot participate in any transactions relating to the Property, as doing so could put it at risk of civil and criminal penalties under the Venezuelan sanctions regime.

I would be happy to facilitate a discussion between you and our sanctions counsel if you think that would be helpful.

Best regards,

Daniel Beuses
General Manager - Procurement
CITGO Petroleum Corporation
Phone: 832-486-1488 / Mobile: 281-546-7570
Email: dbeuses@citgo.com

---

**From:** Luis Alonso Rincon [mailto:Luisalonso.Rincon@clovergroup.com]
**Sent:** Monday, March 11, 2019 10:43 AM

To: Beuses, Daniel
Subject: [EXT] FW: Warehousing Fees

Dear Daniel

I know you are very busy with all the internal requirements and changes that have recently taken place at Citgo and all we can do is offer our support in an effort to assist in every way possible as a dedicated contributor.

I have not heard back from you with regards to what the procedure will be in order to Bill or Invoice Citgo the Warehousing Expenses that are being accumulated for the cargoes we have within our facilities. It is important that we receive instruction in order to not accumulate the expense. Also whenever you have time I would like to continue to explore opportunities with regards to our past discussions. I have not received any requests from your Procurement Teams and I would like to engage them in order not to lose momentum. Finally we presented the results of the Ariba event we did on Citgo's behalf, but never received feedback nor have we been given another opportunity to manage a process on your behalf.

When you have time please give me a call. Regards,


Luis Rincon

---

**From:** Luis Alonso Rincon
**Sent:** Monday, March 4, 2019 12:20 PM
**To:** 'Beuses, Daniel' <dbeuses@citgo.com>
**Subject:** Warehousing Fees

Daniel good morning,

After our conversations last week we were able to determine that we have over 1,800,000 Lbs. and 86,000 ft. of goods in storage for Citgo. Please find the report attached.

As you are aware Teknik has never billed Citgo for Warehousing fees, even though we could have, but we decided not to because our business is not warehousing, but instead Purchase Order Management services.

For the past year we have been warehousing goods in our facilities, but Citgo shipments and business has pretty much been at a standstill for the past 9 months. We have been incurring the warehousing expense, insurance expenses, etc. but we have not been able to offset these expenses simply because there are no shipments. We never designed the business to warehouse goods at our facilities because the business was designed to ship goods not warehouse them, but looking at the fact that there are no shipments, we need to begin to bill for said services.

The rates we have for warehousing fees are set at either $0.03 per Lbs. or $0.75 per cuft. Whichever is greater. Looking at the amount of cargo you have in our warehouses it would seem that the expense if calculated by weight would be $54,066.90 or if calculated by Cuft. It would be $64,600.24. In order to reduce the impact, we would be willing to provide a 25% discount on the rate of the higher amount ($54,066.90 -$16,150 = $48,450.24 per month) , but the expense would need to be from the time of the last shipment we shipped for Citgo which was back in September 2018.

Therefore our proposal would be to bill Citgo $290,701.44 for Sept. 2018 thru Feb. 2019. And then $48,450.24 monthly until shipments can begin once again.

When speaking to you last week, I was not aware that we had so much cargo in our warehouses waiting to be shipped and had to ask my team to create a report that would substantiate the storage values and amounts. Just to give you an idea the amount stored in our warehouse is equivalent to 70 to 80 containers. Please indicate if you feel our proposal is reasonable and if you have any questions, please do not hesitate to call me. Regards,


Luis Alonso Rincon

# EXHIBIT "D"



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

LICENSE No.  VENEZUELA-2019-363495-1

**VENEZUELA SANCTIONS REGULATIONS**

**LICENSE**

Issued under the authority of one or more of 50 U.S.C. §§ 1601-51, 1701-06, Pub. L. 113-278, Executive Orders 13692, 13808,
13827, 13835, 13850, 13857, and 13884, and 31 C.F.R. Parts 501 and 591.

**To:**   Teknik Trading LLC
c/o The Volkov Law Group LLC
2200 Pennsylvania Avenue, NW
4th Floor East
Washington, DC 20037
**Attn:**  Michael Volkov

**1.** Based upon your request dated October 3, 2019, as supplemented on February 9, 2021, to the Office of Foreign Assets Control (the "Application"), and information otherwise available to the Office of Foreign Assets Control, the transactions described herein are hereby authorized.

**2.** This License is subject to the condition, among others, that the Licensee complies with its terms and with all regulations, rulings, orders, and instructions issued under one or more of the authorities cited above.

**3.** This License **expires upon the earlier of the completion of the authorized transaction, or on February 28, 2023**, and is not transferable.  The transactions described in this License are subject to the authorities cited above and any regulations and rulings issued pursuant thereto.  This License may be revoked or modified at any time.  If this License was issued as a result of willful misrepresentation it may be declared void from the date of its issuance or from any other date.

**4.** This License does not authorize transactions prohibited under any law or regulation (including reporting requirements) administered by the Office of Foreign Assets Control other than those listed above.

**5.** This License does not excuse the Licensee from the need to comply with any law or regulation (including reporting requirements) administered by any other agency or the need to obtain any required authorization(s) from any other agency.

Issued on behalf of the Secretary of the Treasury:

**OFFICE OF FOREIGN ASSETS CONTROL**

By _Mary Patricia Rasmussen_          **February 18, 2021**
    **Mary Patricia Rasmussen**                    **Date**
    **Deputy Assistant Director for Licensing**

Attention is directed to, *inter alia*, 18 U.S.C. § 1001, 50 U.S.C. § 1705, and Pub. L. 113-278, § 5(b)(2) for provisions relating to penalties.

**SECTION I – AUTHORIZATION:** Subject to the conditions and limitations stated herein, Teknik Trading LLC (the "Licensee") is hereby authorized to engage in all transactions necessary to collect accounts receivable from CITGO Holding, Inc. (CITGO) and Petroleos de Venezuela S.A. (PDVSA), for good and services provided to CITGO and PDVSA for the total amount of $2,056,261.95, which includes the total amount of accrued warehousing fees through September 9, 2019, plus $70,103.07 per month, from October 9, 2019 until CITGO settles this matter with the Licensee and takes custody of the goods, and if a settlement cannot be reached for the Licensee to be able to pursue its legal rights pursuant to its agreement with CITGO, including the disposal of the goods, as described in the Application.

**SECTION II – WARNINGS: (a)** This License does not authorize the transfer of any blocked property, the debiting of any blocked account, the entry of any judgment or order that effects a transfer of blocked property, or the execution of any judgment against property blocked pursuant to any Executive order or Chapter V of Title 31 of the C.F.R.

**(b)** This License does not authorize the transfer to or receipt of funds or other property, directly or indirectly, from any entity or individual whose property or interests in property are blocked pursuant to any Executive order or Chapter V of Title 31 of the C.F.R.

**(c)** Any transfer of funds through the U.S. financial system pursuant to the authorization set forth above should reference the number of this License to avoid the rejection of the transfer.

**SECTION III – RECORDKEEPING & REPORTING REQUIREMENTS: (a)** The Licensee is subject to the recordkeeping and reporting requirements of, *inter alia*, 31 C.F.R. §§ 501.601 and 501.602, including the requirement to maintain full and accurate records concerning the transactions undertaken pursuant to this License for a period of five years from the date of each transaction.

**(b)** No later than 30 days after the expiration of the License, the Licensee shall submit a detailed report of all transactions engaged in pursuant to this License. Reports are to be mailed to: Ofacreports@treasury.gov or Sanctions Compliance & Evaluation Division, Office of Foreign Assets Control, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, N.W., Freedman's Bank Building, Washington, D.C., 20220, and refer to this case no: **License No. VENEZUELA-2019-363495-1**.

**SECTION IV – PRECEDENTIAL EFFECT:** The authorization contained in this License is limited to the facts and circumstances specific to the Application.
**************************************************************************************

# EXHIBIT "E"

# JONES DAY

717 TEXAS • SUITE 3300 • HOUSTON, TEXAS 77002.2712

TELEPHONE: +1.832.239.3939 • FACSIMILE: +1.832.239.3600

Direct Number: (832) 239-3791
nmperry@JonesDay.com

August 25, 2021

**VIA EMAIL**

Nima Tahmassebi
Perlman, Bajandas, Yevoli & Albright, P.L.
200 South Andrews Avenue, Suite 600
Fort Lauderdale, Florida 33301

Re:     Teknik Warehouse Inspection Next Steps

Dear Nima:

I write on behalf of CITGO Petroleum Corporation ("CITGO") to follow up on CITGO and Crane's visit to Teknik Trading, Inc.'s ("Teknik") warehouse in Houston, Texas on July 6, 2021 and Teknik's warehouse in Doral on July 27, 2021.  The visits to Teknik's warehouses confirmed CITGO's understanding that Teknik's storage charges do not comply with the terms of the Agreement and at least some of the goods have not been properly maintained and stored, resulting in damage to the goods and their value.  These issues will be addressed in the pending litigation.

To eliminate any further storage costs Teknik may incur and prevent any additional damage to the goods, CITGO again proposes that it take possession of the goods.  CITGO proposes that the transfer of the goods from Teknik's warehouses to CITGO proceed as follows:

- Teknik will separate the relevant goods from those of other customers and will ensure that the goods are safely packaged for transport.

- Crane will arrive at Teknik's warehouse to remove the goods.

- Crane will do the inventory of the goods against the packing lists and PO details to confirm accuracy of the quantity and the material.

- Any items needing reinforcement or repackaging will be repacked at the site by Crane.

- Crane will transport the items back to the Crane warehouse on its trucks.

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • RIYADH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Nima Tahmassebi
August 25, 2021
Page 2

CITGO is prepared to pay Teknik's direct and reasonable costs related to transferring the goods to CITGO's possession. CITGO would pay those costs into escrow with the Court in the pending lawsuit. CITGO will not pay Teknik's expenses related to separating the PdVSA goods from the goods of other Teknik customers and will not pay for costs related to re-crating goods that are unsafe to move due to Teknik's neglect. Transferring the goods to CITGO will end any additional costs Teknik is incurring for storage of the goods while the parties' litigate what amounts are actually due under the Agreement.

Alternatively, if Teknik does not agree to the above proposal, CITGO is willing to pay $12,000 into escrow with the Court for a full inspection of the goods at Teknik's Houston and Doral facilities to further evaluate storage and other charges claimed by Teknik and to determine the value of the goods (including the extent of the damage resulting from Teknik's failure to maintain proper storage conditions). We anticipate that CITGO's inspectors and packaging team will need approximately two weeks in Teknik's Houston warehouse and approximately one week in the Doral warehouse. CITGO has allocated $12,000 based on the availability of two warehouse resources at both locations with a billing rate of $50/hour each. These resources will support CITGO with movement of goods. All other services that relate to opening and repackaging of boxes will be carried out by Crane representatives at the relevant locations. To the extent it remains an issue, Crane is amenable to Teknik's requested additional insured designation. In the event the inspection reveals more time will be needed, CITGO will escrow additional funds as necessary.

Please let us know when you are available to further discuss these inspection logistics issues.

Sincerely,

*Nicole M. Perry*

Nicole M. Perry

JONES DAY

Nima Tahmassebi
August 25, 2021
Page 3

CC:     Mark Holstein, CITGO
        Paul Turner, Perlman, Bajandas, Yevoli & Albright, P.L.
        Benjamin Reiss, Perlman, Bajandas, Yevoli & Albright, P.L.
        C. Mark Stratton, Greenberg Traurig, LLP
        Bob Meyer, Wilkie Farr & Gallagher LLP
        Brendan Forbes, Wilkie Farr & Gallagher LLP

# COMPOSITE EXHIBIT "F"

| | |
|---|---|
| From: | Jacqueline Mendez |
| Date: | April 22, 2016 1:55:20 PM (-05) |
| To: | 'Twin City Clarage c/o Heinzmann Company LLC' |
| Cc: | Jennifer Martinez |
| Subject: | **RE: Export Compliance - TEKNIK Purchase Order #POTT0305** |
| Attachments: | TERMS_AND_CONDITIONS_FOR_PURCHASE_Clarage comments_040116.doc; |

Hi Betty,

As per CITGO's legal department we can proceed with the PO.

Best regards,


**\*\* PLEASE DO NOT REMOVE THE NUMBERS IN OUR EMAIL ADDRESS.**

**Jacqueline Mendez**
**Teknik Trading, LLC**
1910 NW 97th Ave, Miami, FL 33172
Telf: 305-592-1512 | Fax: 305-591-3004
jacqueline.mendez@tekniktrading.com



**CONFIDENTIALITY NOTE:** The information contained in this transmission is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, do not read it. Please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** Twin City Clarage c/o Heinzmann Company LLC [mailto:betty.meleski@heinzmannco.com]
**Sent:** Monday, April 11, 2016 4:03 PM
**To:** Jacqueline Mendez
**Cc:** Monica Nino; Jennifer Martinez
**Subject:** RE: Export Compliance - TEKNIK Purchase Order #POTT0305

Thank you Jacqueline. The factory want me to check.

**From:** jacqueline.mendez@tekniktrading.com [mailto:jacqueline.mendez@tekniktrading.com]
**Sent:** Monday, April 11, 2016 3:00 PM
**To:** Betty Meleski <betty.meleski@heinzmannco.com>
**Cc:** Monica Nino <Monica.Nino@tekniktrading.com>; Jennifer Martinez <jennifer.martinez@tekniktrading.com>
**Subject:** RE: Export Compliance - TEKNIK Purchase Order #POTT0305

Hi Betty,

CITGO's legal department is reviewing the T&C.
I will advise as soon as I receive a response.

Thank you,



**\*\* PLEASE DO NOT REMOVE THE NUMBERS IN OUR EMAIL ADDRESS.**

**Jacqueline Mendez**

CONFIDENTIAL

**Teknik Trading, LLC**
1910 NW 97th Ave, Miami, FL 33172
Telf: 305-592-1512 | Fax: 305-591-3004
jacqueline.mendez@tekniktrading.com
TeknikLogoSCREEN (1)

**CONFIDENTIALITY NOTE:** The information contained in this transmission is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, do not read it. Please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** Monica Nino
**Sent:** Monday, April 11, 2016 3:54 PM
**To:** Twin City Clarage c/o Heinzmann Company LLC
**Cc:** Jacqueline Mendez
**Subject:** RE: Export Compliance - TEKNIK Purchase Order #POTT0305

Perfect, thank you Betty.

Jacky will provide the information regarding the T&C.

Regards,

**Monica Nino**
Trade Compliance Officer
**Teknik Trading, LLC**
1910 NW 97th Ave, Miami, FL 33172
Tel: 305-592-1512 | Fax: 305-591-3004
monica.nino@tekniktrading.com
‗
Teknik_logo2014

**\*\* PLEASE REPLY TO ALL AND DO NOT REMOVE THE NUMBERS IN OUR EMAIL ADDRESS \*\***

**CONFIDENTIALITY NOTE:** The information contained in this transmission is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, do not read it. Please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** Twin City Clarage c/o Heinzmann Company LLC [mailto:betty.meleski@heinzmannco.com]
**Sent:** Monday, April 11, 2016 3:42 PM
**To:** Monica.Nino <Monica.Nino@tekniktrading.com>
**Cc:** Jacqueline Mendez <Jacqueline.Mendez@tekniktrading.com>
**Subject:** RE: Export Compliance - TEKNIK Purchase Order #POTT0305

Monica,

These are bearing parts. See the attached.

I also sent T&C for review to Jacqueline. Have you heard anything on them.

Regards,
Betty

**From:** Monica Nino [mailto:monica.nino@tekniktrading.com]
**Sent:** Monday, April 11, 2016 1:43 PM

CONFIDENTIAL

TEKNIK_025163

**To:** Betty Meleski <betty.meleski@heinzmannco.com>
**Cc:** jacqueline.mendez@tekniktrading.com
**Subject:** Export Compliance - TEKNIK Purchase Order #POTT0305

Good afternoon Betty,

I am in the process of reviewing this order for compliance approval and would like your assistance with some information.

Please advise if the items are the actual bearings or parts of bearings.   Also, please provide any brochure, technical specifications, or any other information you may have that will assist us with our verification process.

Thanking you in advance for your assistance with this matter.


Cordially,


**Monica Nino**
**Trade Compliance Officer**
**Teknik Trading, LLC**
1910 NW 97th Ave, Miami, FL 33172
Office: 305-592-1512 | Fax: 305-591-3004
monica.nino@tekniktrading.com


**\*\* PLEASE DO NOT REMOVE THE NUMBERS IN OUR EMAIL ADDRESS \*\***

CONFIDENTIALITY NOTE: The information contained in this transmission is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received his transmission in error, do not read it. Please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

AVISO DE CONFIDENCIALIDAD: Este correo electronico y/o el material adjunto es para uso exclusivo de la persona o entidad a la que expresamente se le ha enviado y puede contener informacion confidencial o material privilegiado. Si usted no es el destinatario legitimo del mismo por favor reportelo inmediatamente al remitente del correo  y borrelo. Cualquier revision retransmission diffusion o cualquier otro uso de este correo por personas o entidades distintas a las del destinatario legitimo queda expresamente prohibido. Este correo electronico no predtende ni debe ser considerado como constitutive de ninugna relacion legal contractual o de otra indole similar. Gracias.

This message has been captured in the Clover Logistics Group account of NetSuite.

This message has been captured in the Clover Logistics Group account of NetSuite.

This message has been captured in the Clover Logistics Group account of NetSuite.

# TEKNIK TRADING LLC
## GENERAL TERMS AND CONDITIONS FOR PURCHASE

1 **APPLICABLE LAW - DEFINITIONS.** The definition of terms, interpretation of this Order, and the rights of parties hereto shall be construed and governed by the laws enacted by Buyer's state (as shown on the face hereof), including the Uniform Commercial Code to the extent not revised by this Agreement. All reference herein to federal, state of local statutes, regulations, rules and orders shall be deemed to include all amendments and revision thereof as of the date of this Agreement. "Buyer" means the division or subsidiary of Teknik Trading, LLC (Teknik) shown on the face hereof. "Seller" means the person or entity to which this purchase order is addressed. "Order" means this purchase order, including all terms and conditions on the face hereof and all specifications issued hereunder as agreed to in writing by both parties and all drawings, models and samples furnished hereunder. "Goods" means those articles, materials, and drawings, data or other property or services that are the subject of this Order. "Seller" also includes Seller's principal if Seller is acting as broker or agent.

2 **ACCEPTANCE**. If this order is deemed to constitute an offer, it shall be accepted in the expressly limited manner specified on the face hereof. If this Order is deemed to constitute acceptance of an offer, such acceptance is expressly made conditional on Seller's assent to the terms of this Order, and shall be considered agreed to when agreed to in writing by Seller.

3 **PRICE.** If the price is omitted in this Order, the Goods shall be billed at the lower of the price last paid or quoted, or the prevailing market price.

4 **ROUTING, RISK OF LOSS, EXCESS SHIPMENTS, DELAYS.**(a)Seller shall use commercially reasonable efforts to meet Buyer's requested delivery date, but Seller shall not be liable for late delivery damages. (b)Buyer may select mode of transportation, routing of, and carrier for the Goods. Seller shall be liable of excess transportation costs resulting from deviation from Buyer's instructions. (c)Goods shall be delivered by Seller to Buyers at Seller's factory. Risk of loss as to such Goods shall remain with Seller until after Goods are delivered at Seller's factory. (d) Buyer shall have no liability for payment for Goods delivered in excess of the quantity ordered. Excess Goods shall be subject to rejection by Buyer and re-delivery to Seller at Seller's expense. (e)If, prior to time for delivery of the Goods, Seller has reason to believe that it will be unable to meet its delivery schedule, it shall immediately notify Buyer in writing, shall indicate the cause of delay, shall use its best efforts to cure the anticipated delay.

5 **EXPEDITING**. Buyer's personnel shall be allowed reasonable access to Seller's facilities, and its sub-suppliers (provided that they give consent when requested), for expediting purposes at Buyer's expense. Seller shall supply schedules and progress reports to Buyer for use in expediting.

6 **DELIVERY:** Packing & Crating. Goods to be furnished hereunder shall be suitably prepared for shipment to secure lowest transportation rates (unless a premium method is specified on the face hereof) and
comply with carrier regulations. No charges are allowed for packing, crating, freight express, or cartage unless authorized hereunder.

7 **QUALITY:** Warranties Seller warrants that all Goods delivered shall be of good material, and workmanship, free from defects, and shall meet applicable industrial and governmental safety standards. Seller further warrants that Seller will have title to and the right to sell such goods at the time of delivery, and that all such Goods shall be new (unless otherwise specified in this Order) at the time of delivery provided that this does not prevent Seller from filing a lien or otherwise protecting its rights in the event of nonpayment by Buyer. All warranties herein mentioned shall survive any inspections, delivery, acceptance or payment by Buyer, and all such warranties shall run to Buyer, its successors, assigns, customers and users of Goods. Seller's warranty is effective the earlier of 12 months from installation or 18 months from delivery. THE LIABILITY OF SELLER UNDER THIS WARRANTY IS LIMITED TO REPLACING, REPAIRING, OR ISSUING A CREDIT (AT COST, FCA SELLER'S FACTORY INCOTERMS 2010 AND AT SELLER'S OPTION) FOR ANY PART OR PARTS WHICH ARE RETURNED TO SELLER DURING THE WARRANTY PERIOD PROVIDED THAT (A) THE DEFECTIVE PART OR PARTS ARE RETURNED TO SELLER, TRANSPORTATION CHARGES ARE PREPAID BY BUYER AND (B) SUCH DEFECTS HAVE NOT BEEN CAUSED BY MISUSE,
NEGLECT, IMPROPER INSTALLATION, REPAIR, UNAUTHORIZED MODIFICATION, BUYER'S DESIGN, ACT OF GOD OR ACCIDENT. ALL COSTS OF DISMANTLING, REINSTALLATION AND FREIGHT AND THE TIME AND EXPENSES OF SELLER'S PERSONNEL FOR SITE TRAVEL AND DIAGNOSIS ONSITE UNDER THIS WARRANTY SHALL BE BORNE BY BUYER. SELLER'S WARRANTY IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO MERCHANTABILITY, FITNESS FOR PURPOSE, THE SPECIFIC APPLICATION FOR WHICH THE GOODS ARE USED OR WITH RESPECT TO THE DESIGN OR OPERATION OF AN ENTIRE SYSTEM IN WHICH SELLER'S GOODS SOLD HEREUNDER ARE MERE COMPONENTS. ALL INDIRECT AND/OR INCIDENTAL COSTS ASSOCIATED WITH THE WARRANTY ARE BUYER'S RESPONSIBILITY. REPAIR OR REPLACEMENT OF THE GOODS SOLD HEREUNDER, OR REFUND OF THE PURCHASE PRICE, IS BUYER'S EXCLUSIVE REMEDY.

8 **INSPECTION OF GOODS:** Rejection of Goods and Revocation of Acceptance. After receipt of Goods, Buyer shall have a reasonable time, but not less than seven days, in which to inspect and accept or reject Goods, and payment for Goods shall constitute acceptance. Buyer may reject Goods not conforming to the specifications mutually agreed to in writing by both parties under this Order if Buyer gives Seller written notice of the defect promptly after receipt of the Goods and Seller fails to correct the defect within a reasonable period of time from receipt of written notice. For all rejected Goods, Seller shall provide Buyer a full refund for or replacement of the Goods, at Seller's risk and expense, excluding transportation costs both ways. Acceptance of part of Goods shall not bind Buyer to accept the remainder.

9 **INFRINGEMENT.** Seller shall protect and indemnify Buyer from a claim of infringement of any intellectual property right of a third person by any of the Goods delivered hereunder. Seller shall defend or settle, at its own expense, any lawsuit, action, or proceeding brought against Buyer. In the event that Buyer should be enjoined from use of the Goods as a result of such lawsuit or proceeding, Seller shall at Seller's option : (a) secure cancellation of the injunction; (b) replace the Goods with non-infringing Goods at Seller's expense; (c) remove the Goods from Buyer's premises and refund to Buyer the amount paid for the Goods. The provisions of this paragraph shall not apply to any claims, demands, and lawsuits or injunctions where Goods have been manufactured by the Seller in accordance with Buyer's specific design. Seller's indemnification obligations shall not apply unless Buyer gives Seller prompt notice in writing of such claim, full opportunity to conduct and control the defense thereof and reasonable assistance and cooperation in said defense. Seller will not be responsible for any settlement made without its written consent

TEKNIK_025165

## TEKNIK TRADING LLC
## GENERAL TERMS AND CONDITIONS FOR PURCHASE

10 **INDEMNIFICATION**. Seller shall defend, indemnify and save harmless Buyer from and against any  any third party claims which may be made against Buyer by reason of injury or death to person or damage to property to the extent caused by Seller's negligent acts or omissions in its performance under this Agreement. , In no event shall Seller be required to indemnify Buyer for any injury, death, or loss caused by the Buyer. Seller's indemnification obligations shall not apply unless Buyer gives Seller prompt notice in writing of such claim, full opportunity to conduct and control the defense thereof and reasonable assistance and cooperation in said defense. Seller will not be responsible for any settlement made without its written consent

11 **BREACH:**   In the event that Seller materially breaches this Agreement, Buyer shall provide Seller with written notice of the material breach. If Seller does not cure the material breach within a reasonable period of time from receipt of Buyer's written notice of the material breach, Buyer shall have the right to terminate this Agreement.

12 **INSURANCE.** Seller shall furnish to Buyer a certificate of insurance showing that Seller has obtained insurance coverage in the following minimum amounts:
(a) ) **WORKER'S COMPENSATION** - statutory limits for the state or states in which the work is to be performed; Employers Liability-$500,000; and
(b) **COMMERCIAL GENERAL LIABILITY** -  $1,000,000 combined single limit per occurrence including Premises and Operations, Independent Contractors, Contractual Liability and Products and Completed Operations coverage's; and

(c) **AUTOMOBILE LIABILITY** (including owned, hired and

non-owned vehicles) -
$1,000,000 combined single limit per occurrence. Such certificate shall set forth the
insurance company, amount of coverage, the policy members and date of expiration. Such insurance coverage shall be maintained by Seller at all times during which it is performing work under this Order. Compliance by Seller with insurance requirement does not affect Seller's indemnification or other liabilities under this Order.

13 **NON-WAIVER**. The failure or delay of Buyer to insist upon strict performance of any terms and condition hereof, to exercise any rights or remedies provided  herein or by law; the acceptance of or payment for any Goods hereunder; , shall not release Seller from any of the obligations of this Order and shall not be deemed a waiver of any right of Buyer to insist upon strict performance hereof or of any of its rights or  remedies  as to the Goods, or as to any default hereunder, not shall any purported  oral modification or rescission of this Order by Buyer operate as a waiver of any of the terms hereof.

14 **EQUAL EMPLOYMENT OPPORTUNITY.** Seller certifies that it is in full compliance with Executive Order No. 11246 as amended, and all administrative regulations issued pursuant thereto, as well as all other applicable equal employment obligations as required by Executive Orders, Rules, Regulations, or law as of the date of executing this order.

15 **OCCUPATIONAL SAFETY AND HEALTH**. Seller warrants that any Goods  sold pursuant to this Order comply in all respects with the Occupational Safety and Health Act of
1970,  (OSHA),  any amendments thereto, and  all applicable regulations, rulings, orders and standards promulgated thereunder. In the event that the Goods sold hereunder do not so conform, Buyer may return the Goods for correction or replacement at Sellers expense.

16 **ENVIRONMENTAL COMPLIANCE**. In the event that this Order is for an amount in excess of $100,000 and Seller is not otherwise exempt, then Seller stipulates and agrees: (a) that none of Seller's facilities is listed on the Environmental Protection Agency(EPA) List of Violating Facilities pursuant to 40 CFR Part 15; (b) to comply with all the requirements of the Clean Air Act, as amended,  and the  Clean Water Act, as amended, including all regulations, guidelines and standards issued thereunder;(c)that this Order is expressly conditional upon Seller   promptly notifying Buyer in the event Seller receives any communication from the U.S. EPA, indicating that a facility to be utilized in the performance of this Order is being considered for listing on the EPA List of Violating Facilities; and  (d) to include the requirements of (a) through  (d)  in  every subcontract exceeding $100,000 which is not otherwise exempt.

17 **COMPLIANCE WITH LAWS**. In the performance of work hereunder, Seller shall comply with all applicable federal, state, and local laws, and rules and regulations of any

CONFIDENTIAL

TEKNIK_025166

# TEKNIK TRADING LLC
## GENERAL TERMS AND CONDITIONS FOR PURCHASE

government authority, which have the effect of law. Any provisions required to be included in this Order by any such applicable law, rules, or regulation shall be deemed incorporated herein. Without limiting the generality of the foregoing, Seller certifies to Buyer that the Goods purchased hereunder were produced in compliance with the applicable requirements of the Fair Labor Standards Act of 1938, as amended.

**18 WITHHOLDING OF PAYMENTS**. Intentionally deleted.

**19 ASSIGNMENT.** None of the amounts due or to become due nor any of the work to be performed under this Order shall be assigned or subcontracted by Seller without the prior written consent of Buyer's authorized representative. With regard to any assignment or subcontract under this Order. Seller shall remain obligated to Buyer as if no assignment or subcontract had been made.

**20 TERMINATION OF ORDER**. (a) Buyer may at any time terminate Seller's performance under this Order, in whole or in part, by written notice to Seller, whereupon Seller shall terminate its performance upon receipt of such notice and shall terminate all orders and subcontracts to the extent they relate to such performance and to the extent allowed by the terms and conditions of the orders and subcontracts. Seller shall promptly advise Buyer of the quantities of Goods and raw material on hand or purchased prior to termination and of the most favorable disposition that Seller can make thereof. Seller and Buyer shall mutually agree in writing to the disposition of Goods and raw materials. Seller shall submit to Buyer in writing notice of its intention to submit claims based on such termination within 90 days from the date of notice of termination, and all such claims shall be made in detail and substantiated within 60 days thereafter, or such claims shall be waived. Buyer shall pay Seller the Purchase Order price of finished Goods delivered by Buyer and for all work in process and raw materials relating to this Order plus a reasonable profit. Buyer reserves the right to verify such claims at any reasonable time or times by inspecting the work or materials of Seller relating to this Order. Buyer will make no payments for finished work, work in progress, or raw materials fabricated or procured by Seller in excess of Buyer's delivery requirements under this Order. Notwithstanding the above, payments made under this paragraph shall not exceed the aggregate price specified in this Order, less any payments made or to be made. Payment provided under this paragraph shall constitute Buyer's only liability in the event this Order is terminated. (b) To the extent this Order covers Goods normally carried in the inventory of Seller, as distinguished from Goods specially made to Buyer's specifications, Buyer shall have no liability for any termination of this Order, in whole or in part, prior to shipment.
For any termination for which notice thereof is sent to Seller after receipt of Goods Buyer is responsible for paying Seller the full price of the Goods as specified in the order..

**21 CANCELLATION.** Buyer may cancel this Order for default with respect to all or any part of undelivered Goods if Seller(a) breaches any terms hereof, including warranties and does not correct the breach within a reasonable period of time from receipt of Buyer's written notice of the breach or (c) becomes insolvent or commits any act of bankruptcy. In the event of cancellation for default, Buyer shall have the right to seek damages for Seller's breach.

**22 BUYER'S PROPERTY; CONFIDENTIALITY**. (a) Buyer retains title to all information and materials furnished to Seller to facilitate performance under this Order, and the same shall be (i) treated as Buyer's confidential information, (ii) used exclusively by Seller to complete this Order, and (iii) returned to Buyer at its direction along with copies or reproductions thereof, unless otherwise agreed to in writing by Buyer. (b)All property of Buyer furnished or made available to Seller for performance of work under this Order, shall remain property of Buyer and shall be segregated from Seller's property and be individually marked and identified as Buyer's property. Such property shall be used exclusively for performance under this Order and shall be returned to Buyer at its written request. The Seller shall: maintain such property in good condition and assume all risks and liabilities for losses arising from its use of Buyer's property, and permit inspection of such property by Buyer; furnish detailed statements of such inventory; and fully cooperate and assist Buyer in any effort by it to obtain possession of such property through court proceedings or otherwise.

**23 SPECIAL TOOLING.** Intentionally deleted.

**24 PROPRIETARY RIGHTS IN INVENTIONS.** Seller does not agree to assign any of its intellectual property rights to Buyer.

**25 TAXES**. Prices stated herein exclude all taxes directly applicable to the Goods sold hereunder (except for income taxes payable by Seller). Notwithstanding the foregoing, Buyer shall only be liable for paying Seller for such federal, state, and local taxes levied on Buyer which Seller is required by law to collect from the Buyer.

**26 BUYER'S RIGHT TO MAKE CHANGES**. Buyer may at any time, by written notice to Seller and with Seller's written agreement, make changes in the drawings, specifications, quantities, and schedules and shipping instructions under this Order. If any such change increases or decreases the cost of performing

this Order or the time required for its performance, an equitable adjustment in prices an/or schedules shall be made as agreed to in writing by both parties, provided, however that any claim by Seller for such adjustment shall be presented in writing to Buyer within 30 days from the date the change is ordered by Buyer.

**27 REMEDIES**. Any right or remedy of Buyer provided herein is in lieu of Buyer's other rights and remedies provided herein or by law, and all of Buyer's rights and remedies hereunder are exclusive.

**28 ENTIRE AGREEMENT.** This order constitutes the entire agreement between the parties with respect to the subject matter hereof and shall supersede all previous proposals, both oral and written, negotiations, representations, commitments, writing and all other communications between the parties. No waiver, alteration, modification of or addition to the terms and conditions contained herein shall be binding unless expressly agreed to in writing by a duly authorized representative of Buyer.

**29 SETTLEMENT OF DISPUTES.** Intentionally deleted.

**30 ERRORS**. Any stenographic or clerical errors contained on the face hereof are subject to correction by Buyer as agreed to in writing by Seller

**31. LIMITATION ON LIABIILTY**. UNDER NO CIRCUMSTANCES SHALL SELLER BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, COLLATERAL, SPECIAL OR INCIDENTAL DAMAGES (INCLUDING WITHOUT LIMITATION, INCREASED MANUFACTURING COSTS, LOSS OF PROFITS, OR GOODWILL) WHETHER SUCH CLAIM IS BASED ON CONTRACT, NEGLIGENCE, STRICT TORT, WARRANTY OR ANY OTHER BASIS.  SELLER'S LIABILITY SHALL, IN NO EVENT, EXCEED THE PURCHASE PRICE PAID TO SELLER BY BUYER FOR THE PARTICULAR GOODS MANUFACTURED OR SERVICES PROVIDED BY SELLER GIVING RISE TO THE CAUSE OF ACTION.

# EXHIBIT "G"

# JONES DAY

717 TEXAS • SUITE 3300 • HOUSTON, TEXAS 77002.2712

TELEPHONE: +1.832.239.3939 • FACSIMILE: +1.832.239.3600

DIRECT NUMBER: (832) 239-3791
nmperry@JonesDay.com

June 4, 2021

**<u>VIA EMAIL</u>**

Nima Tahmassebi
Perlman, Bajandas, Yevoli & Albright, P.L.
200 South Andrews Avenue, Suite 600
Fort Lauderdale, Florida 33301

      Re:    *Teknik Trading, Inc.'s Letters of April 19, 2021 and May 10, 2021*

Dear Nima:

I write on behalf of CITGO Petroleum Corporation ("CITGO") both to memorialize the issues we discussed in our call on Thursday, May 27, 2021 and in response to Teknik Trading, Inc.'s ("Teknik") letters of April 19 and May 10, 2021 regarding the additional supporting documentation requested by CITGO and the inspection of goods in Teknik's possession. Nothing in this letter should be construed as a waiver of CITGO's rights under the Commercial Agreement between Teknik and CITGO dated May 5, 2010 (the "Agreement"), and CITGO reserves its rights to challenge any claimed amounts.

Specifically, we discussed the following open issues:

- CITGO expressed its willingness to take over storage of the goods to prevent Teknik from incurring further storage costs. Based on your email correspondence of June 2, we understand that Teknik is not interested in allowing CITGO to store the goods.

- CITGO again expressed its opposition to any sale or auction of the goods, which would irreparably harm CITGO's ability to exercise its inspection rights under the Agreement. Teknik agreed to notify CITGO immediately upon scheduling a date and time for the sale. In addition, Teknik confirmed that it has no intention of disposing of the goods.

- Teknik confirmed that the more detailed inventory lists it provided to CITGO during the week of May 24 are static in nature; Teknik is not receiving new goods or shipping goods on CITGO's behalf. Jones Day agreed to follow up with CITGO

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • RIYADH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Nima Tahmassebi
June 4, 2021
Page 2

> regarding whether these new inventory lists provide sufficient information for CITGO to determine the logistics of an inspection. Jones Day is in touch with CITGO on this and will report back soon.

- CITGO raised that in its May 10 letter, Teknik estimates inspection costs of approximately $107,000 based on several categories of expenses. CITGO expressed that this amount is unreasonable and is not supported by the Agreement or industry standards. By way of comparison, Teknik has only invoiced CITGO for approximately $8,000 in inspection charges for all the goods in its possession. Although CITGO reserves all rights with respect to whether the OFAC license permits payment of any inspection costs, CITGO understands that there may be some expenses associated with a full inspection of the goods. Accordingly, CITGO would like to continue to discuss what constitutes a reasonable inspection charge. Teknik agreed to investigate this estimate and engage in further negotiations regarding a reasonable inspection cost.

- The parties discussed Teknik's insistence that Crane, CITGO's third-party inspection vendor, add Teknik and Clover as an additional insured under Crane's general commercial liability policy. CITGO expressed its view that because Crane has agreed to have each of its representatives sign waivers of liability and assumption of risk agreements before they commence the inspections, there is no need or basis to have insurance or additional insurance for claims that have already been waived. Given the nature of the contemplated inspection, there is little risk that Crane personnel could cause property damage, and requiring such additional insurance as a prerequisite to a contractually-supported inspection violates the Agreement and is not consistent with industry standards. In response, Teknik requested that we provide a copy of Crane's insurance policy and suggested that doing so might eliminate the need for the additional insured designation. We are discussing this matter internally and will follow up when we have contacted Crane regarding this request.

In addition, the parties discussed whether CITGO had evaluated the documentation provided by Teknik regarding claimed amounts due. CITGO stated that it had done so and that it would provide a deficiency list. Further to that point, as expressed in our letter of March 29, 2021, the Agreement requires Teknik to provide a "detailed summary" of costs and expenditures, along with "sufficient supporting documentation such as invoices, sales receipt[s] or other receipt evidencing payment of such expenditures." While CITGO acknowledges that Teknik has provided some information, Teknik has not provided CITGO with sufficient supporting documentation to validate certain amounts Teknik claims are due. And, in some cases, it appears that Teknik has

Nima Tahmassebi
June 4, 2021
Page 3

not properly calculated the amounts due.  CITGO therefore requests the following additional information:

- <u>Storage and warehousing</u>: Teknik's letter of April 19 states that warehousing fees are calculated at the following rates: "1) $0.0009863 per pound daily—which is the equivalent of $0.03 per pound monthly; or 2) $0.02465753 per cubic foot daily—which is the equivalent of $0.75 per cubic foot monthly.  The rate chosen is whichever is greater."  Per Exhibit B of the Agreement, warehousing fees are to be charged at $0.75 per square foot monthly for storage in Miami and $0.50 per square foot monthly for storage in Houston.  It appears that Teknik may have improperly charged the Miami rate for all goods, including those located in Houston.  CITGO therefore requests that Teknik provide a document that identifies the location of each good listed on the invoices, so that CITGO can ensure that the proper storage and warehousing rates have been charged.  Further, the Agreement does not contain language that permits Teknik to select the higher of the given rates (either by volume or by weight).  Please provide justification for Teknik's authority to make such a decision as to the warehousing charges.

- <u>Inspection costs</u>:  Although Teknik has provided third-party invoices for several of the inspection costs, Teknik has not provided the third-party invoice that corresponds with commercial invoice INTT3059.  Please provide a third-party invoice to support commercial invoice INTT3059 for purchase order 170149-T-CRP.

- <u>Service Fee / Commission</u>:  CITGO again requests supporting documentation related to whether the goods on which Teknik is claiming a Service Fee have been delivered to the delivery point, as well as the dates of any delivery.  The invoices Teknik has provided do not indicate whether the underlying goods have been delivered and thus CITGO is unable to determine whether the Service Fee for such goods is due.  In addition, CITGO is unable to substantiate the amounts Teknik claims it paid to vendors because Teknik has not provided the third-party purchase orders and invoices for such payments.

- <u>Freight</u>:  Teknik previously provided three commercial invoices that contained freight charges.  On April 19, however, Teknik provided only one third-party invoice to substantiate the charges claimed.  Please provide third-party invoices to substantiate freight charges for the two remaining commercial invoices (INTT3059 and INTT3043).

Nima Tahmassebi
June 4, 2021
Page 4

- <u>Handling</u>:  The documentation Teknik provided to support its handling charges contains several inconsistencies.  Please provide third-party and vendor invoices for all handling charges so that CITGO can verify the accuracy of the invoiced charges.

- <u>Insurance</u>:  CITGO again requests supporting documentation that justifies imposition of insurance charges when the "Fee" in Exhibit B includes such costs.  Without conceding that any amounts for insurance are due, CITGO notes that on March 19, 2021, Teknik provided commercial invoices for three insurance charges.  On April 19, however, Teknik only provided third-party invoices to substantiate two of the insurance charges.  Please also provide a valid third-party invoice to substantiate the insurance charge for commercial invoice INTT3059.

- <u>Finance charges</u>:  As to Teknik's request that CITGO provide the reference to the Commercial Agreement provision that sets out the 1% rate, the relevant provisions are Exhibit A Scope of Work, Sections 2(XII) and 3(A)(c).  CITGO again requests that Teknik justify its imposition of a 1.5% finance charge.

- <u>Inventory Discrepancy</u>:  The summary inventory list Teknik provided on May 10 is materially different from the list provided on March 29.  Specifically, the inventory list provided on May 10 contains two additional items weighing 1,524.20 lbs and 53,154.71 lbs (rows 33 and 35, respectively).  CITGO requests that Teknik explain what these items are and why they were included on the May 10 list but not the March 29 list.

We look forward to receipt of the supporting documentation requested herein and scheduling and completion of the inspection of the goods.

Sincerely,

*Nicole M. Perry*

Nicole M. Perry

JONES DAY

Nima Tahmassebi
June 4, 2021
Page 5

CC:     Erika Courtade, CITGO
        Paul Turner, Perlman, Bajandas, Yevoli & Albright, P.L.
        Bob Meyer, Wilkie Farr & Gallagher LLP
        Brendan Forbes, Wilkie Farr & Gallagher LLP